# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

2014 MAR 30  P 9: 41

RECEIVED

**FILED**

APR - 8 2014

**Clerk, U.S. District and Bankruptcy Courts**

**Dr. TIEMOKO COULIBALY, Pro Se (PhD, Sorbonne)**
2013 Grace Church Road
Silver Spring, MD 20910
Telephone: 301 221 7646
**Plaintiff**

*VS.*

COMPLAINT

**Mr. JOHN KERRY**
**Secretary, U.S. Department of State**
**2201 C Street, N.W.**
**Washington, DC 20520**
Telephone: 202 647 4000
**Defendant**

**CIVIL ACTION No:**

Case: 1:14-cv-00712
Assigned To : Contreras, Rudolph
Assign. Date : 4/8/2014
Description: Employ. Discrim.

**Ms. Ruth Whiteside, Director**
Foreign Service Institute (FSI),
U.S. Department of State
2201 C Street, N.W.
Washington, DC 20520
Telephone: 202 647 4000
  **Defendant**

**Ms. Cathy RUSSELL,** Executive Director
Foreign Service Institute (FSI),
U.S. Department of State
2201 C Street, N.W.
Washington, DC 20520
Telephone: 202 647 4000
  **Defendant**

**Ms. Marianne MYLES,** Dean
Foreign Service Institute (FSI),
U.S. Department of State
2201 C Street, N.W.
Washington, DC 20520

RECEIVED

MAR 3 1 2014

**Clerk, U.S. District and Bankruptcy Courts**



RECEIVED
Mail Room

MAR 3 1 2014

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

*1*

Telephone: 202 647 4000
  **Defendant**


**Mr. James NORTH**, Associate Dean, Foreign
Service Institute (FSI),
U.S. Department of State
2201 C Street, N.W.
Washington, DC 20520
Telephone: 202 647 4000
  **Defendant**

**Ms. Debra BLAKE, Division Director, FSI**
U.S. Department of State
2201 C Street, N.W.
Washington, DC 20520
Telephone: 202 647 4000
**Defendant**



**Ms. Deborah DUCKETT,** Head of HR, FSI,
U.S. Department of State
2201 C Street, N.W.
Washington, DC 20520
Telephone: 202 647 4000
**Defendant**

**Ms. Phuong NGUYEN,** HR Officer, FSI
U.S. Department of State
2201 C Street, N.W.
Washington, DC 20520
Telephone: 202 647 4000
**Defendant**

**Mr. Brian SPRINGER,** HR Officer, FSI
U.S. Department of State
2201 C Street, N.W.
Washington, DC 20520
Telephone: 202 647 4000
**Defendant**

**Ms. Michelle D. BRYANT,** HR Officer, FSI
U.S. Department of State
2201 C Street, N.W.
Washington, DC 20520

Telephone: 202 647 4000
**Defendant**


**Mr. Philippe CASTEUBLE**, French Supervisor, FSI
U.S. Department of State
2201 C Street, N.W.
Washington, DC 20520
Telephone: 202 647 4000
**Defendant**

**Ms. Laura FYFE,** French Supervisor, FSI
U.S. Department of State
2201 C Street, N.W.
Washington, DC 20520
Telephone: 202 647 4000
**Defendant**

**Ms. Hilary SACHS,** French supervisor, FSI
U.S. Department of State
2201 C Street, N.W.
Washington, DC 20520
Telephone: 202 647 4000
**Defendant**

**Ms. Dora CHANESMAN,** Training specialist, French Section, FSI
U.S. Department of State
2201 C Street, N.W.
Washington, DC 20520
Telephone: 202 647 4000
**Defendant**



**Ms. Kristina MEDICK**, Lawyer
U.S. Department of State
2201 C Street, N.W.
Washington, DC 20520
Telephone: 202 647 4000
**Defendant**


**Ms. Jennifer TOOLE**, Lawyer
U.S. Department of States
2201 C Street, N.W.

Washington, DC 20520
Telephone: 202 647 4000
**Defendant**



CLERK
US DISTRICT &
BANKRUPTCY COURTS

2014 MAR 30 P 9: 41

# COMPLAINT RECEIVED

## PLAINTIFF'S COMPLAINT FOR RETALIATION FOR REQUESTING AND USING LEAVE UNDER THE *FAMILY MEDICAL LEAVE ACT (FMLA) AND* THE DISTRICT OF COLUMBIA NEW LEAVE LAW ENTITLED *"THE EARNED SICK AND SAFE LEAVE AMENDMENT ACT OF 2013"* LEGALLY EFFECTIVE SINCE FEBRUARY 22, 2014

1. Plaintiff Dr. Tiemoko Coulibaly proceeding Pro Se, (Historian, PhD, Sorbonne) brings **timely** this action this **March 30, 2014** under Title I of federal law Family Medical Leave Act of 1993 after he was wrongfully fired during his "trial period" or probationary period by his employer on April 2, 2012 only few days after his psychiatrist instructed him to return on March 26, 2012 to work in retaliation of his leave request and EEO complaint. The Agency approved officially his leave request on March 28, 2012 after numerous complaints by Plaintiff: the agency initially refused to approve the leave request by pretending the psychiatrist provided too much information in his medical certificate: in fact the psychiatrist blamed the agency for Plaintiff's mental health issues. Plaintiff had to request leave during six weeks to address health issues due to very hostile work environment, bullying, harassment and retaliation during several months, as established by the Agency's extensive EEO Report of Investigation (ROI) with plenty of emails and memos from the agency.

4

2.  The Agency harassed constantly Plaintiff by numerous emails and at some point Plaintiff was so afraid to even open his work emails. For the first time of his life, Plaintiff quickly lost about fifteen (15) pounds, experienced Suicidal Thoughts, High blood pressure issues, Post Traumatic Stress Disorder, Depression, Anxiety disorders as established by his psychiatrist Dr. Willie Hamlin and primary doctor Dr. Mark Major because of the illegal retaliation and others illegal adverse actions taken against him by the Agency as soon as he filed his informal EEO complaint on November 23, 2011 and the formal EEO complaint on December 20, 2011. Less than four months later, in pure retaliation and after months of harassment, the agency fired Plaintiff on April 2, 2012 and quickly cancelled his medical insurance while Plaintiff was under medical treatment, so he could not take care anymore of his mental and physical health seriously damaged by the agency. Consequently, during several months, Plaintiff was not able to see any doctor, which worsened his medical situation. Plaintiff is currently under medical treatment by psychiatrist and gastroenterologists. Plaintiff worked for the Agency during thirteen (13) years without any interruption and without any issue of misconduct, performance or health issue until the new management came and decided to increase retaliation and to destroy him. The Agency used all tactics during several years against Plaintiff by refusing to give him a position of direct hire even if he was the best candidate based on education, experience and/or seniority because of previous complaint filed with Diplomatic Service for workplace violence against the agency or because of discrimination, disparate treatment and retaliation. As probationary (1 year) officially fired in retaliation during his "trial period" a week after he returned from his leave, Plaintiff is eligible to file this FMLA retaliation complaint under Title I of FMLA. The agency was not able to articulate any logical explanation of the termination after the EEO complaint and even admitted in a motion filed with the EEOC judge that evidence in the ROI prove Plaintiff was victim of illegal retaliation. **The ROI covered also leave and health issues.**

**Plaintiff was not able to work during about six weeks from February 15, 2012 to March 26, 2012. Evidence in the ROI shows the Agency SINGLED OUT PLAINTIFF.**

## JURISDICTION

2. This action involves application of the Title I of Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2617 and 28 U.S.C. § 1331 and the District of Columbia (D.C.) new law entitled the *"Earned Sick and Safe Leave Amendment Act of 2013"* effective since February 22, 2014. This Complaint is filed on March 30, 2014 *after* this new D.C. law became effective.

## VENUE

3. The claims asserted in this action arose within this district and the alleged discrimination, retaliation, violations and damages occurred in this district. Venue of this action is proper pursuant to 29 U.S.C. § 2617 and 28 U.S.C. § 1391.

## PARTIES

4. Plaintiff, Dr. Tiemoko Coulibaly, is from Cote d'Ivoire (West Africa), is Black, and a resident of Silver Spring, in Maryland. Plaintiff is a member of protected group. At all times relevant to this suit, until his termination on April 2012, he was continuously working with U.S. Department of State (District of Columbia) as French instructor at the Foreign Service Institute (FSI) since June 1999 to April 2012, during thirteen (13) years without any interruption and vacation, under the **direct and total control** of this agency for all aspects of his work.

5. Defendant Mr. John Kerry is currently the Secretary of State Department in the District of Columbia. Mr. Kerry is being sued here is his official capacity.

6. Defendants Ruth Whiteside FSI Director at the time of the events involved in this action, Cathy Russell, FSI Executive Director who signed Plaintiff's termination letter, Marianne Myles, Dean at FSI at the time of the events involved in this action, James North, Associate Dean at Foreign Service Institute (FSI), Debra Blake, Division Director at the time of the events involved in this action, Deborah Duckett, head of Human Resources at FSI, Phuong Nguyen, HR Officer at FSI, Brian Springer, HR Officer at FSI, Michelle D. Bryant, HR Officer at FSI, Philippe Casteuble, French supervisor at FSI, Laura Fyfe, French supervisor at FSI, Hilary Sachs, French supervisor at FSI, Dora Chanesman, Training Specialist, French Section at FSI, Ms. Kristina Medic, currently employee as lawyer at the Department of State, Ms. Jennifer Toole currently employee as lawyer at the Department of State are all subordinates of Mr. John Kerry, Secretary of U.S. State Department.

7. A supervisor who acts, directly or indirectly, in the interest of the employer to any of the employees of such employer both in the private and public sectors **may be held individually liable under the Family Medical Leave Act.** See *Haybarger v. Lawrence County Adult Probation and Parole; County of Lawrence et al.,* U.S. Court of Appeals for the Third Circuit, 667 F. 3d 408, 2012 U.S. App. Lexis 1776.

## I) - CHRONLOGY OF FACTS ESTABLISHED BY UNDISPUTED OFFICIAL EVIDENCE FROM THE AGENCY EEO REPORT OF INVESTIGATION (ROI) PROVING FMLA RETALIATION AND WRONGFUL TERMINATION

8. November 23, 2011: Plaintiff filed his **informal** EEO Complaint against management. Management was aware of the meeting with EEO Counselor Sheila Weird because she called

management to request administrative leave so Plaintiff can go to her EEO office. Management immediately retaliated by increasing retaliation during several months.

9. December 20, 2011: Plaintiff filed his **formal** EEO complaint.

10. January 17, 2012: EEO approved investigation of the complaint

11. Management continues to increase retaliation, harassment, hostile work environment and destroyed Plaintiff's mental and physical health seriously (lost of 15 pound, depression, anxiety, etc.).

12. On February 15, 2012, Dr. Mark Major instructed Plaintiff to not return to work because of his health issue. And provided some medication for depression Plaintiff respected the established policy and informed immediately his employer earlier in the morning of the first days he was not able to return to work. Plaintiff was not able to return to work for health issue and call immediately his management to inform them. During the following days and weeks, Plaintiff constantly informed his employer by many emails and phone calls about his health issues, his medical treatment and why he was not able to return to work. Plaintiff followed all procedures to inform immediately and constantly his employer about his health issues during his about six weeks of absence from work (February 15, 2012 – March 26, 2012).

13. Dr. Mark Major (primary doctor) referred Plaintiffs to psychiatrist Dr. Willie Hamlin after some medical exams and treatment for depression.

14. Dr. Willie Hamlin established in his medical certificate of March 10, 2012 (sent immediately by mail and emails to the employer) attached the diagnosis: Post Traumatic Stress Depression

Disorders, Depression, Anxiety disorders, blamed the agency for Plaintiff's health issue caused by hostile work environment after his EEO complaint. Dr. Willie Hamlin indicated in is medical certificate Plaintiff will return to work on March 26, 2012 and requested a new supervisor in order to protect Plaintiff health. He also provided the EEOC case number.

15. **The management refused to process Plaintiff's leave request by pretending Dr. Willie Hamlin "provided too much information in his medical certificate" even if he provide the key information requested by the Agency: diagnosis and date of return to work.** This created another tension between Plaintiff and Brain Springer (HR), another target of Plaintiff's EEO complaint (several emails were exchanged on this issue). Brian Springer refused to process the leave request. Later, on March 26, 2012, when Plaintiff returned to work. Brian Springer told Plaintiff he refused to process his leave request with the medical certificate because he "wanted to protect Plaintiff's privacy"!!! **(Attached Brian Springer's EEO affidavit).**

16. After Plaintiff emailed several times Dr. Willie Hamlin's medical certificate to many executives, supervisors, management, **Dr. Willie Hamlin himself sent officially by Expedite Mail his official medical certificate to Cathy Russell, FSI Executive Director. The Post Office record showed FSI refused three times during two weeks  (March-April 2012) to accept the medical certificate and falsely claimed Executive Director Cathy Russell left FSI and didn't provide any address to forward her official letters (Attached Post Office Record and EEOC letter on this issue).** If that was true, FSI could have provided the official medical letter to another executive, manager or asked the Post Office to forward it to the Department of State Headquarter in DC. They simply rejected the letter. But the reality is Cathy Russell never left her position of FSI Executive Director, was at FSI when the Post Office tried several time to deliver the official medical certificate and was not on leave or vacation. During the same period Plaintiff sent many emails to Cathy Russell and others FSI executives, supervisors and

management about his medical certificate and the refusal to process his leave request. The reality is FSI refused on **March 2012** the medical certificate when they recognized the name of Dr. Willie Hamlin on the envelope. Cathy Russell is still today the FSI Executive Director and never left FSI at any time. While she was refusing to acknowledge the medical certificate the Post Office was trying to serve t her, **Cathy Russell is the one who signed at the same time Plaintiff's termination letter on April 2, 2012 during his "probationary period".** Later, in her EEO affidavits, Cathy Russell affirmed she just signed the termination letter at the request of her subordinates. **When the EEO investigator asked her to provide the "documentation" she relied on to sign the termination letter, she responded she didn't have such "documentation".** *(Attached Cathy Russell's EEO affidavit)*

17. As instructed by Dr. Willie Hamlin, Plaintiff returned to work on **March 26, 2012** and provided the same day all medical documentation against to the management and Human Resource and filled up all form again to request leave.  Under the policy, such medical document must be provided within three days (no later after 15 days) after the employee returned to work.

18. On **March 28, 2012,** the management and HR approved Plaintiff's leave request officially by an email and documents received from the Dean 's office.

19.  Few days later, on **April 2, 2012**, Human Resources Office sent an email to Plaintiff to call for a meeting. At this meeting, HR gave to Plaintiff a termination letter **("during trial period")** dated of April 2, 2012 for failure to follow procedures to request leave (even if the management approved the leave on March 28, 2012) and for issues with his supervisors (the only issue Plaintiff have with his supervisor was his EEOC complaint against the management and retaliation). ***How could an employee or worker still be on "trial period" or probationary period of one year after thirteen years (13) of continuing work without any interruption in the same***

*line of service and in the same agency with positive evaluation?* The termination letter of April

2, 2012 indicated the last day at work for Plaintiff is April 6, 2012. **Between April 2, 2012 and**

**April 6, 2012, Plaintiff asked several times by emails questions about the reasons of his**

**termination while the EEO case was pending and while he provided all medical information**

**to management, timely and continuously informed the management by phone and emails**

**during his absence from work.** The management was not able to provide any logic explanation.

This is what the termination letter of **April 2, 2012** states:


*"Dear Mr. Coulibaly:*

*This is to advise you that your limited Excepted Service appointment with the Foreign Service Institute will be terminated, during your trial period, on April 6, 2012. This action is being taken as a result of your unacceptable conduct.*

*You have displayed unacceptable conduct that has adversely affected the operations of the French Section, European and African Languages. Specifically, your inappropriate interactions with your supervisors, and your failure to follow established procedures for requesting leave.*

*Please come to FSI/EX/HR, Room F2210 on or before April 6, 2012 to sign separation papers, turn in your ID badges, and receive materials and information regarding your benefits. (…) Sincerely,*

*Catherine J. Russell*
*Executive Director"*


(Emphasis added, *Letter attached).*


20. Plaintiff was forwarding all emails of constant harassment, humiliation, retaliation and

bullying from management to his EEOC manager. According to the management in an affidavit

by Division Director Debra Blake in the EEO Report of Investigation, the management contacted

the EEO office about Plaintiff's case. The EEO office advised the management to avoid any

retaliation. But the management continued the harassment, seriously damaged Plaintiff's health

and terminated Plaintiff. Soon after the management fired Plaintiff, EEO started its investigation the same month of April 2012.

21. Few months later, on June 2012, the direct supervisor of Plaintiff at the time of his termination, Philippe Casteuble (who destroyed Plaintiff's health by active harassment, retaliation, bullying, humiliation by numerous emails and during meetings) lost his memory and indicated in his EEOC affidavit he didn't know who fired Plaintiff, why Plaintiff was fired, he didn't know if any investigation was done before his termination, he was not aware of Plaintiff's EEOC complaint even if he was aware of Plaintiff's complaint about discrimination, retaliation, hostile work environment. On January 24, 2012, the same Philippe Casteuble gave an official reprimand letter to Plaintiff because Plaintiff complained briefly against discrimination, retaliation and violation of No Fear Act during a staff meeting. Evidence in the ROI shows emails s sent by Plaintiff to supervisor Philippe Casteuble (and others) informing him he was the target of his EEO complaint as well as others like Division Director Debra Blake *(Attached Philippe Casteuble's EEO affidavit.)*

22. **In retaliation, the management quickly canceled Plaintiff's medical insurance so he could not continue his medical treatment with Dr. Willie Hamlin. Dr. Hamlin has indicated in his medical certificate that Plaintiff was continuing his medical treatment with him with two sessions by week. By firing Plaintiff a week after Dr. Willie Hamlin asked him to return to work on March 26, 2012, after approving officially by email his request for sick leave and advanced sick leave on March 28, 2012 and by immediately cancelling his medical insurance, the Agency seriously harmed Plaintiffs and his family, worsened his medical condition because he could not continue his medical treatment with Dr. Hamlin or any other doctor during several months. Of course, that made things worse for Plaintiff's health. In addition, by refusing to provide to Plaintiff his last salary after approving his sick leave and advanced sick leave request, it was clear the agency wanted to retaliate against**

**Plaintiff because of Dr. Willie Hamlin's medical certificate blaming the management and plaintiffs numerous complaints by emails and verbally when the agency refused without any legal reason or justification to process his leave request with Dr. Wille Hamlin's medical certificate.** All of these facts established by undisputed evidence, emails and the chronology of the facts and time of wrongful termination prove clear violation of Plaintiff's right under Family Medical Leave Act AND District of Columbia Leave law of 2013.

23.  According to Ms. Phuong (HR) since Plaintiff was fired on April 2, 2012, he had no right for any previous approval of sick leave and advanced sick leave. Consequently, he cannot receive his salary because of his "misconduct", according to one of her email in the ROI. She also failed to provide to Plaintiff explanation about the reason of his termination *(Exchanged emails attached.*

24.  In violation of his fundamental rights to due process, and in violation of the Agency's policy, Plaintiff never received any verbal warning, written warning, suspension and any right to defend himself before his termination few days after his doctor Willie Hamlin (psychiatrist) asked him to return to work after about six (6) weeks of medical treatment from February 15, 2012 to March 26, 2012.

25. Very strangely, during a meeting with others colleagues, management explained they had to fire Plaintiff that week because when he was sick, he didn't inform the management and he simply disappeared during several weeks. This strange theory is totally contradicted by numerous emails, fax and phone conversation exchanged between the management and the Plaintiff when he was sick. Plaintiff called early in the morning the first day to inform the management he was very sick and could not go to work. In addition, Plaintiff called frequently each morning to inform the management he was still sick so he could not return to work. This is clearly evidence of

character assassination, defamation and another proof of misrepresentation and lies by the management.

26.  On **May 2012**, when Plaintiff applied for unemployment, **DC Department of Employment** Office investigated the issue of **misconduct** claimed by the management and **concluded officially the agency failed to provide any evidence of Plaintiff's misconduct _(evidence attached)._** The Agency refused to appeal this decision. According to the DC Department investigator, the management was not able to provide any logical explanation and even refused to explain the termination.

27.  After the EEO investigation, Plaintiff requested appointment of an EEOC Judge. The agency sent the ROI to the EEOC Judges on January 4, 2013. **The same month, the Agency fired Division Director Debra Blake who wrongly fired Plaintiff on April 2, 2012** and then removed two others Executives: Dean Marianne Myles and FSI Director Ruth Whiteside, all involved in Plaintiff's case.

28.  The Agency's OIG Report of Inspection of Foreign Service Institute of March 2013 concluded the management under Division Director Debra Blake and in the French section was very poor, negative and violated many rules.

29. By firing Plaintiff "during his probationary period" on April 2, 2012 only few days after psychiatrist Dr. Willie Hamlin asked Plaintiff to return to work on March 26, 2012 by using false accusations and pretexts, official evidence in the EEO/ROI show the agency violated its own policy on leave, violated federal law Family Medical Leave Act and violated DC new amendment on leave effective on February 28, 2014 and entitled **"Earned Sick and Safe Leave Amendment Act of 2013"** (the "Act").

30. These violations of federal and District of Columbia laws on leave were the direct consequence of retaliation because of Plaintiff's EEO complaint and opposition to discrimination, hostile work environment, retaliation, violation of EEO laws, No Fear Act in so many emails or memos sent to management, during meetings with the management.

31. All undisputed official evidence in the extensive EEO ROI (about 1400 pages) established actionable legal action for FMLA and leave retaliation. The Agency itself already admitted in an EEO motion filed with the EEOC Judge that evidence in the ROI provided by the management itself established clearly retaliation (Plaintiff's opposition to discrimination and his formal EEO complaint is established by undisputed official evidence; Evidence shows the management was aware of Plaintiffs EEO activity as established by numerous emails and even supervisor Philippe Casteuble gave to Plaintiff on January 24, 2012 a reprimand letter for opposition to discrimination and retaliation during a staff meeting on December 29, 2011, three weeks before and he even prevented Plaintiff to speak in violation of his First Amendment Rights; the management took serious adverse action by firing Plaintiff on April 2, 2012 without any credible explanation (pretext) only a week after Dr. Willie Hamlin asked Plaintiff to return to work on March 26, 2012 and wrote a dishonest negative performance report on December 27, 2011). Supervisor Laura Fyfe (White) who wrote this dishonest performance report claimed during a meeting with Acting Director Ann Keller-Lally she believed Plaintiff was against her because her former husband was Ivorian and had a PhD like Plaintiff and he was very violent during their failed marriage. They had a son together and were separated at the time of his death about ten years ago. So clearly, she compared Plaintiff to her former husband and decided to punish him because of his same national origin and education background with her former "violent" Ivorian husband. Laura Fyfe admitted she made this strange comparison (and false accusations) in an email (in the ROI) sent to Division Director Debra Blake and Associate Dean James North.

32. Before leaving FSI on April 6, 2012, Plaintiff asked the management and Ms. Nguyen (FSI/HR) by emails to explain their argument of "misconduct" (when, where, why, how, who, etc.,). Plaintiff also asked Ms. Phuong Nguyen to explain why the management approved officially by email and others documents on **March 28, 2012** his sick leave request and advanced sick request and then fired him only few days later on **April 2, 2012** for failure to follow appropriate procedure to request leave. Plaintiff wants to know which procedure of leave he failed to follow. In addition, the management later refused to pay Paintiff his salary but pretending it was the consequence of his "misconduct" (according to Ms. Phuong Nguyen in an email sent to Plaintiff).

33. This is a case clearly based on evidence of retaliation, violation of due process. Plaintiff never received any verbal warning, any written warning, never had the right to defend himself against false accusation before his termination violation of due process and never receive any information about his right to appeal the adverse actions (harassment, severe emotional distress, dishonest performance report, wrongful termination, violation of FMLA, etc.) to MSPB. By firing illegally Plaintiff during his "probationary period" (after thirteen years of continuing service for this agency without taking any vacation) only few days ( a week) on April 2, 2012 after he returned to work from his medical leave on March 26, 2012, the evidence of violation of federal FMLA laws and District of Columbia leave laws and evidence of retaliation is established.

34. **The agency's lawyer even already admitted retaliation against Plaintiff, as explained below and as established by exhibits (official undisputed evidence from agency) attached to this complaint. <u>Therefore, evidence proves the agency cannot prevail in this FMLA retaliation complaint under federal and District of Columbia leave laws of 2013.</u>**

16

**II) - DEFENDANT JENNIFER TOOLE, AGENCY'S LAWYER, ADMITTED IN HER EEO MOTION FILED ON APRIL 22, 2013 WITH THE EEOC ADMINISTRATIVE JUDGE THAT OFFICIAL AGENCY'S EVIDENCE IN THE EXTENSIVE *EEO/ROI* REPORT ESTABLISHED *"THE KNOWLEDGE PRONG OF RETALIATION"* WHILE DEFENDANTS ASSOCIATE DEAN JAMES NORTH AND SUPERVISOR PHILIPPE CASTEUBLE FALSELY CLAIMED IN THEIR EEO AFFIDAVITS SIGNED UNDER PENALTY OF PERJURY THEY WERE NOT AWARE OF PLAINTIFF'S EEO COMPLAINT WHEN THEY CONSPIRED WITH OTHERS TO FIRE PLAINTIFF ILLEGALLY ON APRIL 2, 2012**

35. **Defendant Jennifer Toole (Agency's lawyer) already admitted undisputed evidence in the ROI proves** Plaintiff previously filed an EEO informal and formal complaint on November 23, 2011 and December 20, 2011 **(protected activities) against the management. She admitted evidence in the ROI shows the** management was aware of these protected activities. She admitted evidence established the agency maliciously and knowingly officially terminated Plaintiff on April 2, 2012 (adverse action). **Therefore ALL elements of retaliation are clearly established by lawyer Jennifer Toole because the** short timing of the events **(about four (4) months) from November 23, 2011 to April 2, 2012 (EEO complaint, retaliation, harassment, serious illness, six weeks of leave, immediate termination upon return from leave) shows there is a** direct nexus and casual connection between the previous EEO and FMLA protected activities and the adverse action (termination after leave covered by FMLA and EEO complaint). **The extensive official Agency's ROI of about 1400 page also raised issues of leave, illness and therefore retaliation on this basis in violation of FMLA. All speculations, misrepresentations and distortions of facts made by defendant Jennifer Toole cannot hide the truth established by her agency's official evidence in the extensive ROI of about 1400 pages.**

17

36. Even if her clients defendants James North and Philippe Casteuble falsely indicated in their EEO affidavits they were not aware of Plaintiffs' EEO activity before they fired him, lawyer Jennifer Toole found more credible to admit official evidence shows they had perfect knowledge of Plaintiff's protected activity before they knowingly and illegally fired him shortly later. The evidence in this case is so strong in the ROI that Plaintiff filed immediately as a first motion with the EEOC Judge a **Motion for Summary Judgment**. In her EEOC *Agency Reply to Appellant's Response to Agency's Motion to Dismiss/Cross Motion for Summary Judgment,* evidence in the ROI forced defendant Jennifer Toole (lawyer herself) to admit retaliation:

"Complainant also quotes the testimony of Philippe Casteuble, who acknowledge in his affidavit that he **"became aware of the Complainant opposing discriminatory practice or policies when (he) received a copy of Debra Blake's Memorandum of Conversation... and Mr. Tiemoko Coulibaly's response dated November 26, 2011."** Complainant's Response at 5 (quoting ROI at 1228 (Affidavit H).

**Clearly, North and Casteuble testified that they understood that Complainant had engaged in some sort of protected activity. The Agency does not dispute this fact. Indeed, the Report of Investigation contains countless references to Complainant speaking out against perceived discrimination and retaliation through testimony and emails, much of which was provided by Agency managers. The knowledge on the part of management that Complainant had engaged in a protected activity is not an issue in dispute.** (…)

Casteuble did also testify that **"I was not aware of any EEO activity before I received the (EEO affidavit form)."** However, it is likely that Casteuble perceived EEO activity as meaning the filing of a Complaint, or some other formal act. Casteuble acknowledges that he was aware of Complainant's opposition to alleged discriminatory practices, **which satisfies the knowledge prong of the retaliation.** It does not, however, prove that Casteuble retaliated against Complainant."

 (EXHIBIT attached, Page 11, ¶ 1-2 and Footnote 5, Emphasis added).

37. Defendant Jennifer Toole tried to mislead the EEOC Judge and to protect Philippe Casteuble by pretending ***"it is likely that Casteuble perceived EEO activity as meaning the filing of a Complaint, or some other formal act."*** Even Philippe Casteuble contradicted her strange theory in his EEO affidavit in the ROI at page 1230 when responding to the EEO investigator's question 23 by affirming he received EEO training:

*"Q23. Have you received training on anti-hostile work environment while employed by the agency. If so, when? Provide a copy of your Training History Report."*

Philippe Casteuble responded: <u>"I attended training on EEO/Diversity Awareness in June 28-29, 2011 and on Leading a Diverse Workforce on March 2, 2012."</u>

<u>After his three days EEO training, Philippe Casteuble clearly knew about the EEO informal and formal process and the related federal anti-discrimination laws. There was no confusion possible on the EEO process in his mind. But, he knowingly, deliberately and maliciously harassed Plaintiff, discriminated, created a very hostile work environment, retaliated and made all efforts by actively conspiring with others executives and managers to fire Plaintiff on April 2, 2012 few days after he returned to work from his leave for illness due to retaliation, harassment and discrimination. Philipe Casteuble has a direct and personal responsibility in Plaintiff's health issues because he was harassing, bullying, retaliating against Plaintiff every day by emails and during meetings by abusing his position of Plaintiff's direct supervisor. Philippe Casteuble was aware he was a target of Plaintiff's EEO complaint because Plaintiffs informed him verbally and by many emails, as established by the ROI.</u>

38. **Trying to protect Philippe Casteuble by pretending he didn't have a clear understanding of an EEO complaint is another example of distortion of facts by defendant Jennifer Toole to mislead the EEOC Judge by refusing to mention other essential but damaging information clearly provided by Philippe Casteuble in his EEO affidavit signed under penalty of perjury on June 29, 2012. Such malicious omission of material fact is a dishonest practice in violation of Lawyer's professional code of conduct established by the Bar.** For lawyer Jennifer Toole, it seems that Philippe Casteuble is an angel: ***"It does not, however, prove that Casteuble retaliated against Complainant"***. She had no personal knowledge

of the facts, she was not a witness of the facts and she cannot testify as lawyer. Defendant

Jennifer Toole is mistaken. Defendant Phillipe Casteuble is not the angel or naïve manager she

tried to portray. **Evidence in the ROI shows Philippe Casteuble is a real bully and a liar or**

**has serious issues with his memory**. Plaintiff has first knowledge of this because of his direct

interaction with Phillipe Casteuble, his direct supervisor during several months. Philippe

Casteuble was perfectly aware of Plaintiff's EEO formal activities and he retaliated against him

so many times.


39. For example, the ROI at page 524 shows an email of **March 06, 2012** sent to Philippe

Casteuble and CC to others HR officer and French supervisors involved in the EEO complaint. It

is strange that Defendant Jennifer Toole has ignored this email. Philippe Casteuble had proved his

ability to read and to understand emails sent to him: he is not deaf or blind. **There is no**

**confusion possible that Philippe received and read many emails informing him he was**

**personally the target of Plaintiff's EEO formal complaint.**


40. In that email dated of **March 06, 2012** at **6:37PM** (about only one month **before** Plaintiff

termination on April 2, 2012), Plaintiff wrote directly to his direct supervisor Philippe Casteuble

previously involved in many acts of discrimination, harassment and retaliation against Plaintiff to

inform again and again defendant supervisor Philippe Casteuble he was personally a target of

Plaintiff's **EEO formal complaint** because of his personal retaliatory actions. Even if Philippe

Casteuble knew perfectly Plaintiff was sick, he was pushing him by phone and emails to return to

work because, as bully, he apparently needed to continue to retaliate against him as usual for his

psychological pleasure:

> **"Dear Philippe:**
>
> Thanks for your message. Since there is an EEO discrimination complaint pending (you
> cannot ignore it), I believe we have to focus on the law, on EEO laws and federal laws. **(…) I will**
> **need to forward your email to EEO and OCR for answer to your request in your email**

below because there is a pending EEO discrimination complaint in this case. We cannot ignore this legal fact in any administrative decision <u>you want to take against me.</u> This is issue of law. (…)

I simply believe that you are using administrative rules as new "pretext" to retaliate against me because of <u>my pending EEO discrimination complaint against you.</u> It is incredible how many emails you sent to me to put pressure on me. But the most important fact is we cannot ignore the LAW, **we cannot ignore the fact that there is an EEO discrimination complaint against you Philippe, Debra Blake and Laura Fyfe.** EEO is federal laws.
I apologize, I cannot answer your email right now since I believe it is retaliation and also I don't feel very well. **I will forward your email to my EEO manager for advice. The point is I am sick because of your retaliation. I cannot go to work now. I am sick because of <u>your</u> retaliation and discrimination against me. But I don't want any further retaliation. My illness doesn't have any natural cause: it is the direct consequence of harassment, discrimination, retaliation in violation of EEO laws and federal laws by <u>you.</u>**

Maybe you would argue that you are simply following the book of administrative rules of State Department. **But you cannot ignore the pending EEO discrimination complaint <u>against you since I have informed all of you many times in the past.</u>** (…)

Again, I am sick, I am under medical treatment by physicians and I am protected against any retaliation or against any State Department administrative rule under EEO laws because of **my pending EEO discrimination complaint <u>against you Philippe, Debra Blake and Laura Fyfe.</u>** (…)

**For now, I need to focus on my health because I am very well aware that as soon as I will be at FSI, the retaliation and persecution will start again.**

Dear Brian (HR), please let me know if HR follows EEO and federal laws and what is your response to the email below since we cannot ignore the pending EEO discrimination complaint.

**Of course, I will return to work as soon as the physicians told me to do that. They have serious concerns about the hostile work environment on my health.**

Respectfully Yours

Dr. Tiemoko Coulibaly"


*(Email in ROI at pages 524 – 526, in response to Philippe Casteuble's email dated of March 6, 2012 **(ROI at 526-527)** complaining again that Plaintiff is not retuning to work even if he knew Plaintiff was absent for medical reasons. **He was looking for a pretext to fire Plaintiff.**)*


41.   **This email below proves clearly the theory presented by lawyer Jennifer Toole to defend Philippe Casteuble is frivolous. Evidence shows Phillipe Casteuble has also serious issues with his memory. Strangely, he frequently loses it to protect himself against the consequences of his illegal actions by using another of his favorite tools: lies and denial.**

42.  Few month after he made all effort to terminate Plaintiff on **April 2, 2012,**  in his EEO affidavit signed under penalty of perjury on **June 29, 2012,** Philippe Casteuble lost again his memory several times and repeated several times (ROI at 1228; 1234; 1237; 1240; 1244):

 **"I was not notified any EEO activity before I received the present document"**

(EEO investigative affidavit form sent by the EEO investigator).


Plaintiff "notified" Philippe Casteuble about his "EEO activity" many times by emails and during meetings.


43. On April 2, 2012, after Plaintiff returned to work on March 26, 2012 as instructed by his psychiatrist Dr. Willie Hamlin in his medical certificate provided to management about two weeks before, the same Philippe Casteuble informed Plaintiff he cannot return to teach his class because Human Resources needed to have a meeting with him. Plaintiff asked Philippe why HR scheduled this meeting. He was confused by the question but refused to respond even if it was clear he had knowledge about the reasons of meeting.


44.  At that meeting, Plaintiff received the termination letter dated of April 2, 2012 from defendant **Phuong Nguyen. Philippe could not ignore that Phuong Nguyen would give to Plaintiff a termination letter that day.**

**III) - EVIDENCE IN THE EEO REPORT OF INVESTIGATION (ROI) SHOWS THE AGENCY *APPROVED* PLAINTIFF'S REQUEST FOR SICK LEAVE AND ADVANCED SICK LEAVE ON *MARCH 28, 2012* AND FIRED HIM IN RETALIATION SHORTLY AFTER ON *APRIL 2, 2012* UPON RETURN ON *MARCH 26, 2012* FROM HIS FMLA LEAVE AS INSTRUCTED BY HIS DOCTOR'S MEDICAL CERTIFICATE OF *MARCH 10, 2012* PROVIDED PREVIOUSLY AND TIMELY TO THE MANAGEMENT: THIS IS CLEAR EVIDENCE OF *RETALIATION,* OF VIOLATION OF FMLA AND DISTRICT OF COLUMBIA LEAVE LAW OF FEBRUARY 22, 2014**

45. This termination on April 2, 2012 happened just few days after **Plaintiff returned from his leave on March 26, 2012. This termination happened also shortly after Plaintiff's request for Sick leave and Advanced Sick Leave was underlined approved on March 28, 2012** by an email from Ms. Faye Hargrove (Dean's office). The subject line of Ms. Hargrove's email was **"Special Request Leave Memo"** and stated:

*"**Your memo is approved for EUA/Tiemoko Coulibaly and ROM/Tamara Shie. I have delivered the original document to EX/HR. You may pick up a copy with SLS Dean's office approval from me.***

Faye
Secretary
FSI/SLS – Dean's Office
SA-42, 302 – 7243"

*(ROI at page 865; email sent to Philippe Casteuble and CC to Plaintiff, **Document attached**)*

46. Plaintiff went to Ms. Faye Hargrove's office as soon as he received her email to pick up the copy of the leave approval and also for clarification: **she explained to Plaintiff both of his Sick Leave and Advanced Sick Leave requests were approved and signed by several managers, executives and supervisors. Philippe Casteuble also confirmed the same information to Plaintiff during a conversation in his office about Faye Hargrove's email and indicated Plaintiff will not lose any part of his salary because his Advanced Sick Leave was approved**

**for 80 hours. Defendant Brian Springer (HR) confirmed the same information to Plaintiff in his office.**

47. In his EEO affidavit, ROI at 1242 - 1243, the EEO investigator asked some interesting questions to Philippe about Plaintiff's leave request (See. **EEO Claim 5: Required to Use Sick and/or Annual Leave to Address Health issues Resulting from Alleged Discrimination**):

*"Q79. Was his request for leave approved or denied? If denied, how denied his request? Provide the full name, job title, telephone number, email address and work location of the person(s):*

**Philippe Casteuble's response (PC): "I approved Leave I had the authority to approve. Philippe Casteuble**
**Language Training Supervisor, GG 13, FSI  (..)**
**I have no information whether Advanced sick leave was denied. This is done by the executive director. I only have a copy of the memo signed up to the school dean. I attached it with documentation to question 56. FSI HR should be able to respond."**

*a. What was the reason for the denial?*

**Advanced sick Leave is approved by executive director, not by supervisor. I don't know.**

*b. Provide a copy of the leave request with the denial and any other documentation to show his request was denied.*

**Plaintiff notices Philippe Casteuble didn't respond to this crucial question.**

c. Provide a copy of any clock ring report or attendance documentation for the date(s) he wanted this leave for.

**Plaintiff notices Philippe Casteuble didn't respond to this crucial question.**

*Q80. The Complainant alleges he should not have been charged with sick or annual leave to address health issues that resulted from alleged discrimination. Is there another type of leave can be used by employees? If so, what type of leave is it?*

**Leave Without Pay of Advanced Sick Leave.**

*Q81. Did the complainant request this other type of leave when he requested time off?*

**Philippe Casteuble (PC): "He requested Leave Without Pay and I approved. He requested Advanced sick leave which must be approved by executive director."**

*a. If so, was his request approved?*

**PC: "Leave without pay was approved."**

*b. If not approved, explain why?*

**PC: "Advanced Sick Leave is approved by the FSI executive director, not by supervisors. FSI HR should be able to help with this question."**

*Q82. Did he tell you or anyone else in management that he did not want to use sick or annual leave for his time off work to address health issues related to alleged discrimination? If so, when?*

**PC: "It was stated in his email response to Mr. Brian Springer and Ms. Debra Blake on March 2, 2012."**

*a. What did he say?*
**PC: "He wrote he didn't want to lose any day of sick or annual leave because of his current illness."**

*b. What did you or management do in response?*

**PC: "FSI/HR Brian Springer handled this personal request".**
*c. Provide documentation to show what occurred and how management responded.*

**PC: "FSI HR should be able to help with this question."**

Q83. What is the policy or procedure for leave? Please provide a copy of the document.

**PC: "FSI HR should be able to answer this question."**

(ROI at 1242-1243)

48.   Since Philippe Casteuble refused to respond about approval of Advanced Sick Leave by affirming this decision was made by FSI Executive Director Cathy Russell (defendant), it is necessary to read what she said about the leave issue in her EEO affidavit. Unfortunately, Defendant Cathy Russell refused to address all issues (especially leave issues) raised by the EEO investigator and stopped her cooperation at Q53 by these sentences:

**"I have no knowledge of any grievance.**
**This the end of my statement, nothing more follows."**

*(ROI at 551, Emphasis added)*

Cathy Russell's favorite answer for most questions asked by the EEO investigator in her short EEO affidavit of 10 (ten) pages dated **June 26, 2012** was: ***"No knowledge" "I have no knowledge" "I do not have knowledge of this" "Not to my knowledge".***

Apparently, defendant Catherine Russell also has the same issue of memory: this honorable court should help her and others defendant to recover fully their memory and to tell the true honestly.

49.   However, evidence forced Defendant Cathy Russell who signed the termination letter of **April 2, 2012** to admit during the EEO investigation she was aware of Plaintiff's opposition to discrimination since **December 2011**, about only **three months before** she fired him on April 2, 2012. She failed to provide "documentation" supporting her decision. Such "documentation" would have clarified all reasons of Plaintiff's termination by defendant Catherine Russell. Clearly, without supporting documentation and investigation, her decision of termination of Plaintiff was capricious, arbitrary, evidence of abuse of authority, illegal and in violation of federal EEO and FMLA laws.

*"Q11. Were you aware of EEO activity by the Complainant? If so, when did you become aware of it and how did you become aware of it? What did you know about the EEO activity?*

**Cathy Russell's response: "Mr. Coulibaly copied me on an e-mail and had attached specific information that indicated he had filed a formal EEO case. The first time I recall seeing the information about a formal filing was in emails – in an email he included exchanges about his formal complaint with an individual in the Department's Office of Civil Rights."**

**(ROI at 543, June 26, 2012)**
**(…)**

*Q15. Did complainant request that the alleged hostile work environment stop? If so, when did he tell you that and what action did you take?*

**CR: "His December 28[th] e-mail and subsequent e-mails relayed his concerns and others responded informing him that he should contact the Office of Civil Rights. That Office conducts official investigations into such allegations. I verbally confirmed with our Human**

Resources Office that management had contacted the Office of Civil Rights about the allegations."

*(ROI at 545)*

## EEO Claim 4: Excepted Service Appointment Terminated Effective April 6, 2012
*(ROI at 549)*

Q42: Was the Complainant on an Excepted Service Appointment? If so what were the dates of this appointment?
**CR: "I do not know – the School of Language Studies and the FSI Human Resources Office would know this.**
a. How long was the appointment to be? **One year.**

**CR: "Yes"**

b. What did this appointment consist of? Describe and/or define the Excepted Service Appointment.

**CR: "The School and the Human Resources Office would have to provide this."**

c. Provide a copy of the Excepted Service Appointment.

**CR: "The School or Human Resources Office would have to provide this.**

Q43: Has the Complainant's Excepted Service Appointment been terminated? If so, what date did this occur"

**CR: "Yes. The School or Human Resources Office would have to provide tis specifics.**

a. Who terminated his Excepted Service Appointment? Provide full name, job title, telephone number and email address for the person(s)

CR: **"In my position as Executive Director, either I or my Deputy sign termination letters based on information provided to us. As the Executive Director, I signed the letter terminating his appointment during the first year trial period based on the information provided by his supervisory chain of command and school. Catherine J. Russell, Executive Director, 703-302-6729; russellcj@state.gov."**

b. Why was his Excepted Service Appointment terminated?

**CR: " Unacceptable conduct that adversely affected the operations of the French Section, European and African Languages. Specifically inappropriate interactions with supervisors and failure to follow established procedures for requesting leave. (a copy of the letter is attached).**

(ROI at 549, June 26, 2012)

d. What date was his Excepted Service Appointment terminated?

**CR: He was provided a letter dated April 2, 2012 which informed him that his appointment would be terminated during his trial period, on April 6, 2012."**

**e. Provide documentation to show his Excepted Service Appointment has been terminated and when this occurred.**

**CR: <u>"I do not have this type of documentation"</u>**

*Q44. Identify any other employee who were treated differently than the Complainant and have not had their limited Excepted Service Assignment terminated when in a similar situation.*

**CR: "I do not have knowledge of this"**

*Provide the full name, job title, race, color, national origin, their supervisor's name and work location for each employee you identify.*

**CR: "I do not have this type of information."**

*Q45. You must explain and describe how the employee(s) was treated differently, how and when they were treated differently and by whom they were treated differently. Provide documentation to prove and support what occurred with the employee(s) you identify.*

**CR: "I do not have this type information"**

*Q46. What policies, procedures or contract provisions were relied on and used when making the decisions about terminating the Complainant's limited Excepted Service assignment?*
*Explain how the policy or procedure was applied to this situation.*
Provide the document name, chapter, section/paragraph for this document.
Provide a copy of the document with your affidavit.

**CR: "FSI Human Resources Office Standard Operating Procedures and 3 F.A.M 2824.4 (attached)"**

*Q47. Identify any other employees who have been treated in a same or similar manner and had their limited Excepted Service appointment terminated for similar reasons as the Complainant.*

**CR: "I do not have knowledge of this."**

(ROI at 550)

50.  There is no regulation, rules, policy in **"FSI Human Resources Office Standard Operating Procedures and 3 F.A.M 2824.4."** authorizing the Department of State to fire in retaliation any individual or employee in violation of his rights under federal EEO and Family Medical Leave Act laws. Federal laws supersede any agency's policy. FSI Executive Director Cathy Russell (defendant) clearly admitted in the ROI **she was aware of Plaintiff's EEO activities and**

opposition to discrimination since December 2011 before she signed the letter of his termination on April 2, 2012 without any internal and impartial investigation in order to respect due process before any adverse action. Cathy Russell herself conceded no investigation was done before the termination, in total violation of the Agency's procedure of termination based on due process.

*Q17. Was an investigation conducted into Complainant's allegations of hostile work environment? If so, by whom and when?*

CR: "**I do not know if the Office of Civil Rights conducted an official investigation.**"

(ROI at 545, June 26, 2012)

51. This answer by FSI Executive Director Cathy Russell (defendant) is absolutely irresponsible because any reasonable and competent manager or employment lawyer know it is necessary for a manager to **conduct immediately an internal, fair and impartial investigation** regarding any allegation of discrimination, retaliation, harassment, hostile work environment and violation of federal law in order to resolve fairly and quickly the issue as soon as possible and more important to precisely avoid that the employee files an EEO complaint (with the Office of Civil Rights) leading to a costly lawsuit like this one against the agency or the company in federal court.

52. Such internal investigation is absolutely necessary if the management wants to fire an employee after he or she filed an EEO complaint and/or took a leave protected by FMLA and the management is clearly aware of this protected activities (EEO, FMLA). Cathy Russell, like others defendants, provided to the EEO investigator many emails and affidavits signed under penalty of perjury proving they all were aware of Plaintiff' EEO complaint and his leave request because of illness due to discrimination and retaliation. **Evidence show (as they admitted in the ROI) they fired Plaintiff without any investigation, without any verbal warning, written warning,**

**suspension and without any right to defend himself because of his EEO complaint against the management and his leave to take care of his illness due to discrimination. This is absolutely illegal and clear violation of the Agency's policy.**

53.  The Office of Civil Right (OCR) is not in charge of the daily management at FSI: this is the direct responsibility of defendant Cathy Russell and others defendants listed in this complaint (executives, supervisors, managers, HR officers) to investigate any issue of discrimination, harassment, retaliation or hostile work environment prohibited by federal laws. It is their legal duty and responsibility to make sure all federal laws like EEO laws and FMLA are fully respected by the management. The Office of Civil Right is in charge of managing the long process of EEO discrimination complaint and investigation for the agency and cannot interfere in immediate daily management. The EEO complaint and investigation is the beginning of litigation since it will logically involve the EEOC judge and/or federal court at some point.

54.  **Since no internal, immediate and impartial investigation was done before his illegal termination, the agency cannot prove any of the pretexts or arguments used to retaliate against Plaintiff because of his EEO complaint and FMLA leave (protected activities). The agency rejected all requests of immediate internal and fair investigation made by Plaintiff in many emails and meetings in order to protect its abusive managers and executives and to prevent the truth to emerge about their numerous, intentional, malicious and willful violations of federal laws. There is no agency's policy, regulations, rule or law preventing these abusive managers to investigate allegations of harassment, discrimination, retaliation, and hostile work environment before an EEO complaint is filed and even after.**

55.  The reasons of the termination stated in the termination letter of April 2, 2012 below are clearly based on pretexts, retaliation and false accusations not supported by any investigation and

evidence (his direct supervisor Philippe Casteuble claimed in his EEO affidavit he even didn't

know why Plaintiff was fired):

*"Dear Mr. Coulibaly:*

*This is to advise you that your limited Excepted Service appointment with the Foreign Service Institute will be terminated, during your trial period, on April 6, 2012. This action is being taken as a result of your <u>unacceptable conduct.</u>*

*You have displayed unacceptable conduct that has adversely affected the operations of the French Section, European and African Languages. Specifically, <u>your inappropriate interactions with your supervisors, and your failure to follow established procedures for requesting leave.</u>*

*Please come to FSI/EX/HR, Room F2210 on or before April 6, 2012 to sign separation papers, turn in your ID badges, and receive materials and information regarding your benefits. (…) Sincerely,*

*Catherine J. Russell*
*Executive Director"*

(Emphasis added, **Document attached**)

60. **In her EEO affidavit defendant Catherine J. Russell affirmed she simply signed the termination letter at the request of the management but she didn't know more about the case, she had no "documentation" to support her capricious decision, a clear abuse of authority.** As defendant, she will have to provide more explanation to this honorable court.

## IV) - THE AGENCY FAILED TO ESTABLISH PLAINTIFF'S MISCONDUCT DURING AN OFFICIAL INVESTIGATION BY DISTRICT OF COLUMBIA EMPLOYMENT SERVICES: EVIDENCE OF PRETEXTS AND RETALIATION

61.  Even if the termination letter of April 2, 2012 mentioned **"inappropriate interactions with your supervisors"**, in his EEO affidavit, **Philippe Casteuble, the direct supervisor of Plaintiff at the time of his termination, claimed he was not aware of Plaintiff's EEO complaint, he**

didn't know who fired Plaintiff, why and if any investigation was done before his termination. Clearly, Philippe Casteuble was not aware of Plaintiff "inappropriate interaction with (his) supervisors. Therefore this argument is clearly frivolous, based on false accusations. The only issue Plaintiff had with the management was his EEO complaint and his request for leave unfairly denied (because they didn't like Dr. Willie Hamlin medical certificate blaming management for Plaintiff's health issues) and then approved on March 28, 2012 after many complaints by Plaintiffs. Filing an EEOC complaint cannot be considered as insubordination, misconduct or inappropriate interaction with supervisors. It cannot be a basis for retaliation, discrimination, harassment and termination.

62. Few weeks later after the termination of April 2, 2012, on May 25, 2012, the management failed to provide any evidence of "unacceptable conduct" or misconduct to DC Department of Employment during its investigation on misconduct and reasons of separation *(Document attached)*. The DC investigator clearly indicated to Plaintiff this agency's behavior was not acceptable, was illegal and recommended to Plaintiff to find a Pro bono lawyer to sue the agency. The investigator informed Plaintiff there were no evidence of misconduct consequently his unemployment benefits request will be approved.

63. Defendant Jennifer Toole (Agency's employment lawyer) provided a strange explanation to explain the agency's failure to prove misconduct during DC Department of Employment Services, a serious step in any employment litigation:

"The fact that the Agency declined to provide evidence of misconduct to the DC Department of Employment Services – to Complainant's benefit – does not prove that Complainant did not engage in misconduct. The record in this case makes clear that Complainant's conduct was disruptive to operations and supports the reasoning in the termination letter."

(EEO Motion, Id, pages 12-13, Emphasis added)

**Apparently, for lawyer Jennifer Toole, apparently the agency fired Plaintiff in order to help him to get unemployment benefits!!!** Any reasonable person would believe the agency failed to provide evidence of misconduct during an official investigation by DC Department of Employment Service required by DC law because there is no evidence of misconduct. An official investigation by DC Department of Employment Service is not a game since the evidence can be used in court. And employment lawyer Jennifer Toole should know that. She failed to prove misconduct with evidence of facts (when, where, how, who, why, etc.). **She simply speculated from her office and imagination because she was not witness of any fact. And has no evidence.**

64.   But, very strangely, it seems that for Defendant Jennifer Toole (a lawyer), Plaintiff termination after serious destruction of his physical and mental health, cancellation of his medical insurance preventing him to continue his medical treatment, lost of his salary was a beautiful gift offered to him by the Agency so he could get unemployment benefits with DC Department of Employment Services because the agency will make a favor to hide his so-called misconduct. The agency was so generous that it refused to provide evidence of Plaintiff's "misconduct" to DC Department of Employment during an investigation required by DC law. This is a legal issue. **The question here is simple: what Agency's policy, regulation, rules, DC or federal laws support the strange reasoning of defendant Jennifer Toole and the agency's refusal to provide its evidence of Plaintiff misconduct to DC Department of Employment Services?**

65.   Since this Agency's lawyer Jennifer Toole is defendant in this case, she will have to provide evidence that ***"the record in this case makes clear that Complainant's conduct was disruptive to operations and supports the reasoning in the termination letter."*** There is no such evidence in the ROI and she didn't provide any evidence to support her allegations. And apparently, the management was not able to prove any Plaintiff's misconduct in several hundreds pages of

affidavits in the ROI. The Agency also refused to respond to Plaintiff about the false accusations of misconduct.

66.   The problem with this strange theory of firing Plaintiff in order to help him ("to Complainant's benefit") by refusing to provide evidence of his misconduct to DC Department of Employment Services is: 1) Defendant Jennifer Toole didn't indicate any specific reference to evidence in the "record" proving Plaintiff's misconduct; 2) there is no evidence of the Agency generosity toward Plaintiff while the record clearly established retaliation, harassment, discrimination, hostile work environment, serious mental and physical illness in retaliation of his protected activities (EEO, FMLA, Whistleblowing); 3) in addition, Plaintiff requested many times by emails to Ms. Phuong Nguyen (FSI/HR) to prove his so-called "misconduct" (when, where, why, how, who, etc.) but she refused to provide any explanation and evidence of misconduct. She simply repeated in her email the same words in the termination letter.

67.   The truth is simple: there is no evidence of misconduct by Plaintiff, as established by the ROI and DC Department of Employment Services. **But there are character assassination and defamation against Plaintiff. The only misconduct clearly established by evidence is the management misconduct and intentional violations of federal EEO, FMLA and Whistleblower laws. The Agency's official evidence in the ROI show management intentionally violated Plaintiff's rights established by these federal laws. The other misconduct is lawyer misconduct because the arguments used by lawyer Jennifer Toole are dishonest, not supported by any evidence and has the purpose to mislead the EEOC Judge. This is clear violation of the Bar rules and Plaintiff will address this issue with the Bar.**

68.   Since the agency always maliciously refused all Plaintiffs' requests by emails or orally of **internal, immediate and impartial investigation on all issues** of retaliation, harassment,

**discrimination and hostile work environment** raised during several months before and after he filed his EEO complaint to establish facts and evidence of all violations the agency cannot explain rationally with supporting evidence from an impartial investigation the reason of the termination. **Clearly, the refusal to investigate and the impossibility to articulate logical explanation of the termination is evidence of discrimination, retaliation and pretext.**

69. The other strange reason of the termination is the **"failure to follow established procedure for requesting leave".** The management never explained which "procedure for requesting leave" Plaintiff failed or refused to follow. **This argument is absolutely frivolous since the management officially approved on March 28, 2012 by email from the Dean's office Plaintiffs' request for sick leave and advanced sick leave, only few days before his termination on April 2, 2012.** This leave approval was confirmed also to Plaintiff verbally by HR officer Brian Springer (defendant), Faye Hargrove (Dean's office) and by his direct supervisor Philippe Casteuble (defendant). **It seems that this Agency's managers and lawyers lost their memory again.** Evidence in the ROI shows many emails exchanged between Plaintiff, HR officer Brian Springer, supervisor Philippe Casteuble, Division Director Debra Blake and the Union representative Andreas Ryschka regarding Plaintiff leave request. Plaintiff provided all documents requested and followed all procedures required by FSI/HR. And the agency approved his request for sick leave on March 28, 2012 based on Dr. Willie Hamlin's medical certificate.

70. **In their EEO affidavits, Plaintiffs former colleagues insisted all on the management pattern of misconduct and violations of employees' rights as well as on the very hostile work environment. They all praised Plaintiff.**

71. **The Agency's OIG Inspection Report of Foreign Service Institute published on March 2013 was very negative for FSI management, especially the management in French Section.**

72.  **This letter of termination dated of April 2, 2012 only few days after Plaintiff's doctor instructed him to return to work on March 26, 2009 (and management received his medical certificate few weeks before) is a clear violation of Plaintiff's right under FMLA and DC laws. This is clearly evidence of retaliation.**

73.  When Plaintiff file his IRA Whistleblower complaint with MSPB (the Board), the agency's lawyer defendant Kristina Medic claimed in a motion filed on April 22, 2013 with the Board that *"the Board lacks jurisdiction because Appellant is not an employee with appeal rights under 5 U.S.C. § 7511(a)(1)(B)." (…) (see page 4, ¶ 4)*

*"Also, he was within the trial or probationary period and did not have the requisite competitive or excepted service to have completed the probationary period. See MSPB 185-1, Appeal Form at 1: Tab 4e.)*

(see page 6, ¶ 1, Emphasis added)

(See Agency File, MSPB, April 22, 2013, *Tiemoko Coulibaly v. Department of State,* page 4-6)

74.  This lawyer Kristina Medic (defendant) is mistaken because under WPEA law, even an applicant for employment and former employee are eligible to file an IRA appeal (being an "employee" is not a requirement):

**"For example, a temporary employee who is fired for whistleblowing may file an IRA appeal, but under most circumstances, this same individual cannot be heard by the MSPB on adverse action appeal. See *Lopez v. Department of Housing and Urban Development,* 98 F.3d 1358 (Fed. Cir. 1996)."**

75.  **Another issue is IRS forced the agency to cancel the BPA contract for violation of the regulation and for misclassification because "contractors" under BPA were in fact "employees" because they were under the total control of the employer for all aspects of**

**their daily work.** Plaintiff was illegally under BPA contract from 2003 until 2011 when he became officially "direct hire under probationary period" of a temporary period of one (1) year. **Plaintiff worked under the total control of this employer without interruption, without any vacation during thirteen (13) years from 1999 to 2012. By knowingly and illegally misclassifying Plaintiff has "contractor" during many years while he was doing exactly the same job like official employees, the agency avoided to pay to Plaintiff all benefits, promotions, health coverage and retirement he deserved.**

75. *However, the most important her is since the Agency claimed officially Plaintiff was NOT an employee when he was fired during his "trial period" or probationary period of one (1) year, Plaintiff is eligible to file this FMLA complaint under Title I. In* **Martin v. Brevard County Public School, No. 07-11196 (September 30, 2008)** *the 11th Circuit court affirms probationary employees' rights to bring private action for violation of heir rights under FMLA. In addition, Plaintiff is also covered by District of Columbia new amendment to the Accrued Sick and Safe Leave Act of 2008. This new amendment, entitled* the **"Earned Sick and Safe Leave Amendment Act of 2013" (the "Act")** *legally effective since February 22, 2014 covers Plaintiff and his Complaint filed after the date of the legal effect of this new Act.*

**V) - THE DISTRICT OF COLUMBIA NEW AMENDMENT OF THE LAW ENTITLED *"EARNED SICK AND SAFE LEAVE AMENDMENT ACT OF 2013"* IS LEGALLY APPLICABLE TO THIS PLAINTIFF'S COMPLAINT FILED AFTER THE DATE OF THE LEGAL EFFECT OF THIS ACT (FEBRUARY 22, 2014).**

76. This new law applies to employers working in the District of Columbia, like U.S. Department of State (Headquarter is based in D.C.). Plaintiff respectfully requests in this Complaint the application of the new District of Columbia Leave law amendment entitled the **Earned Sick and Safe Leave Amendment Act of 2013 (the "Act")** which took legally effect on **February 22,**

**2014** since this Complaint is filed on March 30, 2014, about a month *after* the date of the effect of this new law. **Consequently, this law should be legally applied to this Plaintiff Complaint.**

76.   Under this new amendment, the statute of limitation is now **three years** and it covers all employers and employees based in the District of Columbia, covers workers under trial period, **create a private right of action,** increased dramatically penalties for non compliance and create a rebuttable presumption that any employee who experiences **an adverse employment action within 90 days of taking leave or protesting an employer's administration of the leave policy has been the victim of retaliation.**

77. In addition, **an aggrieved worker may be awarded back pay, reinstatement or other injunctive relief, compensatory damages, and punitive damages, including a penalty of at least $500 for every day an employee was denied access to paid leave and was required to work. Attorney's fees and cost can be awarded to a prevailing plaintiff in a civil action.**

78.   **Plaintiff respectfully requests all remedies available under this D.C. new laws of 2013 in ADDITION to all others remedies available under federal law Family Medical Leave Act.**

79.   The Agency (U.S. Department of State) with about 15,000 employees has an annual budget of about **$50 BILLIONS** of dollars according to official documents from White House. Therefore, the agency can pay all damages requested by Plaintiff knowing that the agency already made clear that reinstatement is not an option. **All previous settlement negotiations failed because the agency was acting in bad faith.** Plaintiff wants litigation for full remedies and justice.

## VI) - LEGAL ANALYSIS:

### EVIDENCE SHOWS PLAINTIFF IS ELIGIBLE TO FILE THIS FMLA COMPLAINT AFTER HIS ILLEGAL TERMINATION DURING HIS PROBATIONARY OR TRIAL PERIOD OF ONE YEAR BECAUSE THE MANAGEMENT INTENTIONALLY VIOLATED HIS RIGHTS UNDER FMLA AND DISTRICT OF COLUMBIA NEW LEAVE LAW OF FEBRUARY 22, 2014

80. **The Agency never notified Plaintiff about his FMLA rights in violation of federal law (800.300-. 301). The Agency failed to notify Plaintiff that leave counted toward 12 weeks FMLA entitlement (825.208(b)(1)-(b)(2). The management never used the world FMLA in any email or communication with Plaintiff.  All actions by the agency were malicious, intentional and in reckless disregard of the law and Plaintiff's rights. Even if Plaintiff could file timely this complaint within three years because the agency's actions were clearly intentional and malicious, Plaintiff timely filed this complaint within two years after his termination on April 2, 2012.**

81.  For the following reasons, Plaintiff's complaint is not frivolous and should proceed for justice.

82. **Plaintiff is eligible to file this complaint under TITLE I of the federal law Family Medical Leave Act (FMLA) of 1993 because he worked without interruption for the Agency during thirteen (13) years and was fired according to the official termination letter of April 2, 2012 "during his trial period" of one (1) year in excepted service. According to the Agency's lawyers in several pleadings filed with MSPB, Plaintiff was not an "employee" and had no grievance rights when he was fired. Consequently Title II cannot be applied here to prevent Plaintiff to pursue his civil claim under federal Family Medical Leave Act.**

83.  Under the law, Plaintiff is eligible to file this FMLA lawsuit (and under D.C. law) because, according to the Agency, he worked <u>continuously for about thirteen (13) years</u> as "contractor" employee and then "direct hire" employee for the Department of State, a covered agency.  IRS considered Plaintiffs and others were misclassified as "contractors" during many years because they were under total control of the Agency. <u>Plaintiff already filed a complaint with OSC against the Agency with MSPB to address this issue during another litigation. This issue of illegal misclassification in violation of IRS regulations during several years is just mentioned here for the simple information of the Court. Plaintiff is eligible to file this FMLA complaint under TITLE I because he was fired during his "trial period" of one (1) year according to the agency's official termination letter of April 2, 2012 only few days after he returned to work from a leave officially approved by the agency.</u>

84.  Plaintiff met the three elements necessary to file a FMLA lawsuit: 1) he has worked continuously for the employer for the last 12 months before his termination; 2) he worked at least 1250 hours over the last 12 months (Plaintiff worked without interruption for the agency during thirteen years); 3) Plaintiff worked during thirteen (13) years for the Department of State, a covered Government and public employer.

85.  This complaint is <u>timely filed within two years</u> after Plaintiff termination on <u>**April 2, 2012**</u> (with last day at work on <u>**April 6, 2012)**</u> based on intentional, deliberate and malicious violation of his rights under FMLA and District of Columbia 2013 law as well as reckless disregard of Plaintiff's rights and laws. **Because the agency illegal actions were intentional, the statute of limitation is three years. <u>Plaintiff's complaint is therefore timely filed with this Court.</u>**

86.   Unlike Title VII and the ADA, **the FMLA does NOT require employees to exhaust administrative remedies before filing a suit in federal court.** *Edward v. Heatcraft, Inc.,* No. 7:05-cv-36 (HL), 2006 U.S. Dist. LEXIS 80134 (M.D.Ga. Nov. 2, 2006)

87.  **Plaintiff used his right under Family Medical Leave Act and District of Columbia new law of 2013 for his serious personal medical conditions during six weeks caused by the Agency in retaliation of his EEO and Whistleblower complaint and others complaints associated to the agency refusal to proceed with his leave request after he submitted timely all requested medical documents. Plaintiff provided timely to the agency appropriate medical certificate and all information requested since the first day of his illness.**

88. **Under the Family Medical Leave Act, an employer is not permitted to fire an eligible employee who takes family or medical leave for a reason outlined in the FMLA.** The employee, working for an employer covered by the FMLA, has a right under federal law to take this leave if they qualify. The employer cannot reprimand or fire the eligible employee for taking this leave.

89.   The employer has terminated Plaintiff shortly after he asked for leave and it even first illegally refused to process his leave request even if Plaintiff followed all leave procedures established by the Agency and provided medical documentation with all details. **The termination letter of April 2, 2012 mentioned leave issue as one reason of discharge without any detail.**

90.   Evidence show the employer constantly acted maliciously, knowingly in **bad faith** and in total retaliation to destroy Plaintiff health and then fired him on April 2, 2012 in reckless disregard of federal law Family Medical Leave Act only few months after Plaintiff filed an informal EEOC complaint on November 23, 2011 and his formal EEO complaint on December

20, 2011. **Management increased retaliation, hostility, discrimination, retaliation and _SINGLED OUT Plaintiff_ as soon as he filed his EEO complaint on November 23, 2011.** Evidence in the ROI (internal emails) shows the management was **aware** of this complaint filed that day. **The retaliation, discrimination and violation of Plaintiff's rights under Family Medical Leave Act is the last event of pattern on intentional, willfully and malicious retaliation during several months before his termination** to punish him because of his initial EEO and Whistleblower activities.

91. In _Martin v. Brevard County Public Schools_, 543 F. 3d 1261 (2008), **a case involving a termination of a probationary employee**, the Eleventh Circuit Court affirmed:

**"To prove FMLA retaliation, an employee must show that his employer _intentionally_ discriminated against him for exercising an FMLA right. See 29 U.S.C. § 2615(a)(2); 29 C.F.R. § 825.220(c). Unlike an interference claim, an employee "bringing a retaliation claim faces the increased burden of showing that his employer's actions were motivated by an impermissible retaliatory or discriminatory animus." _Strickland_. 239 F. 3d at 1207 (international quotation marks omitted)"**

92. In this Plaintiff's case, **the situation is clear because the employer mentioned the leave issue as a reason of the discharge in the termination letter of April 2, 2012.** The management falsely claimed Plaintiff failed to follow established procedures to request leave **after** the same management previously **approved** Plaintiff's leave request only few days before on March 28, 2012 by an email from the Dean's office sent to Plaintiff and his supervisor. **This contradiction is strange and absurd: it is clear evidence of intentional "retaliatory or discriminatory animus." The Agency officially approved the leave request on March 28, 2012 because Plaintiff followed all established procedures to request leave. The truth established by undisputed official evidence of facts is the Agency harassed, bullied, discriminated and retaliated against Plaintiff because of his formal EEO complaint and his numerous oppositions by emails and verbally to harassment, to discrimination, to very hostile work**

environment, and retaliation, as established by the Agency's extensive EEO Report of Investigation (ROI of about 1400 pages).

93.  **Consequently, official Agency's evidence in the ROI  shows Plaintiff met the burden of proof of FMLA retaliation claim established by the Eleventh Circuit Court above: "Unlike an interference claim, an employee *"bringing a retaliation claim faces the increased burden of showing that his employer's actions were motivated by an impermissible retaliatory or discriminatory animus." Strickland.* 239 F. 3d at 1207 (international quotation marks omitted)"**

94.  *"Retaliations claims: A Plaintiff must prove his or her Retaliation claim. To establish an FMLA retaliation claim a Plaintiff must show:* **1) He or she engaged in statutory protected conduct; 2) He or she suffered an adverse employment action; and 3) there is a causal connection between the two"** (See. Tracy A. Cinocca, *The Family Medical Leave Act Overview,* page 4)

95.  In this case, the official termination letter of April 2, 2012 is itself evidence of adverse action since it clearly mentioned leave request (covered by FMLA and D.C. laws) as a reason of the termination: **consequently, the agency itself connected both actions and established by strong and undisputable official evidence the FMLA retaliation claim in a context which Plaintiff had filed an EEO complaint against the management. Evidence shows this EEO complaint was discussed in numerous emails and memos by the management during several months, as established by the EEO Report of Investigation, and the agency increased retaliation and discrimination against Plaintiff, including on the leave request made by Plaintiff to address health issues due to very hostile work environment. *During two weeks, the management refused to approve the request without any legal justification. Plaintiff has to complain many***

_times by emails and verbally before the Agency officially approves his leave request on March_ _28, 2012._ The agency claimed he refused to approve the leave request with the medical certificate established by Dr. Willie Hamlin because it has too much information and they want "to protect Plaintiff privacy". _Finally, the agency approved the leave request with the_ _same medical document after two weeks of battle and complaints by emails and verbally._

96.  Evidence of facts in the Agency's ROI shows The Agency cannot provide any legitimate and honest reason to fire Plaintiff or to explain its adverse actions. Plaintiff never had any issue of misconduct and/or performance or any other issue during his thirteen (13) years of service for the agency before he filed his informal EEO complaint on November 23, 2011. Immediately after he filed his EEO complaint, all forms of bullying, humiliation, harassment, vendetta, persecution and retaliations already started were increased until Plaintiff became seriously sick and has to take leave for six weeks, per instruction of his doctors.    From that moment, the Agency executed the FMLA retaliation, used all misrepresentations to try to deny unfairly his leave request. The Agency fired Plaintiff on April 2, 2012 (last day at work was April 6, 2012) only one week after his doctor instructed him to return to work on March 26, 2012. The management approved by email the leave request on March 28, 2012 after many complaints by emails and verbally made by Plaintiff. Clearly, Plaintiff's numerous written and verbal complaints about the mismanagement of his leave request after he provided all medical documents requested and followed all procedures to request leave led to more tensions and retaliation against him. In the termination letter of April 2, 2012 the management raised issues of leave as argument of termination after it approved on March 28, 2012 Plaintiff leave request only few days before his termination. The management was totally mad against Plaintiff and was trying to find any pretext to fire him, even if their pretext was in total contradiction with their own written evidence. Nothing was rational and legal.

97. **The employees don't have to expressly invoke the FMLA on Leave Requests**. The employer has the duty to examine the situation and determine whether the requested leave implicates the eligible employee's FMLA rights. **Plaintiff provided timely all medical documents and information from doctors to the management in order to address properly his leave request. <u>Plaintiff informed the Agency immediately by phone and emails about his health issues preventing him to return to work on February 15, 2012 until March 26, 2012.</u>**

98. **The agency admitted all medical documentation provided had all information necessary to proceed with the leave request. This didn't prevent the agency to illegally retaliate maliciously, intentionally, knowingly and willfully against Plaintiff in violation of his FMLA rights and his rights under District of Columbia law of 2013 by firing him only few days after his doctor asked him to return to work on March 26, 2012. This agency also seriously damaged Plaintiff physical and mental health with serious negative consequence on his family since Plaintiff had no more income to take care of his family of five.**

99. Until today, Plaintiff and his family continue to suffer the serious consequences of the illegal actions by the agency.

100. Plaintiff attached some supporting undisputed official evidence to this Complaint and is ready to provide more evidence during this litigation. **This case has many undisputed official evidence from the Agency's ROI covering EEO, FMLA and Whistleblowing issues. Even the Agency admitted retaliation against Plaintiff in an EEO motion filed with the EEOC Judge. Evidence and laws show the Agency cannot prevail in this case.**

## VII) - PRAYER FOR RELIEF

CLERK
US DISTRICT &
BANKRUPTCY COURTS

2014 MAR 30  P 9: 47

RECEIVED

WHEREFORE, because the statement of facts above and official evidence attached clearly established violations of Plaintiff's rights under **federal law FMLA as well as under District of Columbia Earned Sick and Safe Leave Amendment Act of 2013 (effective February 22, 2014)** and serious continuing damages for him and his family, **Plaintiff SINGLED OUT by Agency** because of his official EEO, Whistleblower and Leave complaints by numerous emails and verbally (as established by the Agency's ROI) respectfully requests that this honorable court award him:

1) **The amount of wages, salary, employment benefits, back pay** from the effective date of illegal termination until now, medical expenses and other compensations denied or lost by reason of the violation **under federal law FMLA AND District of Columbia Earned Sick and Safe Leave Amendment Act of 2013 (effective February 22, 2014)**

2) **The lost of <u>Front pay</u>** under federal law FMLA **AND District of Columbia Earned Sick and Safe Leave Amendment Act of 2013 (effective February 22, 2014) from the date of this complaint until the date Plaintiff would have retired from federal government at the <u>age of 65</u>. <u>The Agency already made clear that reinstatement is not an option for Plaintiff during EEO and MSPB litigation</u>. Many of the harassers executives, supervisors and managers involved in retaliation against Plaintiff are still working for the Agency. <u>The refusal of the reinstatement is clear evidence that the employer has ongoing animus toward Plaintiff because he sought FMLA leave and filed an EEO complaint as well as Whistleblower complaint for others issues.</u>**

3) **Liquidated damages under federal law FMLA AND District of Columbia Earned Sick and Safe Leave Amendment Act of 2013 (effective February 22, 2014)** because evidence shows the Agency deliberately violated Plaintiff's rights in total **bad faith**, maliciously, intentionally, knowingly and in reckless disregard of the federal law FMLA, of **District of Columbia Earned Sick and Safe Leave Amendment Act of 2013 (effective February 28, 2014)** and others State and Federal EEO laws against discrimination and retaliation. Consequently, Plaintiff deserves liquidated damages, **the double of the total amount of compensation awarded under federal law FMLA AND District of Columbia Earned Sick and Safe Leave Amendment Act of 2013 (effective February 22, 2014) .**

4) Others remedies available under federal law FMLA **AND** District of Columbia leave law of February 2014 and any others appropriate remedies the court deems appropriate to prevent the Agency to continue its pattern of violations against others employees.

5) Equitable relief under FMLA **AND** District of Columbia new leave law of February 22, 2014.

6) Expert witness fees and other costs of the action to be paid by the defendant under both laws above.

7) For a cost of suit herein

8) All interests, pre-judgment and post-judgment authorized by the law.

9) Attorney's fees if appropriate

47

10) For such other and further relief as the Court deems just and proper under FMLA and District of Columbia leave law of February 22, 2014 because evidence in the Agency's ROI proves the **Agency SINGLED OUT Plaintiff** because of his numerous complaints on **leave issues and EEO activities.**

## JURY TRIAL DEMAND

### The plaintiff respectfully requests trial by Jury

Respectfully submitted this **March 30, 2014**

**Dr. Tiemoko Coulibaly, Pro Se (Historian, PhD, Sorbonne)**

2013 Grace Church Rd,

Silver Spring, MD 20910

Email: Tiemoko2005@yahoo.com;

Phone (Cellular): (301) 221 7646

RECEIVED 2014 MAR 30 P 4 42 CLERK US DISTRICT & BANKRUPTCY COURTS