# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|                                         |   |                     |                |
|-----------------------------------------|---|---------------------|----------------|
| TIEMOKO COULIBALY,                      | : |                     |                |
|                                         | : |                     |                |
| Plaintiff,                              | : | Civil Action No.:   | 14-0712 (RC)   |
|                                         | : |                     |                |
| v.                                      | : | Re Document Nos.:   | 23, 27, 30, 35 |
|                                         | : |                     |                |
| REX TILLERSON,[1] *U.S. Secretary of State,* | : |                     |                |
| *et al.*,                               | : |                     |                |
|                                         | : |                     |                |
| Defendants.                             | : |                     |                |

## MEMORANDUM OPINION

### DENYING THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTIONS TO ADD NEWLY ACQUIRED EVIDENCE

## I. INTRODUCTION

Plaintiff Tiemoko Coulibaly, proceeding *pro se* and *in forma pauperis*, brings this action against the Secretary of State and fifteen other individuals who are current or former employees of the U.S. Department of State (collectively, "Defendants"). Dr. Coulibaly alleges that by firing him, Defendants violated Title I of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601–2654. The parties now move for summary judgment. After filing his cross-motion for summary judgment, Dr. Coulibaly also moved twice to add newly acquired evidence to the record.

Because Defendants have not shown that Title II of the FMLA governs this suit, the Court will deny Defendants' motion for summary judgment with respect to that argument. And because a genuine issue of material fact remains with respect to whether retaliation for

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes Rex Tillerson as defendant.

FMLA-protected activities actually motivated Defendants' decision to terminate Dr. Coulibaly's

employment, the Court will deny the parties' motions for summary judgment on the merits of

Dr. Coulibaly's FMLA claim. Because the additional evidence that Dr. Coulibaly provided does

not affect the Court's conclusion about the remaining issue of material fact, the Court will deny

Dr. Coulibaly's motions to add newly acquired evidence.

## II. BACKGROUND[2]

### A. Employment as an FSI Contractor (1999–2011)

Dr. Coulibaly joined the Department of State's Foreign Service Institute ("FSI") as a

French instructor in 1999. Compl. ¶ 4, ECF No. 1; Defs.' Stmt. Material Facts Supp. Cross-Mot.

---

[2] As Defendants note, Dr. Coulibaly filed neither a statement of undisputed material facts (separate from the facts recounted in his motion brief) nor an opposition to Defendants' statement of material facts. *See* Defs.' Reply Supp. Cross-Mot. Summ. J. ("Defs.' Reply") at 4 n.2, ECF No. 34; *see also, e.g.*, Mem. Supp. Pl.'s Mot. Sua Sponte Summ. J. ("Pl.'s Mem.") at 6–7, 14–18, ECF No. 23 (discussing "stipulated facts"); *id.* at 22–29 (including a "statement of material facts" within Dr. Coulibaly's motion brief, but including few "references to the parts of the record relied on to support the statement," as required by D.D.C. Civil Rule 7(h)(1)); Pl.'s Reply Defs.' Cross-Mot. Summ. J. & Opp'n Pl.'s Mot. Summ. J. ("Pl.'s Reply") at 7–42, ECF No. 32 (countering Defendants' view of the facts, but without "a separate concise statement of genuine issues," which D.D.C. Civil Rule 7(h)(1) requires).

Defendants argue that their own statement of material facts may therefore be deemed admitted. Defs.' Reply at 4 n.2. But because "[a] document filed *pro se* is to be liberally construed," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal quotation mark omitted) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)), and because the Court "must always determine for itself whether the record and any undisputed material facts justify granting summary judgment," *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 505 (D.C. Cir. 2016) (quoting *Grimes v. District of Columbia*, 794 F.3d 83, 97 (D.C. Cir. 2015) (Griffith, J., concurring)), the Court declines to do so.

In this section, therefore, the Court recounts undisputed facts by citing to Defendants' statement of material facts and to portions of Dr. Coulibaly's complaint that are not in dispute with Defendants' statement of material facts. The Court also cites to the record to provide a more exhaustive summary of the facts of this case. *See* Fed. R. Civ. P. 56(c)(3) ("The court . . . may consider other materials in the record.").

Summ. J. & Opp'n Pl.'s Mot. Summ. J. ("Defs.' Stmt.") ¶ 1, ECF No. 27-1. As an instructor,

Dr. Coulibaly taught students speaking, reading, listening comprehension, and writing skills, and

he provided input for planning, design, development, and evaluation of course content. Defs.'

Stmt. ¶¶ 5–6, 9; *see also* Position Description, Pl.'s Mot. Summ. J. Ex. F, ECF No. 23-2, at 26–

27.[3] According to several of his colleagues, Dr. Coulibaly was well-regarded by his students and

colleagues during this time.[4]

FSI initially hired Dr. Coulibaly as a contractor under a series of Blanket Purchase

Agreements ("BPAs"). *See* Compl. ¶¶ 75, 83; Defs.' Stmt. ¶¶ 2–3; *see also, e.g.*, BPA Contract

Modification, Pl.'s Mot. Summ. J. Ex. A, ECF No. 23-1, at 111–22 (modifying Dr. Coulibaly's

BPA with an updated description of his work responsibilities, and indicating that the modified

---

[3] Because the exhibits that Dr. Coulibaly appended to his complaint, to his motion for summary judgment, and to his reply brief are available on the docket in just four large files, they are not consecutively paginated throughout. *See* ECF Nos. 1-1, 23-1, 23-2, 32-1. When citing Dr. Coulibaly's exhibits, therefore, the Court cites to the page numbers automatically generated by ECF.

[4] *See, e.g.*, Haftner Suppl. Aff., ROI at 1335, ECF No. 26-12 ("[O]n numerous occasions, students came to thank [Dr. Coulibaly] for his help and his teaching method."); Smith Aff., ROI at 1364, ECF No. 26-12 ("Dr[.] Coulibaly has been teaching at FSI for approximately 12 years and has been recognized as an outstanding French language teacher, having received work performance awards for many years."); Richards Aff., ROI at 1367, ECF No. 26-12 (Dr. Coulibaly was . . . a consummate professional, committed to serve the needs of his students, and extremely responsive to my guidance and suggestions."); *see also* PAR, ROI at 790, ECF No. 26-7 (noting "the positive student feedback" that FSI received about Dr. Coulibaly during his time as a contractor).

A note on the Court's citations: Dr. Coulibaly's exhibits consist primarily of portions of the Report of Investigation ("ROI") for Dr. Coulibaly's EEO complaint, Case No. DOS-F-025-12, which Dr. Coulibaly filed with the Department of State's Office of Civil Rights. *See* ECF Nos. 23-1, 23-2, 32-1. *See generally* ROI at 58–59, ECF No. 26-1 (documenting the receipt of Dr. Coulibaly's discrimination complaint by the Department of State's Office of Civil Rights). Defendants have filed the complete 1418-page ROI as ECF Nos. 26-1 to -12. Because, as Defendants note, both parties have referred to portions of the ROI in this case, *see* Defs.' Notice of Filing at 1, ECF No. 26, the Court will cite to the ROI instead of the parties' exhibits wherever possible.

BPA would take effect on November 10, 2010). These BPAs stated that Dr. Coulibaly was a contractor only, and not an employee. *See* Defs.' Stmt. ¶ 4; *see, e.g.*, BPA Contract Modification at 120 ("Awardees of a [BPA] are not civil service or Foreign Service employees of the United States Government, and . . . should not identify themselves as Government employees either orally or in writing."). The BPAs also required Dr. Coulibaly to submit invoices to the State Department to receive payment. *See* Defs.' Stmt. ¶ 3; *see, e.g.*, BPA Contract Modification, at 119 ("Contractors will submit invoices bi-weekly for hours worked through presentation of a Work Schedule and an invoice to the FSI Budget Office.").

## B. Excepted Service Appointment at FSI (June 2011)

On June 19, 2011, Dr. Coulibaly began a two-year Excepted Service appointment within the Department of State as a French instructor. *See* Compl. ¶¶ 75, 83; Defs.' Stmt. ¶¶ 5–7; *see also* Letter from Swati Limaye to Tiemoko Coulibaly (May 27, 2011), Compl. Ex., ECF No. 1-1, at 113–14. Under this appointment, Dr. Coulibaly performed substantially the same duties as he had while he was a contractor. *See* Compl. ¶¶ 75, 83; Defs.' Stmt. ¶¶ 5–7. His appointment was subject to an initial one-year trial period. *See* Compl. ¶¶ 75, 83; Defs.' Stmt. ¶ 8.

## C. Conflict with Supervisor Laura Fyfe (July 2011–November 2011)

During his appointment, Dr. Coulibaly initially reported to Language Training Supervisor ("LTS") Laura Fyfe. *See* Compl. ¶ 6; Defs.' Stmt. ¶ 11. The record contains several email chains that document the interactions between LTS Fyfe and Dr. Coulibaly during the first few months of his employment. *See, e.g.*, Email from Laura Fyfe (Nov. 7, 2011, 7:23 PM), ROI at 721–24, ECF No. 26-7; Email from Ann Keller-Lally to James North (Nov. 8, 2011, 9:38 AM), ROI at 725–34, ECF No. 26-7.

In one such email, LTS Fyfe states that, after establishing Dr. Coulibaly's "work commitments" on June 20, 2011, she met with Dr. Coulibaly on July 8, 2011 for a performance discussion. Email from Laura Fyfe (Nov. 7, 2011, 7:23 AM), ROI at 721. LTS Fyfe said that, during the discussion, she recommended to Dr. Coulibaly that he "work on his teaching portfolio by developing a specific skill since he [didn't] have pedagogical training." *Id.* When Dr. Coulibaly replied that he did not know how to do that, she told him to develop a "reading lesson plan." *Id.* This reading lesson plan later became a point of contention. *See id.* at 721–22.

LTS Fyfe reports that in advance of a planned observation of Dr. Coulibaly's class the following month, she requested class readings from Dr. Coulibaly. *See id.* at 721. According to LTS Fyfe, Dr. Coulibaly responded by stating that he felt that his students were not yet ready to read. *See id.* LTS Fyfe later opined that the reading delay was "out of the ordinary" in a French section, where she stated that "teachers begin teaching reading starting in the first week with A level texts varying from advertisements to menus." *Id.*

LTS Fyfe observed Dr. Coulibaly's class on August 18, 2011, as planned. *Id.* She followed up with Dr. Coulibaly by email later that day and the next day. *Id.* at 721–22.[5] In her August 19, 2011 email, LTS Fyfe told Dr. Coulibaly to "prepare a reading lesson" for his class based on "the four P's" method. *See* Email from Laura Fyfe (Aug. 19, 2011, 12:02 PM), ROI at 733.

Five days later, on August 24, 2011, Dr. Coulibaly submitted his reading lesson plan to LTS Fyfe.[6] LTS Fyfe later characterized Dr. Coulibaly's lesson plan as "a template for writing a

---

[5] *See* Email from Laura Fyfe (Aug. 18, 2011, 5:36 PM), ROI at 734, ECF No. 26-7; Email from Laura Fyfe (Aug. 19, 2011, 12:02 PM), ROI at 733, ECF No. 26-7.

[6] *See* Email from Tiemoko Coulibaly (Aug. 24, 2011, 2:32 PM), ROI at 732–33, ECF No. 26-7; *see also* Email from Laura Fyfe (Nov. 7, 2011, 7:23 PM), ROI at 722 (reproducing what LTS Fyfe alleges was the document that Dr. Coulibaly sent her).

lesson plan—not an actual lesson plan." Email from Laura Fyfe (Nov. 7, 2011, 7:23 PM), ROI at 722. LTS Fyfe states that she told Dr. Coulibaly during the following week that the plan was "a beginning" and then asked Dr. Coulibaly to make improvements—namely, to include a specific article for the students to read and to "address some of the specifics of the article and the timing and level of the lesson." *Id.* at 722–23 (reproducing an email from August 30, 2011). According to LTS Fyfe, Dr. Coulibaly responded later that day and requested clarification about whether his lesson plan was satisfactory. *See id.* at 723 ("I would be grateful if you could tell me if this 'beginning' is appropriate or not for you, if it is good or not, so I could try to improve it."). LTS Fyfe claims that she responded to Dr. Coulibaly's request by giving him "specific questions." *See id.*

More than a month later, LTS Fyfe says that she again requested a reading lesson plan. *See id.* Two days after her second request, Dr. Coulibaly responded by forwarding LTS Fyfe the same generic lesson plan that he had sent her in August. *See* Email from Tiemoko Coulibaly (Oct. 5, 2011, 8:55 AM), ROI at 732–33, ECF No. 26-7. LTS Fyfe then clarified that she found the August lesson plan to be unsatisfactory. *See* Email from Laura Fyfe (Oct. 5, 2011, 11:24 AM), ROI at 732, ECF No. 26-7 ("[W]hen I wrote, 'this is a beginning,' I was suggesting that [the August lesson plan was] *not* complete and [that] it needed to be revised." (emphasis in original)). Dr. Coulibaly said that he was "confused and unclear about what to do exactly" and stated that he "would appreciate" a time to meet with LTS Fyfe for clarification. *See* Email from Tiemoko Coulibaly (Oct. 5, 2011, 12:36 PM), ROI at 731–32, ECF No. 26-7. LTS Fyfe states that she attempted to meet with Dr. Coulibaly on October 12, 2011, but that she "made a mistake about his teaching schedule," so no meeting occurred. *See* Email from Laura Fyfe (Nov. 7, 2011, 7:23 PM), ROI at 724. LTS Fyfe asserts that, instead, she delegated the matter to another FSI

employee, Dora Chanesman. *See id.*; Email from Laura Fyfe (Nov. 4, 2011, 9:57 AM), ROI at 731, ECF No. 26-7.

In early November 2011, LTS Fyfe contacted Dr. Coulibaly again about the reading lesson plan and wrote that "[s]ince [she and Dr. Coulibaly had] not been able to set up a time to go over a writing lesson plan, [she had] asked Dora Chanesman [to] assist [him] with the process." Email from Laura Fyfe (Nov. 4, 2011, 9:57 AM), ROI at 731. Dr. Coulibaly responded later that day with his interpretation of LTS Fyfe's message: "This suggests in my mind that I have refused or I have rejected to 'set up a time to go over writing a lesson plan.'" Email from Tiemoko Coulibaly (Nov. 4, 2011, 7:11 PM), ROI at 728, ECF No. 26-7. Disputing the idea that it was his fault they did not meet, Dr. Coulibaly emphasized that he had "never refused to meet with [LTS Fyfe] and [that he had] never refused to do what [she] requested." *Id.*

**D.  Communications with Second-Line Supervisors (November 2011–December 2011)**

A few days later, on November 7, 2011, Dr. Coulibaly wrote to Acting Division Director Ann Keller-Lally and expressed that he was "feeling hostility" from LTS Fyfe, that he believed he was "a victim of psychological abuse, retaliation and discrimination," and that "this is a case of intentional and negligent infliction of emotional distress to an employee." Email from Tiemoko Coulibaly (Nov. 7, 2011, 1:41 PM), ROI at 727, ECF No. 26-7. In response, Acting Director Keller-Lally provided Dr. Coulibaly with the procedures to report alleged discrimination, but she also suggested a face-to-face meeting with Dr. Coulibaly and with LTS Fyfe to discuss the conflict. Email from Ann Keller-Lally (Nov. 7, 2011, 5:01 PM), ROI at 725–26, ECF No. 26-7.

That meeting occurred the next day, on November 8, 2011. *See* Email from Ann Keller-Lally (Nov. 9, 2011, 4:12 PM), ROI at 754–56, ECF No. 26-7 (memorializing the

conversation from the meeting in writing). During the meeting, Acting Director Keller-Lally's notes state that she held a meeting with LTS Fyfe and Dr. Coulibaly, that Dr. Coulibaly expressed his confusion with respect to LTS Fyfe's instructions, and that LTS Fyfe felt that her instructions were clear. *See id.* at 754–55. In particular, Acting Director Keller-Lally's notes indicate that Dr. Coulibaly found LTS Fyfe's "four P's" method confusing, because another colleague had told Dr. Coulibaly that the method "was not particularly applicable with regard to reading lessons." *Id.* at 754. According to Acting Director Keller-Lally's notes, LTS Fyfe later in the meeting acknowledged that Dr. Coulibaly was "rightly confused." *Id.* Apart from the "four P's" method, Dr. Coulibaly also reportedly expressed that he felt "hostility" from LTS Fyfe, and that "he was sure whatever he proposed would be rejected." *Id.* at 754–55. In response, LTS Fyfe reportedly stated that her goal was to help Dr. Coulibaly to "do the best he could" and felt that she had simply "said some things that [Dr. Coulibaly] did not want to hear." *Id.* at 756. According to Acting Director Kellar-Lally's notes, LTS Fyfe ultimately "offered to drop the reading lesson plan project" if Dr. Coulibaly would attend formal trainings instead. *Id.* at 755–56.

The next day, Acting Director Keller-Lally sent her notes documenting the meeting to LTS Fyfe and Dr. Coulibaly. *See generally id.* at 754–56. She told LTS Fyfe and Dr. Coulibaly to "[p]lease feel free to respond with any remarks or corrections based on [their] recollection of what we discussed." *Id.* at 754. The following week, on November 15, 2011, Dr. Coulibaly provided voluminous comments in response to Acting Director Keller-Lally's notes. *See* Email from Tiemoko Coulibaly (Nov. 15, 2011, 5:03 PM), ROI at 743–49, ECF No. 26-7. Dr. Coulibaly's response alleged that, during the meeting, LTS Fyfe had accused him of "'discrimination' 'against' her because of her 'background' and because her 'former husband'

was 'Ivorian' (like [Dr. Coulibaly])." *Id.* at 744; *see also id.* at 747 (alluding to a point during the meeting in which LTS Fyfe "became very emotional and . . . started crying," and in which she mentioned the Ivory Coast "and her former husband, an Ivorian"). His response also accused LTS Fyfe of "knowingly and intentionally act[ing] . . . in bad faith to create false excuses to . . . punish [Dr. Coulibaly]," of "retaliation," and of "character assassination." *Id.* at 745–46. Reacting to Dr. Coulibaly's comments, LTS Fyfe asserted that his accusations had no basis, but she admitted that she "was brought to tears" during the meeting and "did ask [Dr. Coulibaly] if he had an ax to grind against [her] because of [her] ex." Email from Laura Fyfe (Nov. 15, 2011, 5:42 PM), ROI at 743, ECF No. 26-7.

On November 16, 2011, the day after Dr. Coulibaly and LTS Fyfe responded to Acting Director Keller-Lally's notes, Division Director Debra Blake, having returned to the office, met with Dr. Coulibaly to address his accusations. *See* Blake Mem. (Nov. 15, 2011), ROI at 773–74, ECF No. 26-7.[7] In her notes documenting this conversation, Director Blake claimed that her purpose in calling the meeting was to determine "precisely what actions" Dr. Coulibaly felt were evidence of LTS Fyfe's "discrimination and hostility." *Id.* at 773. According to Director Blake, Dr. Coulibaly was initially "reluctant" to articulate specific allegations of discrimination and hostility, but he then cited the fact that LTS Fyfe's "former husband shared the same country of origin" as Dr. Coulibaly, as well as allegations that LTS Fyfe treated Dr. Coulibaly unfairly in the way that she supervised him. *See id.* Director Blake shared her notes of the meeting with

---

[7] Director Blake actually dated her memorandum November 15, 2011, *see* Blake Mem. (Nov. 15, 2011), ROI at 773–74, but, as Dr. Coulibaly noted in his response to Director Blake's memorandum, the meeting in fact took place on November 16, 2011, *see* Coulibaly Mem. (Nov. 23, 2011), ROI at 766, ECF No. 26-7. *See also* Email from Debra Blake (Nov. 16, 2011, 8:12 AM), ROI at 757, ECF No. 26-7 (stating that Director Blake intended to meet with Dr. Coulibaly that day).

Dr. Coulibaly the next week. *See* Email from Debra Blake to Tiemoko Coulibaly (Nov. 22, 2011, 11:43 AM), ROI at 764–65, ECF No. 26-7.

The day after Dr. Coulibaly received Director Blake's notes, Dr. Coulibaly responded with lengthy comments that expressed his views on the conversation. *See* Email from Tiemoko Coulibaly (Nov. 23, 2011, 9:01 PM), ROI at 764, ECF No. 26-7; Coulibaly Mem. (Nov. 23, 2011), ROI at 766–72, ECF No. 26-7. In his comments, Dr. Coulibaly repeatedly expressed that he believed that Director Blake was "simply trying to protect" LTS Fyfe: he wrote that Director Blake "had already decided to totally support" LTS Fyfe and had become "a zealous lawyer" for LTS Fyfe during the meeting. *See* Coulibaly Mem. (Nov. 23, 2011), ROI at 766–72.

That same day, Director Blake met with both Dr. Coulibaly and LTS Fyfe to facilitate their working relationship going forwarded. *See* Email from Laura Fyfe (Nov. 23, 2011, 3:12 PM), ROI at 761–62, ECF No. 26-7 (memorializing the meeting). At the meeting, LTS Fyfe reports that she told Dr. Coulibaly that "the administration ha[d] ruled" that she would continue as Dr. Coulibaly's supervisor, even though he had requested a change in supervisor. *Id.* at 762. LTS Fyfe states that she also expressed "her willingness to move forward in the supervisory role" and that she and Dr. Coulibaly "both agreed to work productively with each other." *Id.* Dr. Coulibaly later emailed LTS Fyfe to clarify the procedure for changing supervisors. *See* Email from Tiemoko Coulibaly (Nov. 23, 2011, 4:35 PM), ROI at 761, ECF No. 26-7. LTS Fyfe responded by informing Dr. Coulibaly that "[t]he decision was made to keep [her] as [his] supervisor until at least the end of this year (December 31, 2011)" and that she had "not received approval to change [his] supervisor . . . after that point." Email from Laura Fyfe (Nov. 23, 2011, 5:33 PM), ROI at 761, ECF No. 26-7.

A few weeks later, on December 14, 2011, Director Blake and LTS Fyfe met again with Dr. Coulibaly to address a new point of contention: his alleged failure to submit required weekly syllabi for a period of three weeks.[8] According to Director Blake, Dr. Coulibaly acknowledged that he had not submitted the weekly syllabi, but claimed that he had been too busy. Blake Mem. (Dec. 14, 2011), ROI at 787. Director Blake further reports that Dr. Coulibaly continued to allege that "he felt discriminated against and felt he was being treated unfairly," particularly when compared to "one other instructor who entered on duty on the same date." *Id.* Dr. Coulibaly commented the next day that, at their meeting, that he had "clearly insisted on the issue of discrimination" and that he had noted "the different standards between teacher Hmimiche AitMouloud ('Mimiche')" and himself. Email from Tiemoko Coulibaly (Dec. 15, 2011, 5:35 PM), ROI at 785–86, ECF No. 26-7. Dr. Coulibaly also states that he had questioned whether "Mimiche" had been held to the syllabus requirement. *Id.*

### E. EEO Complaint (December 20, 2011)

Around the time that he was communicating with Director Blake, Dr. Coulibaly met with an Equal Employment Opportunity ("EEO") counselor and filed an informal EEO complaint with the Department of State's Office of Civil Rights.[9] On December 20, 2011, Dr. Coulibaly filed a formal EEO complaint with the Office of Civil Rights, in which he alleged that FSI management had discriminated against him on the basis of race, color, and national origin and

---

[8] *See* Email from Debra Blake (Dec. 15, 2011, 4:33 PM), ROI at 786, ECF No. 26-7 (noting the meeting that took place the day before); Blake Mem. (Dec. 14, 2011), ROI at 787, ECF No. 26-7.

[9] *See* Compl. ¶ 8 (stating that Dr. Coulibaly filed an informal EEO complaint on November 23, 2011); EEO Counselor's Report, ROI at 68–73, ECF No. 26-1 (showing that Dr. Coulibaly made contact with an EEO Counselor at the Department of State on November 18, 2011); Email from Debra Blake (Nov. 28, 2011, 8:12 AM), ROI at 776, ECF No. 26-7 (discussing "the EEO complaint filed by Tiemoko Coulibaly last week").

had committed "reprisal" against him. *See* Compl. ¶ 9; Formal Compl. of Discrimination, ROI at 62–63, ECF No. 26-1.[10] The resulting EEO investigation generated affidavits from many of Dr. Coulibaly's former colleagues, as well as the lengthy report of investigation that forms much of the record in this case.[11]

### F. Performance Appraisal Report (December 27, 2011)

Later in December 2011, Dr. Coulibaly received a Performance Appraisal Report ("PAR") from LTS Fyfe that noted "several issues" with Dr. Coulibaly's performance.[12] LTS Fyfe noted that Dr. Coulibaly was "continu[ing] to attempt to repair" his performance with respect to those issues. Performance Appraisal Report ("PAR") by Laura Fyfe, ROI at 790, ECF No. 26-7.

In response, Dr. Coulibaly sent an email to Director Blake, LTS Fyfe, and others in FSI management, in which he alleged that the PAR was "evidence of retaliation" and that Director Blake and LTS Fyfe could not "separate performance evaluation from discrimination and retaliation against" Dr. Coulibaly. Email from Tiemoko Coulibaly (Dec. 27, 2011, 5:53 PM), ROI at 788–89, ECF No. 26-7. Dr. Coulibaly's email accused his supervisors of omitting "the important issues of discrimination and retaliation" in the PAR, given that, according to Dr. Coulibaly, "these disputes clearly influenced [their] performance report." *Id.* at 789.

---

[10] Dr. Coulibaly has filed a Title VII discrimination complaint in a separate action in this Court. *See generally* Compl., *Coulibaly v. Kerry*, No. 14-cv-0189 (D.D.C. Feb. 10, 2014).

[11] *See* ROI, ECF Nos. 26-1 to -12; *see, e.g.*, Haftner Suppl. Aff., ROI at 1335, ECF No. 26-12; Smith Aff., ROI at 1363–65, ECF No. 26-12; Richards Aff., ROI at 1366–69, ECF No. 26-12.

[12] *See* Email from Tiemoko Coulibaly (Dec. 27, 2011, 5:53 PM), ROI at 788–89, ECF No. 26-7; *see also* PAR by Laura Fyfe, ROI at 790, ECF No. 26-7 (discussing Dr. Coulibaly's lesson plans and weekly syllabi).

Director Blake responded by telling Dr. Coulibaly that he should pursue his discrimination allegations "through the proper channels" and that LTS Fyfe, as his supervisor, "reported on [his] performance as required." Email from Debra Blake (Dec. 28, 2011, 3:10 PM), ROI at 795–96, ECF No. 26-7. She also stated that Dr. Coulibaly had "been repeatedly instructed to refrain from this line of accusations" while discussing his work performance. *Id.* She opined that, therefore, his continued accusations were "tantamount to insubordination." *Id.* Continuing his disagreement with Director Blake, Dr. Coulibaly responded by stating that "[t]here is no insubordination when a teacher denounces discrimination and retaliation," and he reiterated that the PAR "was simply discrimination and retaliation." Email from Tiemoko Coulibaly to Debra Blake (Dec. 28, 2011, 4:09 PM), ROI at 795, ECF No. 26-7.

### G. Event for FSI's French Language and Culture Instructors (December 29, 2011)

The next day, on December 29, 2011, Dr. Coulibaly attended an event for FSI's French Language and Culture instructors. *See* Casteuble Mem. (Jan. 24, 2012), ROI at 815, ECF No. 26-7; *see also* Cazeau Aff., ROI at 1339–40, ECF No. 26-12. The parties dispute the purpose of the meeting and the nature of Dr. Coulibaly's actions during the meeting.

Defendants adopt the position taken in a memorandum written by LTS Phillipe Casteuble, who stated that the meeting was a "training workshop provided to all French Language and Culture Instructors" about "specifications for writing the weekly syllabi." Casteuble Mem. (Jan. 24, 2012), ROI at 815, ECF No. 26–7; *see also* Mem. Supp. Defs.' Cross-Mot. Summ. J. & Opp'n Pl.'s Mot. Summ. J. (" Defs.' Mem.") at 8–9, ECF No. 27 (adopting LTS Casteuble's view). LTS Casteuble's memorandum also accuses Dr. Coulibaly of "inappropriate conduct" and comments that "were off topic" during the meeting: Dr. Coulibaly allegedly "stood up and loudly began to speak about the 'No Fear Act' and discrimination and

retaliation against [him] on the part of the French Supervisors," and he allegedly "continued to stand up and loudly protest" despite LTS Casteuble's request for Dr. Coulibaly to sit down. Casteuble Mem. (Jan. 24, 2012), ROI at 815, ECF No. 26-7.

Dr. Coulibaly, however, adopts the view of his colleague, Elder Cazeau, who also attended the meeting. *See* Pl.'s Reply at 7–8, ECF No. 32. Mr. Cazeau recalls that the meeting was merely a "section meeting that had been organized to discuss lesson plans." Cazeau Aff., ROI at 1339, ECF No. 26-12. Mr. Cazeau also recounts that Dr. Coulibaly "was publicly humiliated and silenced by his supervisor who told him that he could not use the meeting as a platform to air his personal issues." *Id.* at 1339–40. In particular, Mr. Cazeau states that "Dr. Coulibaly started saying that he felt discriminated against because of his lesson plan," that Dr. Coulibaly's supervisor "cut him off," and that "Dr. Coulibaly remained silent" after that. *Id.* at 1440.

### H. Conflict with New Supervisor Philippe Casteuble (January 2012–February 2012)

In January 2012, LTS Casteuble replaced LTS Fyfe as Dr. Coulibaly's supervisor. *See* Email from Tiemoko Coulibaly (Jan. 27, 2012, 9:37 AM), ROI at 813–14, ECF No. 26-7 (indicating that LTS Casteuble's first day as Dr. Coulibaly's new supervisor was on January 24, 2012); Casteuble Aff., ROI at 1228, ECF No. 26-11 (indicating that Dr. Coulibaly started reporting to LTS Casteuble in January 2012). On January 24, 2012, LTS Casteuble met with Dr. Coulibaly with the expressed intention of "talk[ing] about expectations." Email from Philippe Casteuble (Jan. 23, 2012, 9:55 AM), ROI at 814, ECF No. 26-7.[13] But, during the meeting, LTS Casteuble presented Dr. Coulibaly with a memorandum that outlined an "informal counseling

---

[13] *See* Email from Tiemoko Coulibaly (Jan. 27, 2012, 9:37 AM), ROI at 813–14, ECF No. 26-7 (indicating that their meeting occurred on January 24, 2012).

session" regarding Dr. Coulibaly's conduct at the December 29, 2011 meeting and that reprimanded him for his conduct at that meeting.[14] LTS Casteuble's memorandum surprised Dr. Coulibaly, who had believed that the January 24 meeting "was only about expectations on teaching." Email from Tiemoko Coulibaly (Jan. 27, 2012, 9:37 AM), ROI at 813, ECF No. 26-7. Dr. Coulibaly was further surprised by the fact that a human resources representative was present for the meeting.[15]

That same day, LTS Casteuble emailed Dr. Coulibaly and thanked him for submitting his weekly syllabus. *See* Email from Philippe Casteuble (Jan. 24, 2012, 12:42 PM), ROI at 829–30, ECF No. 26-8. In his email, LTS Casteuble also asked Dr. Coulibaly a list of questions regarding the syllabus. *See id.* (asking, among other things, whether "there is a theme" that Dr. Coulibaly planned to explore, and how an activity would help Dr. Coulibaly's students "reach the professional proficiency level").

Some time later, LTS Casteuble again brought up the issue of Dr. Coulibaly's weekly syllabus. On February 2, 2012, LTS Casteuble emailed Dr. Coulibaly and said that, after looking at Dr. Coulibaly's weekly syllabus, he needed "to talk about it" with Dr. Coulibaly. Email from Philippe Casteuble (Feb. 2, 2012, 2:14 PM), ROI at 820, ECF No. 26-7. LTS Casteuble suggested a meeting early the next morning. *See id.* Because Dr. Coulibaly "was very surprised by what happened in [LTS Casteuble's] office at the meeting of January 24, 2012,"

---

[14] *See* Email from Tiemoko Coulibaly (Jan. 27, 2012, 9:37 AM), ROI at 813, ECF No. 26-7 ("I was surprised when Philippe gave me his letter . . . reprimanding me for an incident of December 29, 2011."); *see also* Casteuble Mem. (Jan. 24, 2012), ROI at 815.

[15] *See* Email from Tiemoko Coulibaly (Jan. 27, 2012, 9:37 AM), ROI at 813, ECF No. 26-7 (indicating Dr. Coulibaly's surprise at Phuong Nguyen's presence); *see also* Email from Phuong Nguyen (Feb. 3, 2012, 9:57 AM), ROI at 821, ECF No. 26-7 (indicating that Phuong Nyugen was a "Supervisory HR Specialist" at FSI).

Dr. Coulibaly asked to schedule the proposed meeting to later in the day so that he could arrange for a union representative to be present. Email from Tiemoko Coulibaly (Feb. 2, 2012, 4:57 PM), ROI at 819, ECF No. 26-7. After confirming with his own superiors that it was appropriate for a union representative to attend the meeting, LTS Casteuble proposed a meeting on February 6, 2012 and informed Dr. Coulibaly that a union representative could attend.[16] But the February 6, 2012 meeting ultimately did not occur: even though Dr. Coulibaly emailed LTS Casteuble to confirm the meeting time on February 6, LTS Casteuble claimed that, based on prior communications, he "could not know if the date and time was accepted, by [Dr. Coulibaly] and by the union representative."[17]

That same day, LTS Casteuble also wrote Dr. Coulibaly a separate email that reminded Dr. Coulibaly about LTS Casteuble's January 24, 2012 questions about Dr. Coulibaly's weekly syllabus. *See* Email from Philippe Casteuble (Feb. 6, 2012, 8:29 AM), ROI at 829, ECF No. 26-8 ("This is a friendly reminder that as of today I have not received any response on the 14 questions I asked . . . ."). In response, Dr. Coulibaly asserted that he had responded to LTS Casteuble's questions by requesting a meeting with him, and that LTS Casteuble "never responded" to Dr. Coulibaly's request. *See* Email from Tiemoko Coulibaly (Feb. 6, 2012, 9:19 AM), ROI at 827–28 ("[A] meeting would be more appropriate to answer your '14 questions.'"). Dr. Coulibaly also sent a separate email to LTS Casteuble, in which he noted that all of his

---

[16] *See* Email from Philippe Casteuble (Feb. 3, 2012, 12:13 PM), ROI at 832, ECF No. 26-8; Email from Phillipe Casteuble (Feb. 3, 2012, 1:26 PM), ROI at 832, ECF No. 26-8.

[17] *See* Email from Tiemoko Coulibaly to Philippe Casteuble (Feb. 6, 2012, 8:32 AM), ROI at 832, ECF No. 26-8 (writing to confirm the 9:00 AM meeting on February 6, 2012); Email from Philippe Casteuble to Tiemoko Coulibaly (Feb. 6, 2012, 8:51 AM), ROI at 831, ECF No. 26-8 (opining that LTS Casteuble did not know whether the 9:00 AM time was acceptable); Email from Tiemoko Coulibaly to Philippe Casteuble (Feb. 6, 2012, 9:08 AM), ROI at 831, ECF No. 26-8 (stating that the 9:00 AM meeting did not occur).

students had passed their recent tests, forwarded complimentary remarks from one of his students, and opined that "[n]othing [was] wrong with [his] syllabus." *See* Email from Tiemoko Coulibaly (Feb. 6, 2012, 9:34 AM), ROI at 839–41, ECF No. 26-8. In light of his students' success, Dr. Coulibaly characterized the criticisms of his syllabi as harassment. *See id.* ("Instead of congratulating me, you are constantly harassing me with [the] Syllabus issue as Debra and Larua Fyfe did [for] the last 6 months.").

Nonetheless, later that week, Dr. Coulibaly provided his answers to LTS Casteuble's January 24, 2012 questions. *See* Email from Tiemoko Coulibaly (Feb. 10, 2012, 6:45 PM), ROI at 902–04, ECF No. 26-8. Dr. Coulibaly also requested a sample satisfactory syllabus. *See id.* at 904 ("I would appreciate if you could provide an example of a perfect syllabus you like so I can follow it line by line."). Although LTS Casteuble expressed privately to Director Blake and LTS Fyfe that he found Dr. Coulibaly's answers unsatisfactory, he later provided Dr. Coulibaly with additional feedback and a sample syllabus to reference.[18]

The next day, Dr. Coulibaly received an email from LTS Fyfe stating that Dr. Coulibaly had not submitted his required weekly syllabus. *See* Email from Laura Fyfe (Feb. 14, 2012, 8:59 AM), ROI at 900, ECF No. 26-8 (noting that the recipients of the email had not submitted weekly syllabi, but without making the recipients known). In response, Dr. Coulibaly stated that, because he had received LTS Casteuble's feedback too late the day before, he had been unable to submit his weekly syllabus by the deadline.[19] Dr. Coulibaly also reiterated that the syllabus was

---

[18] *See* Email from Philippe Casteuble (Feb. 13, 2012, 8:13 AM), ROI at 895, ECF No. 26-8 ("I see a laundry list of activities but I still don't see how they reinforce each other or how they are linked with his teaching objectives."); Email from Philippe Casteuble to Tiemoko Coulibaly (Feb. 13, 2012, 2:57 PM), ROI at 901, ECF No. 26-8.

[19] *See* Email from Tiemoko Coulibaly (Feb. 14, 2012, 10:49 AM), ROI at 898, ECF No. 26-8 (explaining that Dr. Coulibaly only saw LTS Casteuble's comments on Dr. Coulibaly's

"just a pretext" for LTS Fyfe, Director Blake, and LTS Casteuble to "harass," to "discriminate" against, and to "retaliate against" him. Email from Tiemoko Coulibaly (Feb. 14, 2012, 10:49 AM), ROI 898–900, ECF No. 26-8. Later, LTS Casteuble explained to Dr. Coulibaly that LTS Fyfe's message was "a mass e-mail," intended to be a reminder and directed at several employees. *See* Email from Philippe Casteuble to Tiemoko Coulibaly (Feb. 14, 2012), ROI at 842–43, ECF No. 26-8.

### I. Absence from Work (February 2012–March 2012)

During this time, Dr. Coulibaly received treatment for his physical and mental health as a result of his perceived "retaliation, harassment, [and] hostile work environment." *See* Compl. ¶¶ 11–14; Letter from Willie Hamlin, M.D., to Cathy Russell (Mar. 10, 2012), Compl. Ex., ECF No. 1-1, at 1 (reporting that Dr. Coulibaly "initiated treatment for severe stress" prior to February 27, 2012). Dr. Coulibaly states that, on February 15, 2012, his primary care physician instructed him not to return to work and referred him to a psychiatrist. Compl. ¶¶ 12–13. Accordingly, beginning on February 15, 2012, Dr. Coulibaly did not go to work. *See id.* ¶ 12; Defs.' Stmt. ¶ 62; *see also* Email from Philippe Casteuble (Feb. 15, 2012, 7:49 AM), ROI at 894, ECF No. 26-8.

On March 1, 2012, Director Blake informed Dr. Coulibaly of his remaining allowance of sick leave and annual leave: "approximately 48 hours of sick leave," if Dr. Coulibaly were to return to work on March 2, 2012, and "about 96 hours of annual leave." Email from Debra Blake (Mar. 1, 2012, 12:19 PM), ROI at 892, ECF No. 26-8. FSI Human Resources Specialist Brian Springer also wrote to Dr. Coulibaly to explain the procedures for requesting advanced sick

---

syllabus at 4:40 PM the day before because LTS Casteuble sent his comments when Dr. Coulibaly was in class, and noting that Dr. Coulibaly had to leave FSI at 5:00 PM for family-related reasons).

leave, the only type of sick leave available if Dr. Coulibaly were to exhaust his remaining sick leave hours. *See* Email from Brian Springer (Mar. 2, 2012, 9:26 AM), ROI at 890–91, ECF No. 26-8; *see also* Springer Aff., ROI at 971, ECF No. 26-9 (noting HR Specialist Springer's position title at FSI). In response, Dr. Coulibaly took issue with the calculations: he claimed that, because the alleged "hostile work environment, the EEO discrimination and retaliation complaint[,] and [his] health issues" were "all connected," "any fair calculation" of his hours of sick leave and annual leave should take into account the context surrounding his sickness. Email from Tiemoko Coulibaly (Mar. 1, 2012, 1:46 PM), ROI at 891–92, ECF No. 26-8. Dr. Coulibaly also told Mr. Springer that he believed that it was "unfair" that he had lost sick and annual leave, given that he was "not responsible" for his health issues, which he felt were "direct consequences of deliberate acts of retaliation and discrimination" by his managers. Email from Tiemoko Coulibaly (Mar. 2, 2012, 11:49 AM), ROI at 888, ECF No. 26-8.

A few days later, LTS Casteuble emailed Dr. Coulibaly to find out when he planned to return to work and to clarify what type of leave Dr. Coulibaly intended to use while he was absent. *See* Email from Philippe Casteuble (Mar. 5, 2012, 4:04 PM), ROI at 887, ECF No. 26-8. Dr. Coulibaly replied that, because his absence stemmed from being sick, he would "of course use **only** sick leave." Email from Tiemoko Coulibaly (Mar. 5, 2012, 5:50 PM), ROI at 886, ECF No. 26-8 (emphasis in original). Dr. Coulibaly also asserted that he should not "have to lose any day of sick leave," because, in his view, his illness was "the direct consequence of . . . several months of illegal discrimination and retaliation" against him. *Id.*

The next day, LTS Casteuble again wrote to Dr. Coulibaly to inform him that Director Blake had been mistaken about Dr. Coulibaly's remaining sick and annual leave allowances; Dr. Coulibaly had in fact "ran completely out of sick leave" on February 23, 2012, and he had

only "68 hours of annual leave remaining" on February 24, 2012, which would cover

Dr. Coulibaly only through March 7, 2012. *See* Email from Philippe Casteuble (Mar. 6, 2012,

4:56 PM), ROI at 885, ECF No. 26-8. Accordingly, LTS Casteuble asked Dr. Coulibaly to

immediately decide whether he would apply annual leave or leave without pay ("LWOP") to

cover his continued absence. *Id.* In response, Dr. Coulibaly repeatedly emphasized that

LTS Casteuble could not "ignore" Dr. Coulibaly's discrimination and retaliation allegations and

accordingly should "focus on the law," instead of trying to enforce the "administrative rules of

[the] State Department." Email from Tiemoko Coulibaly to Philippe Casteuble (Mar. 6, 2012,

6:37 PM), ROI at 882–84, ECF No. 26-8. Dr. Coulibaly stated, therefore, that he was unable to

respond to LTS Casteuble's request: "I cannot answer your email right now since I believe it is

retaliation and also I don't feel very well . . . . The point is I am sick because of your retaliation,

[and] I cannot go to work right now." *Id.* at 883.

The next day, HR Specialist Springer responded to Dr. Coulibaly's message by

commenting that "there are Federal laws that govern the official Time and Attendance of ALL

Federal Employees." Email from Brian Springer (Mar. 7, 2012, 11:00 AM), ROI at 882, ECF

No. 26-8 (capitalization in original). HR Specialist Springer followed with a reminder that, if

Dr. Coulibaly did not provide a leave type for his ongoing absence, he would be considered

absent without official leave ("AWOL"). *See id.* Dr. Coulibaly responded by stating that, "[o]f

course, [he would] follow all federal laws for official Time and Attendance," and accordingly, he

wanted "to apply for advanced leave." Email from Tiemoko Coulibaly (Mar. 7, 2012, 1:10 PM),

ROI at 881, ECF No. 26-8.

But on Friday, March 9, 2012, HR Specialist Springer reminded Dr. Coulibaly that,

because he had not yet submitted a request for advanced leave, he was scheduled to come to

work on Monday, March 12, 2012. Email from Brian Springer (Mar. 9, 2012, 11:48 AM), ROI at 874, ECF No. 26-8. In his response, Dr. Coulibaly expressed that he was "very surprised to hear" this: "It was very clear in our messages [over the] last few days that I cannot and I won't come to work on Monday since I am requesting Leave without pay and Advance [sick] leave because of health issues." Email from Tiemoko Coulibaly (Mar. 9, 2012, 2:13 PM), ROI at 873–74, ECF No. 26-8. Dr. Coulibaly also said that he had "faxed a document" to LTS Casteuble the day before regarding leave, and that LTS Casteuble had "confirmed by email that he [had] received it." *Id.* HR Specialist Springer then explained that the leave slip that Dr. Coulibaly had submitted the day before covered only his absence "from February 13 through . . . March 9, 2012," and so Dr. Coulibaly would "need to submit another [leave] request or return to work on Monday." Email from Brian Springer (Mar. 9, 2012, 2:56 PM), ROI at 873, ECF No. 26-8. Dr. Coulibaly, however, did not submit an additional leave request until March 13, 2012. *See* Email from Tiemoko Coulibaly (Mar. 13, 2012, 2:14 PM), ROI at 872–73, ECF No. 26-8 (submitting a request for advanced sick leave and for LWOP).[20]

After receiving Dr. Coulibaly's request for advanced sick leave and LWOP, HR Specialist Springer did not immediately process Dr. Coulibaly's request. *See* Email from Brian Springer to Tiemoko Coulibaly (Mar. 13, 2012, 3:44 PM), ROI at 870–72, ECF No. 26-8.

---

[20] Defendants note that Dr. Coulibaly's leave requests did not expressly invoke the FMLA. *See* Defs.' Mem. at 11–12; *see, e.g.*, Request for Leave or Approved Absence (Mar. 8, 2012), ROI at 1315, ECF No. 26-11 (declining to check the box by which the requester would "hereby invoke [his] entitlement to Family and Medical Leave"); Request for Leave or Approved Absence (Apr. 4, 2012), ROI at 1317, ECF No. 26-11 (same). But because Defendants do not ascribe legal significance to Dr. Coulibaly's failure to invoke the FMLA, the Court will not do so either. *See* Defs.' Mem. at 16–26. *See generally* 29 C.F.R. § 825.303(b) (stating that, though an employee must "provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request," he "need not expressly assert rights under the FMLA or even mention the FMLA" when he seeks leave "for the first time for a FMLA-qualifying reason").

Instead, he told Dr. Coulibaly to "please follow [HR Specialist Springer's] instructions to request Advanced Sick leave OR LWOP," and noted that Dr. Coulibaly's doctor's note, which Dr. Coulibaly had submitted with his request, "include[d] some comments that shouldn't be there." *Id.* at 870 (capitalization in original). Dr. Coulibaly, however, refused to do so, because he felt that the doctor's note included all the required information. *See* Email from Tiemoko Coulibaly (Mar. 13, 2012, 4:59 PM), ROI at 869–70, ECF No. 26-8 (noting that "the diagnosis . . . and the time [he would] be incapacitated . . . are in the letter").

Dr. Coulibaly reports that he returned to work on March 26, 2012, following his psychiatrist's instructions. *See* Compl. ¶¶ 14, 17; *see also* Request for Advanced Sick Leave and Leave Without Pay (Mar. 26, 2012), ROI at 1326, ECF No. 26-12 ("I returned to work today March 26, 2012."). Upon his return, he also wrote a letter to Cathy Russell, a higher-level FSI manager, in which he requested "Advanced Sick Leave for 80 hours" for the period between March 12, 2012 and March 23, 2012. *See* Compl. ¶ 17; Request for Advanced Sick Leave and Leave Without Pay, ROI at 1326, ECF No. 26-12. Defendants acknowledge that Dr. Coulibaly's managers ultimately approved Dr. Coulibaly's leave for that period, despite HR Specialist Springer's initial refusal to accept Dr. Coulibaly's doctor's note.[21]

Two days later, Dr. Coulibaly submitted another leave request, this time with LTS Casteuble, for eight hours of advanced sick leave on March 29, 2012.[22] After receiving the

---

[21] *See* Defs.' Mem. at 11 (noting that Dr. Coulibaly's leave request for March 12, 2012 through March 23, 2012 was approved on April 4, 2012); *see also* Request for Leave or Approved Absence (Apr. 4, 2012), ROI at 1317, ECF No. 26-11 (showing that LTS Casteuble approved Dr. Coulibaly's requested LWOP for March 12 through March 23 on April 4, 2012).

[22] *See* Email from Philippe Casteuble (Mar. 28, 2012, 4:17 PM), ROI at 1324, ECF No. 26-12 (noting that LTS Casteuble found Dr. Coulibaly's request for advanced sick leave on his chair at 4:00 PM on March 28, 2012); *see also* Request for Leave or Approved Absence (Mar. 28, 2012), ROI at 1323, ECF No. 26-12.

request late in the day on March 28, 2012, LTS Casteuble emailed Dr. Coulibaly to tell him that LTS Casteuble lacked the authority to approve the leave request and Dr. Coulibaly had to request advanced sick leave with a different managing office. *See* Email from Philippe Casteuble (Mar. 28, 2012, 4:17 PM), ROI at 1324. LTS Casteuble informed Dr. Coulibaly that LTS Casteuble would accordingly enter the leave as "leave without pay pending . . . approval" from the other managing office. *Id.* Dr. Coulibaly then asked LTS Casteuble to "[p]lease enter the 8 hours as leave without pay pending . . . approval," and he noted that he would give LTS Casteuble "the memo" on the day after he returned. Email from Tiemoko Coulibaly (Mar. 28, 2012, 4:29 PM), ROI at 866, ECF No. 26-8. By "the memo," Dr. Coulibaly later clarified that he intended to "present a new complete request" for leave. *See* Email from Tiemoko Coulibaly (Mar. 29, 2012, 3:40 PM), ROI at 867, ECF No. 26-8.

But, on the day for which Dr. Coulibaly requested leave (March 29, 2012), Dr. Coulibaly reports that he received a call "at noon" from LTS Casteuble, who told Dr. Coulibaly that the managing office had denied the request for advanced sick leave. *Id.* In a message to LTS Casteuble, Dr. Coulibaly noted that LTS Casteuble had submitted the advanced sick leave request to FSI management against Dr. Coulibaly's wishes: "I answered by email to you [and said] that I will submit . . . the request [again] on Friday with the appropriate memo and information. So I don't understand why you presented this incomplete request to HR." *Id.* Dr. Coulibaly interpreted the incident as more evidence of retaliation and discrimination against him. *Id.* at 867–68.

That same day, Dr. Coulibaly received an email from the secretary to FSI Associate Dean James North. *See* Email from Faye Hartgrove (Mar. 28, 2012, 11:28 AM), ROI at 865, ECF No. 26-8. The email suggested that Dr. Coulibaly's leave request, purportedly submitted against

Dr. Coulibaly's wishes, had been approved. *See id.* But Supervisory HR Specialist Phuong Nguyen later clarified that the email addressed a different request for leave (the request for the period beginning March 12, 2012 and ending March 23, 2012). *See* Email from Phuong Nguyen (Apr. 5, 2012, 2:52 PM), ROI at 858–860, ECF No. 26-8. Ms. Nguyen also explained that the email only said that the Dean's office had allowed Dr. Coulibaly's leave request to be forwarded on to the Department of State official who held the authority to approve advanced sick leave requests; it did not, as Dr. Coulibaly believed, mean that the Dean's office had approved the leave request. *See id.*; *see also* Email from Faye Hartgrove (Mar. 28, 2012, 11:28 AM), ROI at 865, ECF No. 26-8 (noting that the "original documents" were forwarded on to another Department of State office).

### J. Termination (April 2012)

The next week, on April 2, 2012, FSI issued a termination letter to Dr. Coulibaly. *See* Compl. ¶ 19; Letter from Catherine Russell to Tiemoko Coulibaly (Apr. 2, 2012), ROI at 864, ECF No. 26-8 (reproducing the termination letter). The letter advised Dr. Coulibaly that FSI would terminate Dr. Coulibaly's employment on April 6, 2012, before he would have completed his one-year appointed trial period. *See* Letter from Catherine Russell to Tiemoko Coulibaly (Apr. 2, 2012), ROI at 864, ECF No. 26-8. As justification, the termination letter cited Dr. Coulibaly's "unacceptable conduct," including "inappropriate interactions with supervisors, and . . . failure to follow established procedures for requesting leave." *Id.*

### K. Procedural History

In April 2014, Dr. Coulibaly filed this action against Defendants, alleging that his termination violated the District of Columbia Accrued Sick and Safe Leave Act and Title I of the FMLA. *See* Compl. This Court previously dismissed Dr. Coulibaly's non-FMLA claim because

the Civil Service Reform Act of 1978 precludes the Court from exercising jurisdiction over that claim. *See Coulibaly v. Kerry*, 130 F. Supp. 3d 140, 146–48 (D.D.C. 2015). This Court held, however, that it has jurisdiction over Dr. Coulibaly's claim under Title I of the FMLA. *Id.* at 148–50.

The parties have now filed cross-motions for summary judgment. *See* ECF Nos. 23, 27. After filing both his motion and reply, Dr. Coulibaly moved twice to add new evidence to the record. *See* ECF Nos. 30, 35. The Court then ordered the parties to file supplemental briefing on various issues related to FMLA, and appointed Plaintiff counsel for the sole purpose of providing such briefing. *See* Order Directing Def. Submit Suppl. Br., ECF No. 36; Order Appointing Pl. Counsel Br. FMLA Issues, ECF No. 40. All motions are ripe for adjudication.[23]

### III. LEGAL STANDARD

A court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The movant bears the initial

---

[23] Because Defendants have not responded to Dr. Coulibaly's motions to add evidence within fourteen days, those motions are also ripe for adjudication. *See* D.D.C. Civ. R. 7(b) ("Within 14 days of the date of service . . . an opposing party shall serve and file a memorandum of points and authorities in opposition to the motion.").

burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See Celotex*, 477 U.S. at 324. In considering a motion for summary judgment, a court cannot make credibility determinations or weigh the evidence. *See Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007). All underlying facts and inferences must be analyzed in the light most favorable to the non-movant. *See Anderson*, 477 U.S. at 255. That said, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## IV.  ANALYSIS

### A.  Dr. Coulibaly's Eligibility Under the FMLA

The Court ordered supplemental briefing on the issue of whether Dr. Coulibaly is eligible under the FMLA, and, if so, under which title. *See* Order Directing Def. Submit Suppl. Br.; Order Appointing Pl. Counsel Br. FMLA Issues. Defendants argue that Dr. Coulibaly was "covered" by Title II of FMLA at the time he was terminated, because he was appointed to the federal service. *See* Defs.' Resp. to Ct.'s Aug. 9, 2016 Order ("Defs.' Suppl. Br.") at 1–4, ECF No. 38. Defendants further argue that even if he was not, the time that he spent as a contractor counted toward the time-in-service requirement under Title II of FMLA, thus making him eligible for Title II but ineligible for Title I. Defs.' Suppl. Br. at 4–5. Dr. Coulibaly maintains that he is eligible to maintain this action under Title I of FMLA. *See generally* Pl.'s Resp. to Ct.'s Inquiries & Suppl. Br. on FMLA Issues ("Pl.'s Suppl. Br."), ECF No. 44. The Court will first address whether Dr. Coulibaly was "covered" by Title II at the time he was terminated and

thus ineligible under Title I before turning to whether the time he spent as a contractor counts for the purpose of Title II FMLA eligibility.

In analyzing the FMLA, the Court bears in mind that "[t]he preeminent canon of statutory interpretation requires [courts] to 'presume that the legislature says in a statute what it means and means in a statute what it says there.'" *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (alteration omitted) (quoting *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–254 (1992)). Thus, the Court begins its analysis with the text, "and ends [it] there as well if the text is unambiguous." *Id.*

    1.  Dr. Coulibaly was Not "Covered" by Title II at the Time of His Termination

Congress enacted the FMLA "to entitle employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition." 29 U.S.C. § 2601(b)(2); *accord* 29 C.F.R. § 825.101(a). The FMLA allows certain employees to take up to twelve weeks of leave for several reasons, including a "serious health condition." *See* 5 U.S.C. § 6382(a)(1)(D); 29 U.S.C. § 2612(a)(1); *see also* 29 C.F.R. § 825.112(a)(4). To be entitled to that leave, an employee must meet certain qualifications. *See* 5 U.S.C. § 6381(1)(B); 29 U.S.C. § 2611(2)(A); *see also* 29 C.F.R. § 825.110(a).

The FMLA recognizes two groups of qualified "employees," defined under Title I and Title II of the FMLA. Of major relevance here, Title I allows individual plaintiffs a private right of action, but Title II does not. *See Chandler v. Bernanke*, 531 F. Supp. 2d 193, 201 (D.D.C. 2008). Both titles require qualified employees to have worked for their employers for at least one year. *See* 5 U.S.C. § 6381(1)(B); 29 U.S.C. § 2611(2)(A); *see also* 29 C.F.R. § 825.110(a).

With respect to federal employees like Dr. Coulibaly, the two categories of FMLA-qualified "employees" are mutually exclusive; Title I expressly excludes "any Federal . . . employee covered under" Title II. 29 U.S.C. § 2611(2)(B)(i). Federal employees not covered by Title II may still be covered by Title I. *See* 29 C.F.R. §§ 825.109(b)–(c); *see also Russell v. U.S. Dep't of the Army*, 191 F.3d 1016, 1018 (9th Cir. 1999). At issue here is whether Dr. Coulibaly is "covered" by Title II, and thus ineligible to maintain this action under Title I.

The first step on the pathway to answering that question is found within Title II. Title II protects "employee[s]" facing certain life events. *See* 5 U.S.C. § 6382(a). To be considered an "employee" under Title II—and thus "covered" in any respect at all—an individual must meet two requirements. *See id.* § 6381(1).[24] First, he must fit the definition of "employee" in § 6301 of Title V of the United States Code. *Id.* § 6381(1)(A). Second, he must have completed at least twelve months of service as an employee, *as defined by § 6301*. *Id.* § 6381(1)(B). Thus, before working for twelve months, an individual can be considered an "employee" under § 6301, but

---

[24] Defendants attempt to define the word "covered" as somehow pertaining to an individual not yet considered an "employee" under Title II. Such a reading simply defies the plain text of the FMLA. Title II only protects "employee[s]." *See* 5 U.S.C. § 6382(a)(1). There is no designated group of individuals mentioned in Title II other than employees. *See id.* The definition of "employee," in its entirety, reads as follows:

> (1) the term "employee" means any individual who--
> > (A) *is an "employee", as defined by section 6301(2),* including any individual employed in a position referred to in clause (v) or (ix) of section 6301(2), but excluding any individual employed by the government of the District of Columbia any individual employed on a temporary or intermittent basis, and any employee of the Government Accountability Office or the Library of Congress; *and*
> > (B) *has completed at least 12 months of service as an employee (within the meaning of subparagraph (A))* . . . .

5 U.S.C. § 6381 (emphasis added). Thus, to be "covered" by Title II in any respect, one must meet Title II's definition of "employee."

not under Title II. Section 6301 incorporates the definition of "employee" in § 2105 of Title V.

Section 2105 defines "employee" as

> an officer and an individual who is--
>> (1) *appointed* in the civil service by one of the following acting in an official capacity--
>>> (A) the President;
>>> (B) a Member or Members of Congress, or the Congress;
>>> (C) a member of a uniformed service;
>>> (D) an individual who is an employee under this section;
>>> (E) the head of a Government controlled corporation; or
>>> (F) an adjutant general designated by the Secretary concerned under section 709(c) of title 32;
>> (2) *engaged in the performance of a Federal function* under authority of law or an Executive act; *and*
>> (3) *subject to the supervision of an individual named by paragraph (1)* of this subsection while engaged in the performance of the duties of his position.

5 U.S.C. § 2105 (emphasis added). So, succinctly stated, to be eligible under Title II, an individual must (1) be (a) duly appointed, (b) engaged in the performance of a federal function, and (c) subject to supervision by an officer or an appointed individual; and (2) have completed at least twelve months in a position meeting those three requirements (appointment, engagement, and supervision). Despite their asserted differences, the parties actually seem to agree on whether Dr. Coulibaly meets each of these requirements.

Neither side disputes that Dr. Coulibaly was appointed, engaged in the performance of a federal function, and subject to applicable supervision when he began his two-year appointed term as a French instructor. *See* Defs.' Suppl. Br. at 3; Pl.'s Suppl. Br. at 2. The word "appointment" is, of course, not synonymous with employment. *See Costner v. United States*, 665 F.2d 1016, 1020–23 (Ct. Cl. 1981) ("An abundance of federal function and supervision will not make up for the lack of an appointment."). Appointment requires "an authorized appointing officer who takes an action that reveals his awareness he is making an appointment in the United States civil service, and action by the appointee denoting acceptance." *Watts v. Office of Pers.*

*Mgmt.*, 814 F.2d 1576, 1580 (Fed. Cir. 1987); *see also Nat'l Treasury Emps. Union v. Reagan*, 663 F.2d 239, 242 (D.C. Cir. 1981) ("For more than one hundred and seventy-five years, the rule as to when an appointment takes place has been clear: 'when the last act to be done by the [appointing authority] was performed . . . .'" (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 157 (1803))); *Curran v. Office of Pers. Mgmt. Bureau of Ret., Ins., & Occup. Health*, 566 F. Supp. 1511, 1514 (D.D.C. 1983), *aff'd*, 735 F.2d 617 (D.C. Cir. 1984) ("Federal employment must ultimately depend on the execution of some 'last-act' ceremony of 'appointment . . . .'" (citation omitted)).

Nor does either side contend that Dr. Coulibaly was "appointed" to any position before he accepted his appointment as a French instructor. *See* Defs.' Suppl. Br. at 3; Pl.'s Suppl. Br. at 2. As both parties acknowledge, Dr. Coulibaly's appointment began on June 19, 2011. *See, e.g.*, Defs.' Stmt. ¶ 8.

Finally, neither side argues that Dr. Coulibaly served in his appointed position for twelve months. FSI terminated Dr. Coulibaly's appointment on April 6, 2012, making the total time he served in an appointed position less than ten months. *See* Letter from Catherine Russell to Tiemoko Coulibaly (Apr. 2, 2012), ROI at 864, ECF No. 26-8. Thus, although Dr. Coulibaly's appointment may have been for a term of more than twelve months, Dr. Coulibaly did not actually complete twelve months of service. *See* 5 U.S.C. § 6381(1)(B). Thus, breaking Title II of FMLA down into its component parts, the parties agree that Dr. Coulibaly was never eligible under Title II, because the relevant definition of "employee" required him to, among other things, serve in his appointed position for at least a year. *See* 5 U.S.C. § 6381(1).

Nonetheless, Defendants argue that Dr. Coulibaly was covered by Title II for three reasons. First, they argue that Dr. Coulibaly was eligible under Title II because he met the

definition of employee set forth in 5 U.S.C. § 2105. *See* Defs.' Suppl. Br. at 2–3. This argument

overlooks the fact that Title II does not simply adopt the definition of employee from 5 U.S.C.

§ 2105, but rather incorporates it as one of two requirements for its own definition. *See* 5 U.S.C.

§ 6381(1). In addition to meeting the definition of "employee" under § 2105, an individual must

"complete[] at least 12 months of service as [such] an employee" to be eligible under Title II. *See*

*id.* As set forth above, Dr. Coulibaly did not complete the necessary 12 months of service.

Second, Defendants argue that because Dr. Coulibaly's term of appointment was for

more than one year, his only potential FMLA eligibility would be under Title II. *See* Defs.'

Mem. at 18. In support of this argument, Defendants cite to two cases suggesting that a federal

employee with an appointment of a year or more falls under Title II: *Moynihan v. Gutierrez* and

*Sutherland v. Bowles*.[25] *See* Defs.' Mem. at 16–18. Neither of these cases applies here.

In *Moynihan v. Gutierrez*, the plaintiff sued under Title II, not Title I. 2007 WL 2885342,

*3 (E.D. Mo. Sept. 27, 2007). As a result, the Eastern District of Missouri emphasized that the

---

[25] Defendants also cite to two similar cases in passing. *See* Defs.' Mem. at 18. Neither applies here.

In *Sullivan-Obst v. Powell*, 300 F. Supp. 2d 85 (D.D.C. 2004), the court noted that it was "undisputed" that the plaintiff fell under Title II because of "the State Department employed [her] for more than twelve months." *Sullivan-Obst*, 300 F. Supp. 2d at 99. Without addressing any argument that the plaintiff worked for less than twelve months, the court simply reaffirmed the lack of a private right of action under Title II. *See id.*

Likewise, in *Keen v. Brown*, 958 F. Supp. 70 (D. Conn. 1997), the court addressed the FMLA claim brought by a plaintiff "employed by the VA Medical Center for 13 years," without addressing any argument that the plaintiff had not served as a federal "employee" for less than twelve months. *See Keen*, 758 F. Supp. at 71–72 (noting the plaintiff's concession that Title II, not Title I, applied to her case). In doing so, the court merely interpreted Title II of the FMLA to preclude an implied right of action, just as this Court held in its prior opinion. *See id.* at 73–75; *cf. Coulibaly*, 130 F. Supp. 3d at 149, 151 n.12 (holding that a Title II claim "would be barred by sovereign immunity" and that "Title II does not create an implied right of action").

Both *Sullivan-Obst* and *Keen* are consistent with the Court's prior conclusion relating to Title II of the FMLA, but they do not address the question at hand: whether Dr. Coulibaly is eligible for relief under *Title I* of the FMLA.

plaintiff was "a Title II employee, and the parties [did] not dispute this classification." *Id.* Just as this Court recognized earlier in this case, the *Moynihan* court ultimately held that Title II does not provide a private right of action. *See Coulibaly*, 130 F. Supp. 3d at 151 n.12; *Moynihan*, 2007 WL 2885342, at *3. Because Dr. Coulibaly brings his FMLA claim under Title I, not Title II, *Moynihan* is inapplicable.

*Sutherland v. Bowles*, No. 94-71570, 1995 WL 367937 (E.D. Mich. Jan. 17, 1995), is also inapplicable. *See* Defs.' Mem. at 17–18 (citing *Sutherland*). There, the plaintiff argued that, as a temporary employee, he fell into an exception under Title II of the FMLA, which provides that "any individual employed on a temporary or intermittent basis" is not an "employee" under Title II of the FMLA. *Sutherland*, 1995 WL 367937, at *2. The *Sutherland* court concluded that the plaintiff had demonstrated only "that he held a temporary *appointment*, not that he was a temporary *employee* for the purposes of the FMLA." *Id.* The *Sutherland* court concluded that Title II of the FMLA applied to the plaintiff there, because the plaintiff had not shown that he was a temporary employee. *Id. Sutherland* did not address the situation where a plaintiff, like Dr. Coulibaly, is appointed to a term of over a year, but serves less than a year of that term. *See id.* Here, by contrast, no one argues that Dr. Coulibaly is excluded from Title II coverage because he is a temporary or intermittent employee. Dr. Coulibaly simply argues that he is not covered by Title II because he did not complete twelve months as an appointed employee, and thus did not meet the twelve-month time-in-service requirement.[26]

---

[26] *See* Defs.' Mem. at 2–3, 13 (acknowledging that Dr. Coulibaly's appointment began June 19, 2011 and was terminated on April 6, 2012, a period of less than twelve months); Letter from Swati Limaye to Tiemoko Coulibaly (May 27, 2011), Compl. Ex., ECF No. 1-1, at 113 (stating that the two-year appointment would become effective June 19, 2011); Letter from Catherine Russell to Tiemoko Coulibaly (Apr. 2, 2012), ROI at 864, ECF No. 26-8 (stating that Dr. Coulibaly's termination was effective April 6, 2012).

Defendants' final argument relating to whether Dr. Coulibaly is "covered" by Title II is that Dr. Coulibaly's claim that he was "a federal employee for over thirteen years for purposes of the FMLA" would "push[] him into Title II and out of Title I." Defs.' Mem. at 18–20; *accord* Defs.' Reply at 5–7. Defendants acknowledge that Dr. Coulibaly was not appointed until June 19, 2011, but note that he originally joined FSI in 1999 and worked as a contractor for "a little under twelve years" before his appointment. *See* Defs.' Stmt. ¶¶ 1–5; *see also* Compl. ¶ 4; De Launay-Fogg Aff., ROI at 1375, ECF No. 26-12. During this period, however, FSI did not employ Dr. Coulibaly through a formal appointment, but instead "under BPAs lasting around one year each." Defs.' Stmt. ¶ 2; *see, e.g.*, BPA Contract Modification, Pl.'s Mot. Summ. J. Ex. A, ECF No. 23-1, at 111–22. Defendants nonetheless contend, in the alternative from their arguments above, that the Court should include Dr. Coulibaly's time as a contractor in the calculation of Dr. Coulibaly's time-in-service under Title II's employee definition. Defs.' Mem. at 18–20; Defs.' Reply at 5–7.

In support of their argument, Defendants cite *Ibrahim v. Defense Language Institute Foreign Language Center*, which held that time spent working under a series of contracts can count toward Title II "employment" in certain circumstances. Defs.' Mem. at 19–20; 2015 WL 7272750, *3 (N.D. Cal. Nov. 18, 2015),. But in *Ibrahim* the plaintiff did not argue that he failed to meet the requirements for an employee under Title II. *See* 2015 WL 7272750, at *3. Instead, he claimed that, like the plaintiff in *Sutherland*, as a contractor, he fell into the Title II exception for individuals "employed on a temporary or intermittent basis." *Id.* (citing 5 U.S.C. § 6381(1)). In fact, *Ibrahim* neither cites to nor discusses the statutory requirements of appointment, function, or supervision under Title II. *See generally id.* Defendants do not provide any authority or evidence suggesting that, in light of Title II's appointment, function, and supervision

requirements for "employees," an individual's prior non-appointment work could be considered "employment" within the meaning of Title II. *See* Defs.' Mem. at 18–21; Defs.' Reply at 5–7.[27] The Court thus concludes that, because Dr. Coulibaly was not an appointed "employee" under Title II for at least twelve months, Title II of the FMLA does not apply to him.[28]

### 2. Genuine Issues of Material Fact Remain As to Whether Dr. Coulibaly Is Eligible Under Title I of the FMLA

The remaining issue with respect to FMLA eligibility is whether Dr. Coulibaly meets the time-in-service requirement under Title I. Plaintiff contends that he does, because as a matter of "economic reality" he was an employee when he was an independent contractor from 1999 until his two-year appointment. Pl.'s Suppl. Br. at 7–9.

As discussed above, to be considered an "eligible employee" under Title I, an individual must have been employed "for at least 12 months by the employer with respect to whom leave is requested" and must have worked "for at least 1,250 hours of service with such employer." 29 U.S.C. § 2611(2)(A). The "employer" from whom the employee requests leave "includes any 'public agency,'" which is defined in part as "the Government of the United States" or "any agency of the United States." 29 U.S.C. § 2611(4)(A)(iii); *id.* § 203(x).

---

[27] Defendants also mistakenly rely on *Berg v. McHugh*, No. 15-2227, 2015 WL 9024622 (N.D. Cal. Dec. 16, 2015), which cites *Ibrahim* approvingly. *See* Defs.' Reply at 6. The court in *Berg* examined whether plaintiff, as an employee for the Army's Nonappropriated Fund Instrumentalities ("NAF"), qualified as an employee under Title II of the FMLA. *Berg*, 2015 WL 9024622, at *1, *7. Because a statute expressly states that NAF employees are employees under Title II of the FMLA, *Berg* concluded that Title II covered NAF employees. *See id.* at *7–8 (citing 5 U.S.C. § 2105(c)(1)(E)); *see also* 5 U.S.C. § 2105(c)(1)(E) (stating that NAF employees fall under Title II's employee definition). Because the parties have not asserted that a similar statute governs Dr. Coulibaly's case, *Berg* is inapplicable to the Court's analysis here.

[28] Because the Court finds that Dr. Coulibaly does not meet Title II's twelve-month appointment requirement, the Court need not determine whether Dr. Coulibaly meets Title II's function and supervision requirements. *See* 5 U.S.C. §§ 2105(a)(2)–(a)(3).

The word "employee" has "the same meaning[]" as under 29 U.S.C. § 203(e), which defines "employee" for purposes of the Fair Labor Standards Act ("FLSA"). 29 U.S.C. § 2611(3); *see also* 29 C.F.R. § 825.110(c). As this Court discussed in its previous opinion, courts "have determined 'employee' status under the FLSA by looking to 'economic reality' rather than 'technical concepts' and examining 'the extent to which typical employer prerogatives govern the relationship between the putative employer and employee.'" *Coulibaly*, 130 F. Supp. 3d at 151 (quoting *Morrison v. Int'l Programs Consortium, Inc.*, 253 F.3d 5, 11 (D.C. Cir. 2001)). In short, although Dr. Coulibaly's time spent working as a contractor at FSI before his appointment does not qualify as "employment" under Title II, it may still count under Title I if in "economic reality" he was an employee of the government. *Compare Morrison*, 253 F.3d at 11 (requiring courts to "look at the totality of the circumstances" under the FLSA "employee" definition, which Title I incorporates), *with Costner*, 665 F.2d at 1020 (rejecting the "totality of the circumstances" approach for Title II's "employee" definition).

To determine whether an individual is an employee as a matter of economic reality, the *Morrison* court held that courts must "look at the totality of the circumstances" and consider factors such as "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Morrison*, 253 F.3d at 11 (quoting *Henthorn v. Dep't of Navy*, 29 F.3d 682, 684 (D.C. Cir. 1994)). Although the existence of an explicit contractual relationship may be relevant under this test, it is far from dispositive. *See Redd v. Rubin*, 34 F. Supp. 2d 1, 6 (D.D.C. 1998); *see also Kimbrel v. DEA Corp.*, 2016 WL 7799340, at *5 (E.D. Tenn. Aug. 2, 2016). Indeed, "[n]o one factor standing alone is dispositive." *Morrison*, 253 F.3d at 11. "The existence and degree of each

factor" "is a question of fact, while the legal conclusion to be drawn from these facts—whether workers are employees or independent contractors—is a question of law." *McGuiggan v. CPC Int'l, Inc.*, 84 F. Supp. 2d 470, 480 (S.D.N.Y. 2000) (quoting *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988)).

Defendants do not dispute that Dr. Coulibaly's service after his June 19, 2011 appointment applies toward Title I's time-in-service requirements. *See* Defs.' Mem. at 16–21 (failing to make any argument about whether Dr. Coulibaly qualifies as an employee under Title I of the FMLA); *id.* at 20 (urging the Court, in addressing Title II of the FMLA, to "consider [Dr. Coulibaly] a federal employee . . . for the entire time he worked as a contractor"). But Plaintiff does not claim that he worked for a year in the appointed position. *See* Pl.'s Suppl. Br. at 2–3. The critical question, then, is whether the time that Dr. Coulibaly spent working at FSI before his June 19, 2011 appointment satisfies the economic reality test; if it does—and the Department of State was actually his "employer," *see* 29 U.S.C. § 2611(4)(A)(iii); *id.* § 203(x)— then the years Dr. Coulibaly spent as an FSA contractor, like the time after the June 19, 2011 appointment, was also time in service under Title I's definition of "employee." *See* 29 U.S.C. § 2611(2); *Morrison*, 253 F.3d at 11. If so, then Dr. Coulibaly would easily meet the one-year time-in-service requirement in Title I.

Defendants argue that Dr. Coulibaly was not an employee as a matter of economic reality, because the BPAs were explicitly issued to Dr. Coulibaly as a "contractor," *see e.g.*, BPA Contract Modification, Pl.'s Mot. Summ. J. Ex. A at 111–22, ECF No. 23-1, and Dr. Coulibaly's formal change from working under BPAs to federal service must have had some meaning. Defs.' Suppl. Br. at 9–10. Dr. Coulibaly claims that he satisfies the time-in-service required under Title I because he was on the "agency payroll for many years during the period 1999 to 2012 and

worked under the total control of the agency without interruption during thirteen years." Pl.'s Mem. at 20, ECF No. 23; *see also* Compl. ¶ 84 (claiming that Dr. Coulibaly "worked continuously . . . for the last 12 months" and "worked at least 1250 hours over the last 12 months"). In support of his claim, Dr. Coulibaly filed the BPA contracts he had with FSI. *See, e.g.*, BPA Contract Modification. These contracts show that there is, at least, a genuine dispute of material fact about whether Dr. Coulibaly was, in "economic reality," an FSI employee.

Although they identified Dr. Coulibaly as an independent contractor, the BPAs gave FSI control over Dr. Coulibaly's work schedule and conditions. *See, e.g.*, *id.* at 118–19 (providing the class schedule and stating that Dr. Coulibaly was "expected to carry out instructions received from [the Government Technical Monitor]"). *See generally Thompson v. Linda And A., Inc.*, 779 F. Supp. 2d 139, 148 (D.D.C. 2011) (holding that such factors showed "a significant degree of control," which "weigh[ed] in favor of plaintiffs' employee status"). They also gave FSI the power to hire and fire Dr. Coulibaly, *see, e.g.*, BPA Contract Modification at 120–21 (stating that Dr. Coulibaly "[could] be terminated from task order without discussion"), and the ability to govern the rate and method of Dr. Coulibaly's payment, *see, e.g.*, *id.* at 119–20, 127–28. *See generally Ventura v. Bebo Foods, Inc.*, 738 F. Supp. 2d 1, 6 (D.D.C. 2010) (holding that a defendant who possessed "the power to hire and fire, control work schedules and supervise employees, determine pay rates, and maintain employment records" was an FLSA employer). The BPA itself is, of course, an example of a record that FSI maintained for Dr. Coulibaly's employment. *See Ventura*, 738 F. Supp. 2d at 6 (noting that maintenance of records helps to demonstrate an employer's "operational control"). Considering "the totality of the circumstances," *Morrison*, 253 F.3d at 11, a reasonable juror could find that Dr. Coulibaly's time under the BPAs as a contractor was "employment" under the economic reality test.

Indeed, Defendants do not directly contest the notion that Dr. Coulibaly's time spent working under BPAs would be "employment" under the economic reality test. If anything, Defendants suggest that there was no meaningful difference between Dr. Coulibaly's work as a contractor and as an appointed employee; they acknowledge that when Dr. Coulibaly "commenced a two-year Excepted Service appointment," he was "performing substantially the same duties as he had while a contractor." Defs.' Mem. at 2. But, as Defendants point out, the BPAs did identify Dr. Coulibaly as a contractor, explicitly stating that "[a]wardees of a [BPA] are not civil service or Foreign Service employees of the United States Government, and . . . should not identify themselves as Government employees either orally or in writing." BPA Contract Modification at 120. Such labels are not, however, dispositive. *See Redd*, 34 F. Supp. 2d at 6. Thus, because genuine issues of material fact remain regarding Dr. Coulibaly's eligibility under Title I, the Court cannot grant summary judgment for either side on the question of whether Title I applies to Dr. Coulibaly. *See McGuiggan*, 84 F. Supp. 2d at 480.

### B. Dr. Coulibaly's Retaliation Claim Under Title I of the FMLA

The Court thus turns to the merits of Dr. Coulibaly's FMLA claim against Defendants.[29] The Court first outlines the applicable law, and then addresses each side's motion in turn.

_____

[29] The Court notes that Title I's antiretaliation provision likely applies not just in cases involving retaliation against FMLA-covered employees, but also in cases involving retaliation against any individual who opposes practices that the FMLA makes unlawful. *See* 29 U.S.C. § 2615 ("It shall be unlawful for any employer to discharge or in any other manner discriminate against any *individual* for opposing any practice made unlawful by [Title I of the FMLA]." (emphasis added)); 29 C.F.R. § 825.220(e) ("Individuals, and not merely employees, are protected from retaliation for opposing . . . any practice which is unlawful under the Act."). However, Title I may only provide a cause of action for FMLA-eligible employees. *See* 29 U.S.C. § 2617(a)(1), (2) (stating that employers who violate Title I "shall be liable to any *eligible employee* affected" (emphasis added) and that plaintiffs suing under this section must bring suit on behalf of "the employees"); *cf. Smith v. BellSouth Telecomms., Inc.*, 273 F.3d 1303, 1305–06 (11th Cir. 2001) (explaining that only employees may bring suit, but holding that former

1. Governing Principles

Title I of the FMLA contains two distinct causes of action for aggrieved employees: (1) an "interference" claim under 29 U.S.C. § 2615(a)(1), which the employee may bring when an employer has "interfere[d] with, restrain[ed], or den[ied] the exercise of or the attempt to exercise" an employee's rights under the FMLA, and (2) a "retaliation" claim under § 2615(a)(2), which the employee may bring when an employer has "discharge[d] or in any other manner discriminate[d] against" the employee for engaging in conduct protected by the FMLA. Dr. Coulibaly sues under § 2615(a)(2), alleging that Defendants retaliated against him after he exercised his FMLA-protected rights.[30]

The D.C. Circuit has adopted the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), for FMLA retaliation claims. *See Gordon v. U.S. Capitol Police*, 778 F.3d 158, 161 (D.C. Cir. 2015). Under *McDonnell Douglas*, the plaintiff has the initial burden of production to establish a prima facie case of retaliation. 411 U.S. at 802. If he does so, the burden shifts, meaning the employer must articulate a legitimate, non-retaliatory reason for its action. *Id.* If the employer is successful in doing so, the plaintiff must show that the employer's reason was pretextual. *See id.* at 803–04; *see also Gordon*, 778 F.3d at 161. To

---

employees also qualify as employees); *Duckworth v. Pratt & Whitney, Inc.*, 152 F.3d 1, 4–11 (1st Cir. 1998) (same). Because Defendants do not raise the issue of whether Plaintiff's FMLA retaliation suit is dependent on his Title I eligibility, the Court does not address it further.

[30] As Defendants correctly note, Dr. Coulibaly did not plead a claim for interference in his complaint. *See* Defs.' Mem. at 22; Compl. ¶¶ 92–94 (alleging only a retaliation claim); *see also Coulibaly*, 130 F. Supp. 3d at 154 n.15 (noting that "Dr. Coulibaly's complaint styles his claim as one for 'retaliation' under the FMLA, not 'interference.'"). Although Dr. Coulibaly now raises an interference claim in his motion, *see* Pl.'s Mem. at 29–30, he has not moved to amend his complaint under Federal Rule of Civil Procedure 15(a). The Court therefore will not address the interference claim because his complaint did not allege an interference claim nor allege damages flowing from any interference. *See District of Columbia v. Barrie*, 741 F. Supp. 2d 250, 263 (D.D.C. 2010) ("[A] party may not amend its complaint or broaden its claims through summary judgment briefing.").

establish a prima facie case of FMLA retaliation, Dr. Coulibaly must show (1) that he "engaged

in a protected activity under this statute"; (2) that he "was adversely affected by an employment

decision"; and (3) that "the protected activity and the adverse employment action were causally

connected." *Gordon*, 778 F.3d at 161 (quoting *Geklen v. Democratic Cong. Campaign Comm.,

Inc.*, 199 F.3d 1365, 1368 (D.C. Cir. 2000)). To prove the third element (causation), Dr.

Coulibaly "must demonstrate that retaliation was not just a mere factor among many, but the

determinative factor or real and true reason behind the adverse action." *Roseboro v. Billington*,

606 F. Supp. 2d 104, 110 (D.D.C. 2009) (internal quotation marks omitted) (quoting *Provencher

v. CVS Pharmacy, Div. of Melville Corp.*, 145 F.3d 5, 10 (1st Cir. 1998)).[31]

---

[31] Although this articulation of the FMLA causation requirement derives from the causation requirement for Title VII cases, *see Provencher*, 145 F.3d at 9–10 (discussing causation in the Title VII retaliation context), courts in this district routinely use it in the FMLA context. *See, e.g.*, *Miles v. Howard Univ.*, 83 F. Supp. 3d 105, 123 (D.D.C. 2015), *aff'd*, No. 15-7027, 2016 WL 3545192 (D.C. Cir. June 14, 2016); *Holloway v. D.C. Gov't*, 9 F. Supp. 3d 1, 8 (D.D.C. 2013). And even though the FMLA's antiretaliation provision does not precisely mirror the Title VII antiretaliation provision, the D.C. Circuit has emphasized the similarities in the statutory text and has accordingly required a "causal[] connect[ion]" between the "protected activity" and "the adverse employment action." *Gordon*, 778 F.3d at 161 (quoting *Geklen*, 199 F.3d at 1368). *Compare* 29 U.S.C. § 2615(a)(2) ("It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual *for* opposing any practice made unlawful by [the FMLA]." (emphasis added)), *with* 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer . . . to discriminate against any individual . . . *because* he has opposed any practice made an unlawful employment practice by [Title VII] . . . ." (emphasis added)). *See generally Gordon*, 778 F.3d at 161 (comparing the two provisions and confirming the idea that the FMLA antiretaliation provision "is intended to be construed in the same manner" as the Title VII antiretaliation provision (internal quotation marks omitted) (quoting S. Rep. No. 103-3, at 34–35 (1993)).

Moreover, the FMLA, unlike Title VII in discrimination cases, does not explicitly prescribe a lower causation standard. *See* 42 U.S.C. § 2000e-2(m) (stating that, to prove Title VII discrimination, the complaining party need only show that "race, color, religion, sex, or national origin was a *motivating factor* for any employment practice, even though other factors also motivated the practice" (emphasis added)). The Court accordingly adopts the "determinative factor" requirement embraced in *Roseboro. See* 606 F. Supp. 2d at 110 (quoting *Provencher*, 145 F.3d at 10).

In *Brady v. Office of Sergeant at Arms*, the D.C. Circuit clarified this process and held that in the Title VII context, "where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision," the district court need only determine whether "the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee." 520 F.3d 490, 494 (D.C. Cir. 2008). Courts in this district have applied this principle to FMLA retaliation claims as well. *See, e.g.*, *Holloway*, 9 F. Supp. 3d at 9; *Deloatch v. Harris Teeter*, 797 F. Supp. 2d 48, 60 (D.D.C. 2011); *see also Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009) (applying *Brady* to Title VII retaliation claims). Once the employer asserts a legitimate, non-retaliatory reason for its adverse employment action, the Court must determine "whether the jury could infer [retaliation] from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of [retaliation] that may be available to the plaintiff." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc); *see Butler v. D.C. Hous. Fin. Agency*, 593 F. Supp. 2d 61, 68–69 (D.D.C. 2009) (applying *Aka*'s approach to FMLA claims); *see also Brady*, 520 F.3d at 495 & n.3 (noting that plaintiffs can "attempt to demonstrate that the employer is making up or lying about the underlying facts that formed the predicate for the employment decision" or point to "changes and inconsistencies in the stated reasons for the adverse action" and "the employer's failure to follow established procedures or criteria," among other things).

The parties in this case have yet to conduct discovery, and that typically, "summary judgment may not be granted until 'all parties have "had a full opportunity to conduct discovery."'" *United States ex rel. Folliard v. Gov't Acquisitions, Inc.*, 764 F.3d 19, 25 (D.C.

Cir. 2014) (internal quotation marks omitted) (quoting *Convertino v. U.S. Dep't of Justice*, 684 F.3d 93, 99 (D.C. Cir. 2012)). This principle is particularly relevant in employment discrimination cases, where there are "substantial interests served by a fair and complete judicial fact-finding process, replete with the tools of discovery and compulsory process." *Hackley v. Roudebush*, 520 F.2d 108, 149 (D.C. Cir. 1975); *see, e.g.*, *Chappell–Johnson v. Powell*, 440 F.3d 484, 488 (D.C. Cir. 2006) (noting that, in the Title VII context, summary judgment is "especially inappropriate at [the pre-discovery] stage," because "discovery may even uncover direct evidence of discrimination, thus entirely eliminating the need to prove a prima facie case"); *see also Ikossi v. Dep't of Navy*, 516 F.3d 1037, 1045 (D.C. Cir. 2008) (applying *Hackley* and *Chappell–Johnson* in a "mixed case" appeal involving FMLA and Civil Service Reform Act claims). Therefore, summary judgment at this stage is disfavored unless the plaintiff "fail[s] to provide any persuasive reason for needing discovery" and "the evidence is 'so one-sided that one party must prevail as a matter of law.'" *Dunning v. Quander*, 508 F.3d 8, 10–11 (D.C. Cir. 2007) (quoting *Twist v. Meese*, 854 F.2d 1421, 1428 (D.C. Cir. 1988)).

### 2. Defendants' Motion for Summary Judgment

Defendants contend that Dr. Coulibaly's termination was not retaliatory, but the result of Dr. Coulibaly's "inability to satisfy basic requirements of his position, his disruptive and combative nature in the workplace, and his failure to follow proper leave procedures when he unilaterally chose to quit coming to work." Defs.' Mem. at 21. Specifically, Defendants claim that Dr. Coulibaly (1) "was unable to consistently put together a lesson plan"; (2) "failed repeatedly to submit required weekly syllabi"; (3) "disrupted a mandatory lesson planning training session"; and (4) "despite failing to complete his weekly syllabus on time for an extended period, became irrationally furious with supervisors when requested to do so." *Id.* at 23

(emphases omitted). Defendants also claim that Dr. Coulibaly failed to follow FSI's leave policy and was absent without leave, which Defendants claim was "another reason to terminate his employment." *Id.* at 14. Defendants have therefore asserted "legitimate, [non-retaliatory] reason[s] for the decision" to terminate Dr. Coulibaly's employment. *Brady*, 520 F.3d at 494. Whether Defendants are entitled to summary judgment, then, turns on whether there is sufficient evidence in the record to "create[] a material dispute on the ultimate issue of retaliation," *Jones*, 557 F.3d at 679, or, at least, whether Dr. Coulibaly is entitled to discovery to explore these issues, *see Chappell–Johnson*, 440 F.3d at 488.

This Court previously noted that "Dr. Coulibaly has proffered considerable evidence that might very well establish a prima facie case under Title I." *Coulibaly*, 130 F. Supp. 3d at 155. Specifically, "Dr. Coulibaly's evidence show[ed] that his termination came only a few days after he returned from medical leave" and that "one of the proffered reasons was his 'failure to follow established procedures for requesting leave.'" *Id.*; *see Gordon*, 778 F.3d at 161 (citation omitted) (noting that an FMLA retaliation claim requires the plaintiff to show (1) that he "engaged in a protected activity under this statute," (2) that he "was adversely affected by an employment decision," and (3) that "the protected activity and the adverse employment action were causally connected"). Now, on summary judgment, Dr. Coulibaly cites to considerable additional evidence that further calls into question Defendants' actions, entitling Plaintiff to pursue these issues during discovery.

First, with respect to Defendants' performance-based reasons for his termination, Dr. Coulibaly argues that his alleged "inability to satisfy basic requirements of his position," Defs.' Mem. at 21, actually resulted from FSI management's perpetual use of pretextual reasons to harass Dr. Coulibaly in retaliation for his protected EEO and FMLA activities, *see* Pl.'s Reply

at 8–42. Along these lines, Dr. Coulibaly claims that, in actuality, he was "constantly praised by his student[s] during [his] thirteen years" as an FSI instructor. *Id.* at 9. In support, Dr. Coulibaly provides affidavits from his former colleagues that support his position.[32] And discovery may validate Dr. Coulibaly's claim that his managers held him to different expectations as compared to other FSI employees—a claim that would also undermine Defendants' performance-based reasons for terminating Dr. Coulibaly. *See* Email from Tiemoko Coulibaly (Dec. 15, 2011, 5:35 PM), ROI at 785–86, ECF No. 26-7 (noting "the different standards" used for Dr. Coulibaly, as compared to another teacher). Dr. Coulibaly also notes that Defendants' "performance based reasons [for terminating him] were never mentioned in the official termination letter of April 2, 2012." Pl.'s Reply at 8; *see Brady*, 520 F.3d at 495 n.3 (noting that "changes and inconsistencies in the stated reasons for the adverse action" can be used to rebut the employer's stated legitimate reason).[33]

---

[32] *See, e.g.*, Cazeau Aff., ROI at 1339, ECF No. 26-12 ("Dr[.] Coulibaly . . . maintained a positive attitude toward his students and colleagues. He kept treating his supervisor professionally."); Smith Aff., ROI at 1365, ECF No. 26-12 ("Dr. Coulibaly is known as one of the best teachers and was often selected to teach Ambassadors assigned overseas."); De Launay-Fogg Aff., ROI at 1375, ECF No. 26-12 ("Dr. Coulibaly was considered . . . an outstanding teacher . . . .").

These affidavits were produced in the EEO investigation initiated by Dr. Coulibaly in November 2011. *See* Compl. ¶¶ 2, 8–9. They remain relevant, however, in this FMLA action as evidence to undermine Defendants' stated reason for Dr. Coulibaly's termination.

[33] *Compare* Letter from Catherine Russell to Tiemoko Coulibaly (Apr. 2, 2012), ROI at 864, ECF No. 26-8 (stating in Dr. Coulibaly's termination letter that FSI planned to terminate Dr. Coulibaly for "inappropriate interactions with [his] supervisors" and "failure to follow established procedures for requesting leave"), *with* Defs.' Mem. at 23 (stating that the Department of State terminated Dr. Coulibaly because he "was unable to consistently put together a lesson plan"; "failed repeatedly to submit required weekly syllabi"; "disrupted a mandatory lesson planning training session"; and "despite failing to complete his weekly syllabus on time for an extended period, became irrationally furious with supervisors when requested to do so." (emphases omitted)).

Second, Dr. Coulibaly also provides evidence to dispute the claim that he "disrupted a mandatory lesson planning training session." Defs.' Mem. at 23; *see* Pl.'s Reply at 7. He refers to the affidavit of Elder Cazeau, a former colleague. Pl.'s Reply at 7; *see* Cazeau Aff., ROI at 1339. In contrast to Defendants' claim that Dr. Coulibaly disrupted the meeting, *see* Defs.' Mem. at 8–9, Mr. Cazeau claimed that Dr. Coulibaly "was publicly humiliated and silenced by his supervisor[,] who told [Dr. Coulibaly] that he could not use the meeting as a platform to air his personal issues and discuss his personal situation," Cazeau Aff., ROI at 1339–40.

Third, with respect to Defendants' claim that Dr. Coulibaly failed to follow proper procedures for requesting leave, Defendants point to only one leave request for which Dr. Coulibaly allegedly failed to follow proper procedures and which FSI management ultimately denied. *See* Defs.' Mem. at 11–14 (stating that FSI management denied Dr. Coulibaly's request for eight hours of advanced sick leave to be applied on March 29, 2012, and arguing that Dr. Coulibaly failed to follow established procedures for requesting those eight hours of leave). But the record suggests that, with respect to that leave request, Dr. Coulibaly realized his procedural mistake, intended to correct the mistake, and communicated his intentions to his supervisor—who nonetheless chose to forward the incomplete request to FSI management.[34] Moreover, the timing of Dr. Coulibaly's termination—which occurred only days

To the extent that the phrase "inappropriate interactions with . . . supervisors" raises a distinct performance-based reason for Dr. Coulibaly's termination, evidence makes that reason suspect as well. As noted above, one of Dr. Coulibaly's former colleagues stated that Dr. Coulibaly "kept treating his supervisor professionally" during the conflict between Dr. Coulibaly and FSI management. Cazeau Aff., ROI at 1339. And one of Dr. Coulibaly's former supervisors, Russell Richards, stated that he disagreed with other FSI supervisors and that he "found Dr. Coulibaly to be committed, capable, and willing to adapt and change to meet student needs." Richards Aff., ROI at 1367, ECF No. 26-12.

[34] *See* Email from Tiemoko Coulibaly (Mar. 29, 2012, 3:40 PM), ROI at 867–68, ECF No. 26-8 ("I answered by email to you [and said] that I will submit . . . the request [again] on

after he allegedly failed to follow appropriate procedures for requesting leave—calls Defendants' leave-based reasons for termination into doubt. *See* Letter from Catherine Russell to Tiemoko Coulibaly (Apr. 2, 2012), ROI at 864, ECF No. 26-8 (terminating Dr. Coulibaly a few days after his LTS Casteuble submitted a leave request on Dr. Coulibaly's request on March 28, 2012). On this record, a juror could reasonably infer that, by the time Dr. Coulibaly failed to follow appropriate leave procedures, Dr. Coulibaly's employers had already decided that he would be terminated.

Fourth, evidence also undermines Defendants' argument that, because FSI management later denied Dr. Coulibaly's leave request with respect to March 29, 2012, Dr. Coulibaly's failure to report to work that day resulted in him being absent without leave ("AWOL"), which Defendants claim was "another reason to terminate his employment." Defs.' Mem. at 13–14. Not only does some evidence imply FSI actually approved Dr. Coulibaly's request to take leave on March 29, 2012, *see* Email from Faye Hartgrove (Mar. 28, 2012, 11:28 AM), ROI at 865, ECF No. 26-8 ("Your memo is approved . . . ."), but Defendants' argument also suffers from the same flaw as the argument that Dr. Coulibaly's leave request was improper in the first place: LTS Casteuble submitted Dr. Coulibaly's leave request prematurely, when it was "incomplete," which may be the reason for any later denial of the request and any resulting unauthorized absence. *See* Email from Tiemoko Coulibaly to Philippe Casteuble (Mar. 29, 2012, 3:40 PM),

---

Friday with the appropriate memo and information. So I don't understand why you presented this incomplete request to HR."); *see also* Email from Tiemoko Coulibaly to Philippe Casteuble (Mar. 28, 2012, 4:29 PM), ROI at 866, ECF No. 26-8 (stating that Dr. Coulibaly would "give [LTS Casteuble] the memo Friday").

ROI at 867–68, ECF No. 26-8.[35] At a minimum, this dispute raises genuine issues of material fact that the parties should explore in discovery.

Having canvassed all of Defendants' asserted non-retaliatory reasons for terminating Dr. Coulibaly and the evidence on record, the Court determines that significant issues have been raised with respect to all of them. In light of the principle that summary judgment is disfavored at the pre-discovery stage, *see Chappell-Johnson*, 440 F.3d at 488, and because genuine issues of material fact remain to be explored in discovery, the Court will deny Defendants' motion for summary judgment.

The Court notes that Defendants could still show that FMLA retaliation was not the cause of Dr. Coulibaly's termination. Indeed, Dr. Coulibaly himself alleges that FSI may have terminated him because of a number of reasons other than FMLA retaliation.[36] Nonetheless, on

---

[35] Additionally, the record suggests that Dr. Coulibaly may have gone back to work on March 29, 2012 after finding out about the fact that he was absent without leave. *See* Email from Tiemoko Coulibaly to Philippe Casteuble (Mar. 29, 2012, 3:40 PM), ROI at 867 (stating that, having been informed at noon that FSI management had denied his request for advanced sick leave, Dr. Coulibaly would "be at FSI" that day).

[36] For instance, Dr. Coulibaly claims that FSI terminated him, at least in part, because of his EEO complaint. *See, e.g.*, Pl.'s Reply at 23 (claiming that "the real reason of the termination" was Dr. Coulibaly's "*EEO* and FMLA activities" (emphasis added)); *id.* at 30–42 (stating that FSI fired Dr. Coulibaly "because of his EEO protected activities"). If Dr. Coulibaly can establish that FSI terminated his employment because of his EEO complaint, then that conclusion would certainly buttress the Title VII claims that Dr. Coulibaly made in his other action against Defendants. *See supra* note 9. But that conclusion would also cut against Dr. Coulibaly's claim that his termination was "causally connected" to the exercise of his FMLA rights. *See Gordon*, 778 F.3d at 161. And the fact that Dr. Coulibaly's protected Title VII activities occurred before his FMLA-protected activities also undermines the notion that FSI terminated him because of those activities. *See generally supra* Parts II.C–I (explaining the timeline of events that occurred before Dr. Coulibaly's termination).

Dr. Coulibaly also alleges other possible reasons for his termination that similarly undermine his FMLA retaliation claims. *See* Pl.'s Reply at 15–22. First, Dr. Coulibaly notes that he reported to FSI management the existence of a "romantic relationship between Division Director Debra Blake and her subordinate." *Id.* at 15. Dr. Coulibaly claims that, as a result, Director Blake (with LTS Fyfe) issued a negative performance appraisal "to try to fire him." *Id.*

the record presented, Defendants have failed to carry their burden to establish that no reasonable jury could find that Defendants' stated reasons for Dr. Coulibaly's terminations were pretextual. *See* Fed. R. Civ. P. 56(a) (stating that summary judgment is warranted only "if the movant shows that there is no genuine dispute as to any material fact" and that "the movant is entitled to judgment as a matter of law"). The Court will accordingly deny Defendants' pre-discovery motion for summary judgment.

### 3. Dr. Coulibaly's Motion for Summary Judgment

The Court also concludes, however, that Dr. Coulibaly has not established that a reasonable jury *must* find Defendants' actions retaliatory under the FMLA. As discussed above, Dr. Coulibaly must show that "the protected activity and the [retaliation] were causally connected," *Gordon*, 778 F.3d at 161 (citation omitted), and that the retaliation "was not just a mere factor among many, but the determinative factor or real and true reason behind the adverse action," *Roseboro*, 606 F. Supp. 2d at 110 (internal quotation marks and citation omitted). At this point in the case, Dr. Coulibaly has failed to show that no reasonable jury could conclude otherwise. Thus, the Court will also deny his motion for summary judgment.

The record is rife with suggestions that Dr. Coulibaly did not get along with FSI management and did not meet FSI management's performance expectations. *See, e.g.*, Email

---

at 17. Second, Dr. Coulibaly also alleges that FSI terminated him because of his "whistleblowing activities" directed at LTS Fyfe. *See id.* at 17–22. For example, Dr. Coulibaly alleges that LTS Fyfe retaliated against him because he "forced [her] to admit that she was wrong [about the correct approach for a] reading lesson plan" and brought to light her possible bias against Dr. Coulibaly because of Dr. Coulibaly's shared national origin with LTS Fyfe's ex-husband. *See id.* Although these allegations may be relevant to Dr. Coulibaly's claims under whistleblower protection statutes, just as with Dr. Coulibaly's discrimination and retaliation claims, these asserted reasons similarly suggest that Dr. Coulibaly's protected *FMLA* activities were not "causally connected" to his termination. *See Gordon*, 778 F.3d at 161. They accordingly serve to harm (instead of to help) his FMLA claim here.

from Laura Fyfe (Nov. 7, 2011, 7:23 PM), ROI at 721–23, ECF No. 26-7 (characterizing Dr. Coulibaly's submitted lesson plan as merely "a template for writing a lesson plan—not an actual lesson plan"); Blake Mem. (Dec. 4, 2011), ROI at 787, ECF No. 26-7 (indicating that Dr. Coulibaly failed to submit required weekly syllabi for a period of three weeks). Although these circumstances do not *require* a reasonable jury to find that Defendants terminated Dr. Coulibaly based on his performance deficiencies, *see supra* Part IV.B.2, they do *permit* a reasonable jury to find that they did. When decisionmakers deny retaliation and claim a non-retaliatory reason for terminating an employee, their true motive becomes a question of credibility—almost regardless of how many holes exist in the story—making summary judgment inappropriate. *See generally Csicseri v. Bowsher*, 862 F. Supp. 547, 570 (D.D.C. 1994) (explaining that ultimately the factfinder must "decide which party's explanation of the employer's motivation it believes" (internal quotation marks omitted) (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 406 U.S. 711, 716 (1983)).[37]

---

[37] Dr. Coulibaly does not change this conclusion by claiming that, when the Department of State "failed to provide any evidence of misconduct" during an unemployment benefits claim investigation conducted by the D.C. Department of Employment Services ("DOES"), the Department of State's non-response showed that Defendants' stated reasons for terminating Dr. Coulibaly are "evidence of pretext[], [and of] retaliatory and discriminatory animus." Pl.'s Reply at 28–29; *see also* Determination by Claims Examiner, Pl.'s Reply Ex., ECF No. 32-1, at 14 ("[T]he employer has provided information stating the claimant was discharged . . . with no additional information . . . to establish misconduct."). Defendants were not required, however, to contest Dr. Coulibaly's eligibility for unemployment benefits; they had "the responsibility to provide evidence of . . . misconduct" only if they had sought to challenge Dr. Coulibaly's eligibility for unemployment benefits. *See* Determination by Claims Examiner at 14. Defendants' choice to allow Dr. Coulibaly to collect unemployment benefits does not require a reasonable jury to find that Defendants' stated non-retaliatory reasons for his termination were pretextual. *See generally* D.C. Code § 51-111(j) ("Any finding of fact or law . . . made by a claims examiner . . . shall not be conclusive or binding in any separate or subsequent action or proceeding . . . .").

In other words, even though a showing of possible pretext allows Dr. Coulibaly to escape summary judgment for Defendants, *see supra* Part IV.B.2, it does not allow him to prevail on his own motion for summary judgment. To do so, he must show not only that Defendants' proffered reasons for his termination were pretextual, but also that Dr. Coulibaly's exercise of his rights under Title I of the FMLA was "the determinative factor" for his termination. *Roseboro*, 606 F. Supp. 2d at 110 (quoting *Provencher*, 145 F.3d at 10). The Court accordingly concludes that neither Dr. Coulibaly nor Defendants are entitled to summary judgment and will deny both sides' motions for summary judgment.[38]

### C. Dr. Coulibaly's Motions to Add Newly Acquired Evidence

Dr. Coulibaly has also filed two requests to add "newly acquired evidence" to the record. *See* Pl.'s Mot. Add Medical Evid., ECF No. 30; Pl.'s Mot. Add OIG Evid. at 2, ECF No. 35. Dr. Coulibaly's first request provides a letter that he claims is from Dr. Rajendra Lowtan, a psychiatrist who claims to be treating Dr. Coulibaly. Letter from Dr. Rajendra Lowtan, Pl.'s Mot.

---

[38] Dr. Coulibaly requests that, as an alternative to summary judgment, the Court "grant Plaintiff's Motion For Leave Of Court to Allow For Trial Based on Stipulated Facts" based on "Rule 91." Pl.'s Mem. at 6–7, 14–17 (capitalization in original). The "Rule 91" that Dr. Coulibaly cites, however, refers to the U.S. Tax Court Rules of Practice and Procedure. *Compare* T.C. R. 91, *with* Pl.'s Mem. at 14–17. *See generally Shami v. Comm'r*, 741 F.3d 560, 573 (5th Cir. 2014) ("Tax Court Rule 91 requires that the parties stipulate in writing 'to the fullest extent to which complete or qualified agreement can or fairly should be reached, all matters' of law or fact relevant to the case." (quoting T.C. R. 91)). Because "Rule 91" does not apply in this Court, the Court will disregard Dr. Coulibaly's alternative request. In federal district court, stipulated facts are typically addressed at the pretrial conference. *See* Fed. R. Civ. P. 16(c)(2)(C) (listing matters for consideration at a pretrial conference, and including "stipulations about facts and documents to avoid unnecessary proof" in that list).

Dr. Coulibaly also alludes to several additional claims in his reply brief. First, Dr. Coulibaly alleges that Defendants engaged in "negligent hiring and negligent retention." *See* Pl.'s Reply at 21. Second, Dr. Coulibaly alleges that his "wrongful discharge" was a "violation of due process." *See id.* at 35–36. Finally, Dr. Coulibaly asks the Court to hold Ms. Duckett "individually liable" for her participation in his termination. *See id.* at 48–52. These claims are separate causes of action and were not made in Dr. Coulibaly's complaint. *See generally* Compl. Therefore, the Court will not address them. *See Barrie*, 741 F. Supp. 2d at 263.

Add Medical Evid. Ex., ECF No. 30, at 4–6. The letter states that Dr. Coulibaly's "present emotional and mental well-being and other present harms relate[] to the direct consequences of his loss of employment." *Id.* Such allegations of "damages to [Dr. Coulibaly's] health and his family," Pl.'s Mot. Add Medical Evid. at 1, do not resolve the genuine issue of material fact discussed above—whether FSI terminated Dr. Coulibaly's employment in retaliation for his exercise of FMLA leave. *See supra* Part IV.B. The Court will thus deny Dr. Coulibaly's motion to include the letter about his damages as evidence. This evidence of claimed damages may be presented later in the proceedings.

Dr. Coulibaly also moves to include the Department of State's April 2016 Office of Inspector General ("OIG") Report. *See* Pl.'s Mot. Add OIG Evid; *id.* Ex. 1 ("OIG Report"), ECF No. 35-1. According to Dr. Coulibaly, the report "shows patterns of violations in disciplinary process at the HR offices for many years." *See* Pl.'s Mot. Add OIG Evid. at 2. Dr. Coulibaly argues that such violations prove that Defendants' stated non-retaliatory reasons for his termination are "based on pretexts, inconsistencies, lies and flip flops." *Id.* But, having reviewed the report, the Court determines that the report would not require a reasonable jury to find that Defendants' stated reasons for Dr. Coulibaly's discharge were pretextual. The OIG Report never mentions Dr. Coulibaly nor any of the people involved in the decision to terminate Dr. Coulibaly. *See generally* OIG Report. And the report did not suggest that the Department of State's management engaged in unfair or unlawful disciplinary practices; instead, the report primarily addressed ways by which the Department could improve its disciplinary practices. *See, e.g.*, *id.* at 5–8 (issuing four recommendations to the Department of State's Bureau of Human Resources). Moreover, the report appears to be a sequel to a November 2014 OIG Report, in which the OIG found no "major issues with processing of disciplinary actions." U.S. Dep't of

State Office of Inspector Gen., *Review of the Department of State Disciplinary Process* (Nov. 2014), https://oig.state.gov/system/files/isp-i-15-04_1.pdf; *see also* OIG Report at 4 (discussing the context of the April 2016 report). Because the report therefore would not change the Court's resolution of the parties' summary judgment motions, the Court will deny Dr. Coulibaly's motion to include the OIG Report. Although it is unclear that the report is relevant to any of Dr. Coulibaly's claims, he is free to present this evidence later in the proceeding if he can better justify its relevance to his claims.

## V.  CONCLUSION

For the foregoing reasons, the parties' cross-motions for summary judgment (ECF Nos. 23, 27) and Dr. Coulibaly's motions to include newly acquired evidence (ECF Nos. 30, 35) are **DENIED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  August 29, 2017                                            RUDOLPH CONTRERAS
                                                                                United States District Judge