# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TIEMOKO COULIBALY,     :
           :
   Plaintiff,      :   Civil Action No.:  14-712 (RC)
           :
   v.        :   Re Documents Nos.: 84, 85, 86
           :
MICHAEL R. POMPEO,    :
           :
   Defendant.     :

## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT; GRANTING IN PART DEFENDANT'S MOTION TO COMPEL FEES; DEFERRING RULING ON DEFENDANT'S MOTION TO EXCLUDE EXPERT OPINION

## I. INTRODUCTION

Plaintiff Tiemoko Coulibaly has brought this action against the U.S. Secretary of State ("Defendant"). He alleges Title VII and Family Medical Leave Act ("FMLA") violations stemming from his time employed by Defendant at the Department of State's Foreign Service Institute ("FSI").

Defendant now moves for partial summary judgment with respect to certain kinds of claims, evidence, and relief. *See* Def.'s Mot. for Partial Summ. J. at 1, ECF No. 85 (moving for summary judgment "with respect to Plaintiff's claims (1) based on a hostile work environment; (2) based on [Plaintiff's] midyear performance evaluation; and (3) for back pay and front pay").[1] Because genuine issues of material fact remain with respect to Dr. Coulibaly's hostile work environment claims, the Court will deny the motion in that respect. As for Dr. Coulibaly's claims based on his midyear performance evaluation, the Court accepts Defendant's argument

---

[1] All page numbers in this opinion refer to the ECF page numbers.

that the evaluation itself is not an actionable adverse action, but agrees with Dr. Coulibaly that it can be considered as a part of an alleged pattern of retaliation and discrimination. Thus construed and narrowed, the Court grants the Defendant's motion as to that issue. Finally, the Court will defer ruling on Defendant's motion as to Dr. Coulibaly's claims for back and front pay. Such remedies are equitable and raise questions that would be better considered in the context of a post-trial proceeding.

Also ripe are Dr. Coulibaly's motion to partially exclude the expert opinion of Dr. Laura Malowane, ECF No. 84, and Defendant's motion to compel fees, ECF No. 86. For reasons explained below, the motion to exclude is deferred and the motion to compel fees is granted in part.

## II. BACKGROUND[2]

As recounted in an earlier opinion, Dr. Coulibaly joined FSI as a French instructor in 1999. Mem. Op. Denying Parties' Cross-Motions for Summ. J., ECF No. 47. He taught students and provided input into course planning and development and, according to several co-workers, was well-regarded as a teacher and colleague. *Id.* at 3. After initially being hired as a contractor, Dr. Coulibaly began a direct-hire appointment on June 19, 2011. *Id.* at 3–4.

The main events giving rise to Dr. Coulibaly's hostile work environment claim took place shortly after that appointment, when Dr. Laura Fyfe was assigned to be his direct supervisor. Def.'s Stmt. Undisputed Facts ("Def.'s SOF") at 1, ECF No. 85-7; Pl.'s Resp. Def.'s Stmt. Undisputed Facts ("Pl.'s SOF") at 1, ECF No. 90-1. Since 2009, Dr. Fyfe and Dr. Coulibaly had communicated on friendly terms, with Dr. Fyfe mentioning that her late husband was, like Dr. Coulibaly, originally from the Ivory Coast (or Côte d'Ivoire). Def.'s SOF at 2. She eventually

---

[2] Unless otherwise noted, the recited facts are undisputed by the parties, at least for the purposes of the motion for summary judgment.

confided more details about her life with her husband, including that he exhibited aggressive behavior. *Id.* She also mentioned that her husband was a member of an ethnic group called the Bété, whose members she described as "violent" or "aggressive." *Id.* Dr. Coulibaly is not, in fact, a Bété member, *id.*, but he was raised by one, Pl.'s SOF at 2. The record does not establish whether Dr. Fyfe actually knew that Dr. Coulibaly was not a member of the Bété, Pl.'s SOF at 2, or whether Dr. Fyfe knew that he was raised by a member of the group. Dr. Fyfe later admitted it was "not great judgment" to generalize about an ethnic group in the workplace. *Id.* at 25.

Shortly after Dr. Fyfe became Dr. Coulibaly's supervisor, he began feeling that she was providing "very hostile negative feedback" and "criticis[m]" and "was trying to find any pretext" and "excuse to blame him." Pl.'s SOF at 3. For example, Dr. Fyfe once said that Dr. Coulibaly "cannot even understand elementary think." Def.'s SOF at 2. Things came to a head over Dr. Fyfe's request for a particular kind of lesson plan, which Dr. Coulibaly found "confus[ing]." Def.'s SOF at 3. On November 8, 2011, the two met to discuss their concerns in the presence of a supervisor, Ms. Keller-Lally. Def.'s SOF at 5. According to Dr. Coulibaly's later recollection of the meeting, Dr. Fyfe became "very emotional" and suggested that he had "an ax to grind against [her]" because her former husband was also from the Ivory Coast. Pl.'s SOF at 8–9. For his part, Dr. Coulibaly understood that Dr. Fyfe was "blaming me for being Ivorian, for being against her because her former husband was from Côte d'Ivoire and talking to me about my background." Pl.'s SOF at 9. In her deposition, Dr. Fyfe also described Dr. Coulibaly's tone in various emails during this period as "belligerent," "aggressive," and "antagonistic." Pl.'s SOF at 25; *see also* Def.'s Resp. Pl.'s SOF at 2, ECF 93-3. She also described his behavior in a particular interaction as "menacing." Pl.'s. SOF at 25 (quoting Pl.'s Opp. Mot. Summ. J. Ex. 1 ("Fyfe Tr.") at 39, ECF No. 90-2 ("I felt like he was—he was out to get me. He was menacing

me. He was staring at me down the hall.")). She later conceded that her request of Dr. Coulibaly for a particular kind of lesson plan may not have been fully justified. Def.'s SOF at 5 ("Dr. Fyfe conceded that '[her suggested approach] may not be a typical way to do reading and that Tiemoko [Coulibaly] was rightly confused by her sending him that.'") (quoting Def.'s Mot. for Partial Summ. J. Ex. B ("EEO Investigation Report") at 17, ECF No. 85-3).

That same month (November 2011), Dr. Coulibaly filed an EEO complaint. Two supervisors—Dr. Fyfe and Debra Blake—asked him about the complaint. Pl.'s SOF at 25; *see* Pl.'s Opp. Mot. Summ. J. Ex. 7 ("Blake Tr.") at 11, ECF No. 90-8 ("He raised something about his complaint. I asked if he had filed a complaint, he didn't answer, and I apologized for asking."); Pl.'s Opp. Mot Summ. J. Ex. 2 ("Coulibaly Tr.") at 41, ECF No. 90-3 ("Debra Blake herself called me in her office several times to ask me about my discrimination claim, to ask me if I filed a discrimination complaint."); Coulibaly Tr. at 44 ("[Dr. Fyfe and Ms. Blake] called me into their office and started bombarding me with questions about the discrimination. Why did you go there? What did you do?").

During this period, Dr. Coulibaly also received pointed criticism for his work; Dr. Fyfe herself acknowledged that some of her critiques of his teaching were "pretty harsh." Fyfe Tr. at 25. He also recounted that Dr. Fyfe "yell[ed] at me" and was "disrespectful" during a meeting. Coulibaly Tr. at 18. He felt that he was singled out and subjected to requirements that other employees were not. *See* Def.'s SOF at 7 ("Plaintiff brought to Ms. Blake a list of the teachers who never posted a syllabus on the intranet and asked whether she had called them in for a meeting to complain that they had not posted their syllabus, and she said no."); Fyfe Tr. at 49 (Q: "Did you in any way reprimand those [other] three instructors for not putting their syllabi on the SharePoint, to your recollection?" A: "I don't recall, no.").

On December 27, 2011, Plaintiff received what he considered to be a negative performance evaluation report, written by Dr. Fyfe. Def.'s SOF at 9. Dr. Coulibaly felt the report was made in bad faith and was "just a tool used to prepare my termination." Def.'s SOF at 9. For example, it contained apparent falsehoods (such as that Dr. Coulibaly was not able to teach beginners, when he had, in fact, taught beginners for two years) and referenced Dr. Fyfe's earlier criticism that she had already admitted was misplaced. Def.'s SOF at 9; Pl.'s SOF at 13–14. A couple of days later, during a December 29, 2011 training session on syllabus preparation, a supervisor (Mr. Casteuble) yelled at Dr. Coulibaly and told him to stop talking when Dr. Coulibaly asked why he was being singled out for additional training. Def.'s SOF at 10.

Dr. Coulibaly went on medical leave in early 2012. Def.'s SOF at 13. He testified that during this time, Mr. Casteuble and employees from human resources "harassed me with several e-mails, phone calls." Pl.'s SOF at 22. He also claims that he was denied leave requests for improper reasons and subjected to additional, unnecessary requirements when requesting leave. Def.'s SOF at 13; Pl.'s SOF at 26. He was ultimately terminated in April 2012 for "unacceptable conduct," including "inappropriate interactions with supervisors, and . . . failure to follow established procedures for requesting leave." *See* Mem. Op. at 24, ECF No. 47 (quoting Letter from Catherine Russell to Tiemoko Coulibaly (Apr. 2, 2012), ECF No. 26-8).

### III.  ANALYSIS

#### A.  Motion for Summary Judgment

##### 1.  Legal Standard

A court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the

litigation, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), while a dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant, *see Scott v. Harris*, 550 U.S. 372, 380 (2007).

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See Celotex*, 477 U.S. at 324. In considering a motion for summary judgment, a court cannot make credibility determinations or weigh the evidence. *See Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007). All underlying facts and inferences must be analyzed in the light most favorable to the non-movant. *See Anderson*, 477 U.S. at 255. That said, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

2. Motion for Summary Judgment as to Plaintiff's Hostile Work Environment Claim

Defendant argues that Dr. Coulibaly's hostile work environment claim is deficient in three respects: (1) the alleged conduct was not sufficiently severe or pervasive, (2) the alleged conduct was not based on Dr. Coulibaly's protected status, and (3) in any case, the Defendant promptly acted to address Dr. Coulibaly's concerns. The Court will address each argument. in turn.

*a. Was the Relevant Conduct Severe or Pervasive?*

To succeed on a discriminatory or retaliatory hostile work environment claim under Title VII, a plaintiff must show that the harassment was so "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *accord Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008). "The key terms . . . are 'severe,' 'pervasive,' and 'abusive,' as not just any offensive or discriminatory conduct rises to an actionable hostile work environment." *Lester v. Natsios*, 209 F. Supp. 2d 11, 22 (D.D.C. 2003) (citing *Oncale*, 523 U.S. at 78). The test has both subjective and objective dimensions: the plaintiff must "subjectively perceive the environment to be abusive" and the conduct must be "severe or pervasive enough to create an objectively hostile or abusive work environment." *Harris*, 510 U.S. at 21–22 (1993).

Defendant acknowledges that Dr. Coulibaly subjectively perceived the harassment as severe or pervasive, but suggests that, viewed objectively, it did not rise to that level. In particular, Defendant argues that the period of alleged harassment was comparatively brief (less than six months) and was similar to non-actionable cases involving mere supervisor criticism and workplace discipline. *See* Def.'s Mem. Support Summ. J. ("Def.'s Br.") at 19, ECF No. 85-1. Dr. Coulibaly contests this characterization and distinguishes the cases cited by the Defendant, noting that Dr. Coulibaly "alleges far more than simple issues with his supervisors' approach." Pl.'s Mem. Opp. Def.'s ("Pl.'s Br.") at 14, ECF No. 90.

Whether a work environment is objectively hostile ultimately depends on the particular acts "taken as a whole." *Whorton v. Washington Metro. Area Transit Auth.*, 924 F. Supp. 2d

334, 353 (D.D.C. 2013). "Very rarely will such fact-based determinations be appropriate for determination on summary judgment," *Armstrong v. Reno*, 172 F. Supp. 2d 11, 24 (D.D.C. 2001), particularly given that the Court is not permitted to weigh the evidence or assess the credibility of witnesses. Here, these considerations make it impossible for the Court to conclude that, as a matter of law, the incidents here were not sufficiently severe or pervasive. Viewing the evidence in a light most favorable to Dr. Coulibaly, a reasonable factfinder could conclude that racial considerations or stereotypes permeated his work environment and compromised his ability to perform his job. In particular, the record suggests that Dr. Coulibaly was, over a period of months leading up to his termination, variously yelled at, singled out for criticism, inappropriately asked about his EEO complaints, and subjected to leave requirements that others were not. These acts go beyond the "simple teasing, offhand comments, and isolated incidents" that have been considered insufficiently serious. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citations and quotations omitted). There are, of course, alternative ways of viewing these events, but a reasonable jury could accept Dr. Coulibaly's characterization. Accordingly, while the objective evidence of workplace hostility remains less than overwhelming, it is enough—particularly because it includes a number of events that can be viewed as stepping stones leading to Dr. Coulibaly's termination—to overcome the summary judgment bar.

   *b. Was the Relevant Conduct Based on Dr. Coulibaly's Race, Ethnicity, National Origin, or Participation in Protected Activity?*

   Additionally, to prevail on a discriminatory or retaliatory hostile work environment claim, a plaintiff must show that he or she was harassed because of his or her protected status. *Lester*, 209 F. Supp. 2d at 22; *see also Holmes-Martin v. Sebelius*, 693 F. Supp. 2d 141, 166 (D.D.C. 2010) (noting that the the plaintiff must provide a linkage "between the allegedly

harassing behavior and the claimed ground of discrimination or her participation in protected activity"). Defendant argues here that Dr. Coulibaly has not shown the requisite causal connection between the alleged harassment and Dr. Coulibaly's race, ethnicity, national origin, or EEO activity. *See* Def.'s Br. at 22.

In response, Dr. Coulibaly first highlights his interactions with Dr. Fyfe. Admittedly, Dr. Fyfe did not state outright that she was discriminating against Dr. Coulibaly because of his race, ethnicity, or national origin. But she did ask if he had "an ax to grind against [her] because of her ex." Pl.'s SOF at 9. For his part, Dr. Coulibaly understood this to mean that she was "blaming me for being Ivorian, for being against her because her former husband was from Côte d'Ivoire and talking to me about my background." Pl.'s SOF at 9. Even though Dr. Frye's statement is couched as accusation of prejudice against her by Dr. Coulibaly, a rational jury could infer that she was making negative assumptions about Dr. Coulibaly due to his shared national origin with her abusive ex-husband. Her comments describing Dr. Coulibaly's emails and behavior as "aggressive," "belligerent," and "menacing" provide further support for this theory, because these characterizations parallel the stereotypes she allegedly held as a result of her experiences with her late husband who was also from the Ivory Coast. Pl.'s. SOF at 25.

Dr. Coulibaly also points to evidence that he was less favorably treated than a white instructor who became a direct hire on the same day as he did. Def.'s SOF at 7; *see also* Pl.'s Br. at 11 ("Other instructors, including those of a race different than Dr. Coulibaly, were not reprimanded in any way for failing to submit syllabi at all, even after the December 29, 2011 training."); Fyfe Tr. at 49 ("Q. Did you in any way reprimand those three instructors for not putting their syllabi on the SharePoint, to your recollection? A. I don't recall, no.").

Finally, Dr. Coulibaly alleges, with support in the record, that multiple supervisors asked him about his EEO activity. *See, e.g.*, Coulibaly Tr. at 44 ("[Dr. Fyfe and Ms. Blake] called me into their office and started bombarding me with questions about the discrimination. Why did you go there? What did you do?"); *id.* at 41 ("Debra Blake herself called me in her office several times to ask me about my discrimination claim, to ask me if I filed a discrimination complaint.").

This evidence, in various ways, connects the alleged harassment to Dr. Coulibaly's various protected statuses. It could suggest to a finder of fact that Dr. Fyfe was poorly disposed towards Dr. Coulibaly because he was from the Ivory Coast and that Dr. Coulibaly was treated less favorably than white employees. It also permits the inference that Dr. Coulibaly's EEO activities sparked retaliatory animus in his supervisors, which in turn encouraged them to manufacture further criticism of his work, behavior, and leave practices. *See Burton v. Donovan*, 210 F. Supp. 3d 203, 215 (D.D.C. 2016) (finding sufficient evidence of retaliatory motive in part because a supervisor was "improperly interested in Plaintiff's prior protected activity and the possibility that she might engage in future protected activity"), *aff'd sub nom. Burton v. Carson*, No. 17-5190, 2018 WL 1391543, at *1 (D.C. Cir. Feb. 21, 2018); *Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006) ("At the prima facie stage of a retaliation claim, a plaintiff's burden 'is not great; [she] merely needs to establish facts adequate to permit an inference of retaliatory motive.'") (quoting *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C. Cir. 1984)) (alteration in original).

Again, the evidence is not overwhelming, and Dr. Fyfe's remarks about her ex-husband, in particular, are subject to different interpretations. But it is enough to merit a jury's consideration.

*c. Did Defendant Take Prompt Action to Address Dr. Coulibaly's Concerns—and Was Dr. Coulibaly Required to Prove That It Did Not?*

Finally, Defendant suggests that "Plaintiff cannot establish that Defendant failed to take action to address the concerns that he raised," which Defendant understands to be an element of a hostile work environment claim. Def.'s Br. at 25–26. Some cases have indeed articulated that as a general requirement. *See, e.g.*, *Lester*, 290 F. Supp. 2d at 22 ("To establish a prima facie hostile work environment claim, plaintiff must demonstrate that," among other things, "the employer knew or should have known of the harassment, but failed to take any action to prevent it."). But subsequent cases have clarified that this element applies only to cases involving harassment by co-workers—that is, situations in which the employer is not directly responsible, but could be vicariously liable. *See Ayissi-Etoh*, 712 F.3d 572, 577 (D.C. Cir. 2013) (citing *Faragher*, 524 U.S. at 789) ("To establish liability when a plaintiff is harassed by his or her co-workers, the plaintiff must prove that the employer was at least negligent in not preventing or correcting the harassment."). In contrast, "[w]hen, as here, the plaintiff is harassed by supervisors with immediate (or successively higher) authority, the supervisors are treated as the employer's proxy." *Ayissi-Etoh*, 712 F.3d at 577 (internal citations and quotations omitted). Thus, "for hostile work environment claims involving the conduct of a supervisor, the plaintiff need not allege as an element of the claim that the employer knew, or should have known, of the harassment and failed to take action to prevent further harassment." *Slate v. Pub. Def. Serv. for the D.C.*, 31 F. Supp. 3d 277, 302 n.12 (D.D.C. 2014). As a result, even if Defendant were correct that Dr. Coulibaly had failed to make such a showing, it would not entitle Defendant to summary judgment.

For all these reasons, Dr. Coulibaly's hostile work environment claim survives summary judgment.

3. Motion for Summary Judgment as to Plaintiff's Claim "Based" on the Midyear Evaluation Report

In one of Dr. Coulibaly's earlier responses to a set of interrogatories, he characterized his negative performance evaluation report as an "adverse employment action." Def.'s Br. at 26 (quoting Pl.'s Suppl. Objections and Responses to Def.'s Interrogatories Nos. 1 and 11 (May 18, 2018)). Defendant contends that such a midyear review had no bearing on Dr. Coulibaly's "position, grade level salary, promotional opportunities, or otherwise caused direct economic harm to Plaintiff" and thus, as a matter of law, "does not constitute a materially adverse employment action that can support a discrimination and retaliation claim under Title VII." Def.'s Br. at 26–27; *see also Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001) ("[N]ot everything that makes an employee unhappy is an actionable adverse action.").

In response, Dr. Coulibaly clarifies that "[t]he December 2011 Performance Appraisal Report is another piece of evidence demonstrating the pattern of hostile and harassing behavior by FSI supervisors against Dr. Coulibaly, and it further demonstrates that FSI supervisors were retaliating against Dr. Coulibaly for engaging in protected EEO activity." Pl.'s Br. at 19–20. Defendant replies that this explanation "sidesteps Defendant's arguments without responding to them." Def.'s Reply at 9, ECF No. 93.

The Court agrees with Defendant that the parties seem to be speaking past one another. Defendant, taking Dr. Coulibaly's interrogatory response at its word, seeks clarity on whether a claim based on the performance appraisal report alone would be viable; Dr. Coulibaly, does not contest that argument and indeed seems to be disavowing any such theory. For what it is worth, the Court agrees with Defendant—a claim based on the mid-year evaluation report alone, without more details, would not be actionable. *See Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) ("Because 'significant' and 'objectively tangible' harm is required, performance

evaluations ordinarily are not actionable under Title VII . . .").  But the Court accepts Dr.

Coulibaly's characterization and agrees that the report can be considered as evidence of "a

pattern of retaliation and discrimination by FSI supervisors that ultimately culminated in Dr.

Coulibaly's termination."  Pl.'s Br. at 19.  Thus, narrowly understood as seeking to dismiss a

freestanding claim based on the evaluation as a separate adverse action (to the extent such a

claim was ever raised), the Defendant's motion for summary judgment is granted.

### 4.  Motion for Summary Judgment as to Plaintiff's Claim for Lost Wages

Defendant also moves for summary judgment "with respect to Plaintiff's claim for at

least $959,850[3] in lost wages."  Def.'s Br. at 2.  In Defendant's view, Dr. Coulibaly has

conceded that the has not mitigated his loss of income because he has not looked for a job since

he left FSI in April 2012.  *Id.*; *see also* Def.'s Mot. for Partial Summ. J. Ex. E ("Excerpts from

Plaintiff's 4/9/2018 Interrogatory Responses") at 4, ECF No. 85-6 ("[A]s a result of his treatment

during and termination from his employment with FSI, [Dr. Coulibaly] suffers from various

medical conditions that have now rendered him *permanently disabled* and unable to work or

otherwise to mitigate damages that arose after his termination.") (emphasis added).  According to

Defendant, this means that "Plaintiff has the burden to establish that there was no suitable

alternative employment available to him and that he was unable to work due to Defendant's

conduct," and "[g]iven that Plaintiff has not disclosed any medical experts, he will be unable to

meet his burden on this issue."  Def.'s Br. at 2.  Disagreeing, Dr. Coulibaly argues (1) that

Defendant bears the burden of proving that alternative employment existed and (2) that there is

"well-developed record evidence and testimony" establishing that Dr. Coulibaly was disabled

---

[3] The Court understands this figure to be the amount of damages (in terms of lost income and benefits) estimated by Dr. Coulibaly's expert, Dr. Korenko.  *See* Pl.'s Mot. to Exclude Mitigation Op. of Dr. Laura Malowane Ex. B ("Expert Report of Dr. George G. Korenko"), ECF No. 84-2.

and that "his disability was the result of his treatment and termination at the hands of the Government." Pl.'s Br. at 20.

### a. Legal Framework

Title VII allows for back pay as a remedy. *See* 42 U.S.C. § 2000e-5(g)(1); *see also Loeffler v. Frank*, 486 U.S. 549, 558 (1988) (recognizing Title VII's provision for back pay as "a manifestation of Congress' intent to make 'persons whole for injuries suffered through past discrimination'") (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975)). Front pay (that is, future, post-judgment lost earnings) can also be awarded if the reinstatement is unavailable. *See Barbour v. Merrill*, 48 F.3d 1270, 1279 (D.C. Cir. 1995) ("The presumption that back pay will extend through the date of judgment derives from the related presumption that the employer will then rectify the discrimination by hiring or reinstating the employee. When that preferred remedy is unavailable, front pay is appropriate.") (internal citations omitted).

At the same time, Title VII requires claimants to minimize their damages. *See* 42 U.S.C. § 2000e-5(g)(1). Even though the statutory duty rests on the claimant, "[t]he employer has the burden of proving failure to mitigate." *Peyton v. DiMario*, 287 F.3d 1121, 1128 (D.C. Cir. 2002). In other words, failure to mitigate is an "affirmative defense" to claims for lost wages. *Barbour*, 48 F.3d at 1280. Generally, employers carry their burden by establishing that (1) the claimant did not make reasonably diligent efforts to find other suitable employment and (2) other suitable employment was, in fact, available. *See, e.g.*, *Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1044 (7th Cir. 1994).[4]

---

[4] Relatedly, and as the parties discuss, *see* Def.'s Br. at 28–29; Pl.'s Br. 20–23, some circuits have held that if a defendant can prove that a plaintiff did not make a reasonable or good faith effort to seek employment, then the defendant is relieved of the burden of establishing that suitable alternative employment opportunities existed. *See, e.g.*, *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 54 (2d Cir. 1998). And the D.C. Circuit seems to have endorsed this

However, different rules generally apply when the claimant is completely unable to work due to a disability. In these circumstances, courts understandably do not focus on whether the disabled claimant sought work or whether suitable employment was available. Instead, courts seem to generally hold that back pay is unavailable, at least when the employer bears no responsibility for the disability. *See Thornley v. Penton Pub.*, Inc., 104 F.3d 26, 31 (2d Cir. 1997) ("The remedy in a discriminatory discharge case is intended to compensate a plaintiff only for 'losses suffered as a result of defendant['s] discrimination,' and does not extend to granting back pay for a period when a plaintiff would have been unable, due to an intervening disability, to continue employment.") (quoting *Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 145 (2d Cir. 1993)); *Lathem v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 794 (11th Cir. 1999) ("[C]ourts exclude periods where a plaintiff is unavailable to work, such as periods of disability, from the back pay award."). Our Circuit does not appear to have expressly articulated such a rule, but has suggested that it would be reasonable to terminate back pay once a plaintiff has "become disabled or voluntarily retired." *Fogg v. Gonzales,* 492 F.3d 447, 454 (D.C. Cir. 2007). If the employer *caused* the disability through its discriminatory conduct, however, back pay is still available. *See*, *e.g.*, *Johnson v. Spencer Press of Maine, Inc.*, 364 F.3d 368, 384 (1st Cir. 2004) ("[A]n employee who cannot mitigate damages because of the unlawful actions of the employer can still receive back pay."); *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 157 (3d

---

exception. *See N.L.R.B. v. Madison Courier, Inc.*, 472 F.2d 1307, 1319 (D.C. Cir. 1972) (*Madison Courier I*); *Conn v. Am. Nat'l Red Cross*, 149 F. Supp. 3d 136, 152 (D.D.C. 2016) (citing *Madison Courier I* for this proposition). As the *Greenway* court noted, this rule's "underlying rationale is that an employer should not be saddled by a requirement that *it* show other suitable employment in fact existed—the threat being that if it does not, the employee will be found to have mitigated his damages—when the employee, who is capable of finding replacement work, failed to pursue employment at all." *Greenway*, 143 F.3d at 54. As this reasoning suggests, the rule is premised on the assumption that the plaintiff is "capable of finding replacement work" and thus appears to be of no relevance here.

Cir. 1999) ("Because [the employer's] conduct affirmatively impaired [the employee's] ability to mitigate her damages, it would be inequitable to reduce her back pay award in this case."); *Lathem*, 172 F.3d at 794 ("[A] Title VII claimant is entitled to an award of back pay where the defendant's discriminatory conduct caused the disability.").

There does not appear to be significant case law on the burden of proof in such a setting. However, the Fifth Circuit has reasoned that

> [w]hile we have recognized that the burden of proving a failure to mitigate damages by finding substantially equivalent work rests on the defendant, we have never held that when a plaintiff seeks front and back pay on the theory that she is disabled as a result of the defendant's conduct, the plaintiff is not obliged to prove up this theory by establishing that the defendant's violation of Title VII caused her disability. The better rule, we think, is to place the burden on the plaintiff to prove such a claim.

*Gamboa v. Henderson*, 240 F.3d 1074 (5th Cir. 2000) (citation omitted). That rule appears sound, as medical causation issues can be complex and will often require the testimony of a physician or treating doctor—something within the plaintiff's initial control, though obviously subject to a defendant's rebuttal. *See, e.g.*, *Gotthardt v. Nat'l R.R. Passenger Corp.,* 191 F.3d 1148, 1156 (9th Cir. 1999) ("Although [plaintiff] had been treated for PTSD for a limited period before [defendant] subjected her to the hostile work environment, the district court's finding of causation is plausible in light of the extensive testimony of [plaintiff's] treating psychologist and psychological expert, that the hostile environment at [defendant] caused [plaintiff's] disability.").

### b. Analysis

In this case, as mentioned above, Dr. Coulibaly represents that he is permanently "disabled and cannot engage in gainful employment" and that he did not make any attempt to return to work since his termination. Pl.'s Br. at 24. He does argue, however, that the "Government's treatment and termination of Dr. Coulibaly caused his disability." *Id.* at 25. The

main issue, then, is whether there is sufficient evidence that Defendant caused his permanent inability to find alternative work, thereby relieving him of his statutory duty to mitigate damages (and, as a result, entitling him to (1) back pay, up until a potentially favorable judgment in this case and (2) front pay, calculated based on his worklife expectancy).[5]

Defendant argues that Dr. Coulibaly will be unable to show make this showing. Specifically, Defendant suggests that Dr. Coulibaly will not be able to present his own opinion regarding medical causation, *see* Fed. R. Evid. 701 (precluding a lay witness from testifying about "scientific, technical, or other specialized knowledge within the scope of Rule 702"), or relay any out-of-court statements that he heard from his physicians, *see* Fed. R. Evid. 801, 802 (hearsay). Def.'s Br. at 30. Additionally, Defendant argues, Dr. Coulibaly did not disclose any expert witnesses that will be testifying about medical causation issues, so there will be no expert opinions on the subject. *Id.* (citing Fed. R. Civ. P. 26(a)(2)); *see also* Def.'s Reply at 1–2 ("Now realizing that he has no expert opinion testimony to support his disability, or that the disability was caused by the Defendant's alleged conduct, Plaintiff pivots . . . Without a medical expert, Plaintiff cannot prove the complex medical question of whether Defendant's conduct, as opposed to another contemporaneous stressful life event, caused his alleged disability.").

Dr. Coulibaly does not dispute that some medical causation testimony is necessary, but maintains that it is sufficient that he "disclosed multiple treating psychiatrists," including a Dr. Hamlin, in his initial disclosures[6] and responses to interrogatories, and that the parties have

---

[5] Again, whether there were alternative employment opportunities available does not appear to be relevant to this analysis here; it is difficult to see why a defendant's liability should hinge on the existence or non-existence of jobs that a plaintiff, due to a disability, concededly had never sought and would never seek. *See supra* n. 4.

[6] Dr. Coulibaly's citation here makes clear that Dr. Hamlin was disclosed initially under Rule 26(a)(1)(A)(i), along with a variety of potential fact witnesses; he was not identified as an expert witness. *See* Pl.'s Br. Ex. 27 at 4, ECF No. 90-28. Dr. Coulibaly does not offer any

discussed these providers' opinions during multiple depositions.  *See* Pl.'s Br. at 25.  He also

cites medical records, including a March 2012 letter from Dr. Hamlin, which noted his mental

health symptoms and observed that "[t]here was no elicited evidence of [any] mental health issue

prior to his current traumatic employment situation."  Pl.'s Br. Ex. 29 at 2–3, ECF No. 90-30.

Defendant is correct that generally "a treating physician who testifies as to her diagnosis

and treatment of the patient is [] giving expert testimony," thereby triggering the expert

disclosure requirements of Rule 26(a)(2).  *Daniels v. Dist. of Columbia*, 15 F. Supp. 3d 62, 69

(D.D.C. 2014); *see also Nat'l R.R. Passenger Corp. v. Ry. Express, LLC*, 268 F.R.D. 211, 216

(D. Md. 2010) ("[A] party may not circumvent the requirements of Rule 26 by employing a

witness, like a treating physician who treated an injured party, to provide testimony extending

into classic expert opinion regarding causation and prognosis.").  And Dr. Coulibaly does not

convincingly argue that the Rule 26(a)(2) disclosure requirements were met here.[7]  He mostly

attempts to selectively quote *Owens-Hart v. Howard Univ.*, 317 F.R.D. 1 (D.D.C. 2016) to

establish that his disclosure of medical records, plus his initial disclosures and interrogatory

responses, satisfies his obligations. But unlike here, the plaintiff in that case made a Rule

26(a)(2)(C) disclosure indicating that a treating physician would testify "as a fact witness as well

---

evidence that he specifically disclosed Dr. Hamlin, or any treating physician, as an expert
witness in accordance with Rule 26(a)(2) ("Disclosure of Expert Testimony").

[7] Because a treating physician is rarely an expert "retained or specially employed to
provide expert testimony in the case," he or she usually is not required to submit a written expert
report.  Fed. R. Civ. P. 26(a)(2)(B).  However, such treating physicians, as experts, must still
disclose "the subject matter on which the witness is expected to present evidence under Federal
Rule of Evidence 702, 703, or 705" and "a summary of the facts and opinions to which the
witness is expected to testify."  Fed. R. Civ. P. 26(a)(2)(C)(i)–(ii).  Of course, none of this
applies if, unlike here, a physician is being employed as "a mere fact witness[]."  *Daniels v. Dist.
of Columbia*, 15 F. Supp. 3d 62, 71 (D.D.C. 2014); *see also Rudder v. Williams*, No. 09-cv-2174
2016 WL 10999915, at *2 (D.D.C. June 9, 2016) (deciding that, "[i]n light of plaintiffs' failure
to disclose any experts under Rule 26," their proffered "medical witnesses" could only "testi[f]y
to any observations that are not based upon medical understanding," such as "when they saw a
particular plaintiff").

as an expert witness regarding Plaintiff's diagnosis, symptoms, treatment, accommodation requests, deterioration over time, and her prognosis." *Id.* at 2. Also unlike here, the disclosure went on to summarize the doctor's opinion, explaining that he would testify that the plaintiff's work environment caused a permanent disability. *Id.* On top of all that, the disclosure also included certain medical records. It was this overall "combination"—the plaintiff's reasonably detailed 26(a)(2)(C) disclosure, plus his medical records—that the court found to satisfy the rule. *Id.* at 3.

Despite the inadequacy of Dr. Coulibaly's expert disclosures, certain considerations nonetheless weigh against granting summary judgment against him on this issue. Although the case law is not completely consistent, front pay and back pay are generally considered to be forms of equitable relief. *See, e.g.*, *Taylor v. State of R.I., Dep't of Mental Health Retardation & Hosps.*, 736 F. Supp. 15, 17 (D.R.I. 1990) (noting that "courts have almost universally defined back pay under Title VII as equitable relief," despite its monetary nature). For its part, our Circuit has been clear that such remedies under Title VII are left to the equitable discretion of the trial court. *See Barbour*, 48 F.3d at 1278 (noting, in its discussion of back pay and front pay awards, that "under Title VII, a district court has wide discretion to award equitable relief"); *Peyton*, 287 F.3d at 1125 ("This Court . . . reviews equitable relief, the standard for calculating back pay and front pay, under an abuse of discretion standard.").

As such, a plaintiff is not required to establish to the satisfaction of a jury an entitlement to back or front pay; indeed, in the absence of the parties' consent to try such claims before a jury, that determination would be purely advisory. *See Kolstad v. Am. Dental Ass'n*, 108 F.3d 1431, 1440 (D.C. Cir. 1997) (finding jury's determination of liability was binding, but its determination of back pay was "advisory," given that it represented a claim for "equitable

relief"), *aff'd*, 139 F.3d 958 (D.C. Cir. 1998) (en banc) (addressing unrelated issues), *vacated and remanded*, 527 U.S. 526 (1999). In a similar vein, the Supreme Court has determined that "Title VII contains no legal bar to raising backpay claims after the complaint for injunctive relief has been filed, or indeed after a trial on that complaint has been had," though it noted that it may be appropriate "[t]o deny backpay because a particular cause has been prosecuted in an eccentric fashion, prejudicial to the other party." *Albemarle Paper Co.*, 422 U.S. at 424. This is all consistent with the statutory language. *See* 42 U.S.C. § 2000e-5(g)(1) ("*If* the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court *may* . . . order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . , or any other equitable relief as the court deems appropriate.") (emphasis added).

These considerations persuade the Court that it would be unwise to grant summary judgment on back pay and front pay due to a failure to disclose a medical expert before trial. If Dr. Coulibaly establishes liability, the Court will consider inviting supplemental briefing and holding an evidentiary hearing on equitable remedies. *Cf. Barbour*, 48 F.3d at 1280 (remanding "the front-pay issue to the district court for it to determine the amount and duration of relief that will make [plaintiff] whole" and leaving to its discretion "whether to hold further evidentiary proceedings on this issue"); *see also U.S. Equal Employment Opportunity Comm'n v. Consol Energy, Inc.*, 860 F.3d 131, 140 (4th Cir. 2017) (noting that "[a]fter briefing by the parties, the court held an evidentiary hearing on equitable remedies, including front and back pay and lost benefits . . ."); *Vera v. Alstom Power, Inc.*, 189 F. Supp. 3d 360, 368 (D. Conn. 2016) ("After the trial, the Court held an evidentiary hearing and oral argument to determine back pay and other

relief."). Any deficiencies in Plaintiff's disclosures can be more fully briefed and argued at that stage. *See* Fed. R. Civ. P. 37(c)(1) (outlining potential consequences for failure "to provide information or identify a witness as required by Rule 26(a) or (e)," including that "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial").

### B. Motion to Exclude Expert Opinion

Separately, Dr. Coulibaly also moves to exclude in part the opinion of Dr. Malowane, Defendant's expert. *See* Mot. to Exclude Mitigation Op. of Dr. Laura Malowane ("Pl.'s Mot. Exclude"), ECF No. 84; *id.* Ex. 1 ("Malowane Rep."), ECF No. 84-1.

Like Dr. Coulibaly's expert (Dr. Korenko), Dr. Malowane provides an estimate of damages based on Dr. Coulibaly's lost earnings and benefits. Assuming liability will be proven, she provides two different estimates: (1) $616,598 if "it is found that Plaintiff's actual post-termination earnings represent his earnings' potential," and (2) $96,580 if "it is determined that Plaintiff's actual post-termination earnings do not accurately represent his earnings' potential." Malowane Rep. at 13. In other words, the first figure is based on the assumption that Dr. Coulibaly was permanently unable to work due to Defendant's conduct[8]; the second on the assumption that, counter to what is alleged, Dr. Coulibaly was actually able to mitigate his damages through alternative employment.

Dr. Coulibaly's motion takes issue only with the basis for this latter figure ($96,580), which it refers to as Dr. Malowane's "mitigation opinion." Pl.'s Mot. Exclude at 8. Specifically, it challenges the evidence (or more precisely, the alleged lack of evidence) supporting Dr.

---

[8] Dr. Malowane makes clear she disagrees with this conclusion; she suggests elsewhere that "Dr. Korenko [] fails to adequately address whether there is a causal link between Defendant's alleged wrongful conduct and Plaintiff's lack of past employment and alleged lack of future employability for the remainder of his life." Malowane Rep. at 12.

Malowane's assumptions about the time it would take Dr. Coulibaly to find a new job and achieve pay parity with his old position. *Id.* at 2. Those calculations, however, could only be relevant after a finding that Defendant was liable and (a) Dr. Coulibaly's permanent disability was not caused by Defendant (if it was caused by Defendant, the parties agree that damages are at least $616,589[9]) or (b) Dr. Coulibaly was not actually permanently disabled. Defendant has not yet suggested the latter, and even under the former, there is still uncertainty about the appropriate manner of calculating damages. *See Johnson*, 364 F.3d at 383 & n.17 (observing that "[s]ome courts have adopted a rule that if a plaintiff is unable to mitigate damages due to a disability not caused by the discriminatory employer, that disability cuts off back pay liability," but noting "[w]hy this should be so is not self-evident").

Because of these uncertainties, and the possibility that some of these issues will be mooted by later determinations of liability and causation, the Court will defer ruling on the motion to exclude. If and when Dr. Malowane's mitigation opinion becomes relevant, the Court will reassess Dr. Coulibaly's objections.

### C. Motion to Compel Fees

Finally, Defendant also moves to compel Dr. Coulibaly to pay $8,436 in fees relating to the deposition of Dr. Malowane. *See* Def.'s Mot. Compel Payment of Fees Related to Expert Dep. ("Def.'s Fee Mot."), ECF No. 86. Plaintiff objects. *See* Mem. Opp. Mot. Compel Payment ("Pl.'s Fee Opp."), ECF No. 89.

The facts are essentially undisputed. Through an appointment through the District Court's Civil Pro Bono Panel, Dr. Coulibaly is currently being represented by the lawyers at the firm of

---

[9] The difference between Dr. Malowane's estimate of $616,598 and Dr. Korenko's estimate of $959,850 appears to be in large part due the different discount rates used in each side's present-value adjustments. Malowane Rep. at 8, 11–12.

Kirkland & Ellis LLP.[10]  After Dr. Malowane had submitted her expert report, Dr. Coulibaly's

counsel requested the opportunity to depose her.  *See* Def.'s Fee Mot. Ex. 2 ("Attorney

Correspondence"), ECF No. 86-4.  Defendant's counsel agreed, suggesting a few possible dates

and adding, "Please note that Dr. Malowane charges $570 per hour for depositions and that fee is

to be paid by Plaintiff under the Federal Rules."  *Id.*  He also noted that "I have a conference call

scheduled for 4:30 [p.m.] on September 27, but I assume her deposition will not take all day."

*Id.*  Plaintiff's counsel replied with a single line: "September 27 works for us.  I am attaching the

subpoena and notice of deposition."  *Id.*  She did not challenge the assertion that Plaintiff would

be responsible for paying the fees. She also did not seek to limit the potential costs of the

deposition, either by trying to negotiate a reduced rate or by limiting the deposition's scope or

length (*e.g.*, by confirming opposing counsel's intimation that the deposition would last less than

a full day (or fewer than seven hours, *see* Fed. R. Civ. P. 30(d)(1))).

    The deposition went ahead as scheduled and lasted around 3.5 hours (starting at 9:30 a.m.

and ending at 1:07 p.m., with a short break along the way).  Def.'s Fee Mot. at 2.  At the

deposition, it came out that Dr. Malowane was charging the Department of State a reduced rate

for her work on the case ($475/hour rather than $570/hour).  *See* Pl.'s Fee Opp. Ex. A

("Malowane Dep.") at 15, ECF No. 89-1.  In a declaration filed with the present motion, Dr.

Malowane has clarified that she offered this $95 dollar discount in a few exceptional cases

involving government clients.  Def.'s Fee Mot. Ex. A ("Malowane Dec.") at 2, ECF No. 86-2.

---

[10] Dr. Coulibaly initiated the suit *pro se* and successfully moved to proceed *in forma pauperis*.  *See* Complaint, ECF No. 1; Minute Order (Apr. 8, 2014).  Due to the complexity of some of the issues raised and "[i]n light of Plaintiff's indigent status," the Court later appointed counsel through the Civil Pro Bono Panel.  Order Appointing Counsel (Sept. 26, 2016), ECF No. 40.

During the deposition, Dr. Malowane also mentioned that, as part of her preparation, she spent "[a]bout an hour" discussing the case with government counsel. Malowane Dep. at 7.

About a week after the deposition, Dr. Malowane submitted an invoice to Dr. Coulibaly's counsel, requesting payment of $8,436. Def.'s Fee Mot. at 3. This sum represented 14.8 hours of work at Dr. Malowane's originally-disclosed billing rate of $570, broken down into 10.6 hours for "deposition preparation" (over four days) and 4.2 hours for the deposition itself (including .7 hours of travel time). *Id.* Ex. 4 ("10/5/2018 Invoice") at 4, ECF No. 86-6.

In a November 13, 2018 letter, Plaintiff's counsel objected to the bill, arguing that (1) paying would result in a "manifest injustice" due to Dr. Coulibaly's indigent status, (2) Dr. Malowane's hourly rate was unreasonable, both because she had not "justified" her customary rate and that it was higher than she was charging her client in the same matter, and (3) Dr. Malowane spent too much time preparing for the deposition. *Id.* Ex. 5 ("First McCarrick Letter"), ECF No. 86-5. After Dr. Malowane sent additional invoices, Dr. Coulibaly's counsel asked her to desist and suggested that "[a]ny future fee request, if any, should come by way of a motion before the Court under Fed. R. Civ. P. 26(b)(4)(E). *Id.* Ex. 6 ("Second McCarrick Letter"), ECF No. 86-6. There was an attempted settlement: Defendant appears to have offered to reduce Dr. Malowane's hourly fee to $475, but Dr. Coulibaly's counsel rejected that offer. *See* Def.'s Fee Mot. at 3; Pl.'s Fee Opp. at 4.

### a. Legal Standard

Rule 26(b)(4)(A) allows a party to take a deposition of an expert who may testify at trial. Fed. R. Civ. P. 26(b)(4)(A). Rule 26(b)(4)(E), in turn, specifies that "the party seeking discovery" must "pay the expert a reasonable fee for time spent in responding to discovery" under that provision, "[u]nless manifest injustice would result." Fed. R. Civ. P. 26(b)(4)(E).

Most courts, including a court in this district, agree that "time spent in responding to discovery" includes the time used by an expert to prepare for a deposition. *Barnes v. Dist. of Columbia*, 272 F.R.D. 135, 137 (D.D.C. 2011).

"The party seeking reimbursement for the fee . . . bears the burden of establishing reasonableness." *Id.* When deciding whether an expert fee is reasonable, courts have considered a whole host of factors, including "(1) the witness's area of expertise, (2) the education and training that is required to provide the expert insight that is sought, (3) the prevailing rates for other comparably respected available experts, (4) the nature, quality and complexity of the discovery responses provided, (5) the cost of living in the particular geographic area, (6) the fee being charged by the expert to the party who retained him, (7) fees traditionally charged by the expert on related matters, and (8) any other factor likely to be of assistance to the court in balancing the interests implicated by Rule 26." *Coleman v. Dydula*, 190 F.R.D. 320, 324 (W.D.N.Y. 1999).

### b. Analysis

On the one hand, Dr. Coulibaly was likely eligible for relief under Rule 26(b)(4)(E)'s "manifest injustice" standard, given his indigent status. *See First S. Bank v. Fifth Third Bank, N.A.,* No. 7:10-2097, 2014 WL 3868000, at *2 (D.S.C. Aug. 6, 2014) ("Courts have generally found that 'manifest injustice' occurs [] where the deposing party is indigent or if requiring the party to pay a deposition fee would create an undue hardship."); *Harris v. San Jose Mercury News, Inc.*, 235 F.R.D. 471, 473 (N.D. Cal. 2006) ("To apply the exception, the court must find that the plaintiff is either 'indigent or that requiring him to pay a deposition fee incurred in litigation that he voluntarily initiated would create an undue hardship.'") (quoting *Edin v. The Paul Revere Life Insurance Co.*, 188 F.R.D. 543, 547 (D. Ariz. 1999)). Defendant argues to the

contrary, pointing out that parties proceeding *in forma pauperis* nonetheless "are responsible for paying all fees and costs associated with subpoenas, including attendance fees and mileage under Federal Rule of Civil Procedure 45(b)(1) and 28 U.S.C. § 1821." Def.'s Reply in Further Support Fee Mot. at 3 ("Def.'s Fee Reply"), ECF No. 92. But Rule 45 and 28 U.S.C. § 1821, unlike Rule 26(b)(4)(E), do not include an express "manifest injustice" exception. Defendant also cites *Harris* for the proposition that if a plaintiff already "has been given reasonably detailed expert reports, and has his own expert covering many of the issues to which they will testify," no manifest injustice results from requiring payment of an opposing party's expert fee (and foregoing a deposition of that expert). Def.'s Fee Reply at 3–4. But in that case, the plaintiff had "not demonstrated he is indigent in the conventional sense (as measured for instance by qualification for in forma pauperis status)," so the court was applying a seemingly less friendly "undue hardship" analysis. *Harris*, 235 F.R.D. at 473.

On the other hand, Plaintiff's counsel had been reminded, via email, of Dr. Coulibaly's default obligations under Rule 26 and Dr. Malowane's customary rate. At that point, Dr. Coulibaly's counsel could have negotiated the rate, proposed limiting the deposition, or sought clarity from the Court about whether he would be required to pay. *See, e.g.*, *Harris*, 235 F.R.D. at 474 (plaintiff prospectively "ask[ed] to be relieved from paying the expert fees charge[d] by Defendant's experts as he normally would"). Defendant's counsel—not unreasonably—took Plaintiff's counsel's silence on this issue as assent.

Ultimately, particularly in light of "the nature, quality and complexity of the discovery responses provided," "the fee being charged by the expert to the party who retained [her]," and the overall "interests implicated by Rule 26," *Coleman*, 190 F.R.D. at 324, the Court finds it would be reasonable to order payment of $6,555.00. This represents compensation for 4.2 hours

of Dr. Malowane's time travelling to and attending the deposition (3.5 hours in deposition plus 0.7 hours travelling), plus an additional 9.6 hours for preparation, all at the rate Dr. Malowane was charging to her client ($475/hour).  It reflects a one-hour reduction from the amount of preparation time actually billed by Dr. Malowane, based on her acknowledgment that she spent this amount of time conferring with government counsel.  *See* Malowane Dep. at 6–7.  It strikes the Court as unfair to charge Plaintiff for this time, given that the meeting was held for Defendant's benefit.  Beyond this, however, the Court does not find it appropriate to further reduce the fee.  Overall preparation of 9.6 hours (the equivalent of one long day) is not unreasonable, given that Dr. Malowane was facing a potentially day-long deposition by sophisticated counsel in a matter with approximately one million dollars at issue.  The Court will, however, not require immediate payment, given Dr. Coulibaly's circumstances and the possibility that it could be later offset against a potential judgment or settlement.

### IV.  CONCLUSION

For the foregoing reasons, Defendant's Motion for Partial Summary Judgment, ECF No. 85, is **GRANTED IN PART** and **DENIED IN PART**.  Defendant's Motion to Compel Payment of Fees Related to Expert Deposition, ECF No. 86, is **GRANTED IN PART**, but the order will reflect that payment is not required until final judgment is entered in this case.  The Court defers ruling on Plaintiff's Motion to Exclude the Mitigation Opinion of Dr. Laura Malowane, ECF No. 84.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 31, 2020                                          RUDOLPH CONTRERAS
                                                                United States District Judge